No. 25-51073

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

STUDENTS ENGAGED IN ADVANCING TEXAS; M.F., by and
through Next Friend Vanessa Fernandez; Z.B., by and through
Next Friend S.B.,

*Plaintiffs-Appellees,*

v.

KEN PAXTON, in his official capacity as the Texas Attorney General,

*Defendant-Appellant.*

consolidated with

_____

No. 26-50001

_____

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION,

*Plaintiff-Appellee,*

v.

KEN PAXTON, in his official capacity as Attorney General of Texas,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
NO. 1:25-CV-1660; NO. 1:25-CV-1662
HONORABLE ROBERT PITTMAN, UNITED STATES DISTRICT JUDGE

_____

**BRIEF OF AMICUS CURIAE NATIONAL CENTER ON SEXUAL
EXPLOITATION IN SUPPORT OF DEFENDANT-APPELLANT
AND REQUEST REVERSAL**

_____

Harvey Brown: Bar #03130500
The Lanier Law Firm
10940 West Sam Houston Pkwy N
Suite 100
Houston, TX 77064
Tel.: (713) 659-5200
Harvey.Brown@LanierLawFirm.com

*Counsel of Record for Amicus Curiae
National Center on Sexual
Exploitation*

Benajmin W. Bull: Bar #009940
Provident Law
16100 N 71st Street Suite 350
Scottsdale, Arizona 85254
Tel.: (480) 388-3343
BBull@ncose.com

*Of Counsel for Amicus Curiae
National Center on Sexual
Exploitation*

Dated: May 26, 2026

ii

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to this Court's Rule 29.2 and Federal Rule of Appellate Procedure 26.1, amicus curiae National Center on Sexual Exploitation submits this certificate of interested persons to fully disclose all those with an interest in this brief and provide the required information as to their corporate status and affiliations.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal. Amicus curiae National Center on Sexual Exploitation is a 501(c)(3) non-profit. It has no parent corporation, and no publicly traded corporation has an ownership interest in it of any kind.

***Plaintiffs-Appellees***
Students Engaged in Advancing Texas
M.F., by and through Next Friend Vanessa Fernandez
Z.B., by and through Next Friend S.B.
Computer & Communications Industry Association

***Attorneys for Plaintiffs-Appellees***
David Morris Gossett
Adam Sieff
Ambika Kumar
Haley B. Zoffer
Abigail Everdell

***Defendant-Appellant***
Ken Paxton, in his official capacity as Texas Attorney General

iii

***Attorneys for Defendant-Appellant***
Zachary Berg
Jeffrey A. Stephens

***Amicus Curiae***
National Center on Sexual Exploitation

***Attorney for Amicus Curiae***
Harvey Brown

Respectfully submitted,

*/s/ Harvey Brown*
Harvey Brown: Bar #03130500
The Lanier Law Firm
10940 West Sam Houston Pkwy N
Suite 100
Houston, TX 77064
Tel.: (713) 659-5200
Harvey.Brown@LanierLawFirm.com

*Counsel for Amicus Curiae*
*National Center on Sexual Exploitation*

Dated: May 26, 2026

iv

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| CERTIFICATE OF INTERESTED PERSONS | | iii |
| TABLE OF AUTHORITIES | | vi |
| I. | INTEREST OF AMICUS CURIAE | 1 |
| II. | PARTIES CONSENT TO FILING AMICUS CURAE BRIEF | 1 |
| III. | STATEMENT PURSUANT TO FED. R. APP. 29(a)(4)E | 2 |
| IV. | SUMMARY OF ARGUMENT | 2 |
| V. | ARGUMENT | 4 |

A. The District Court Erred in Treating the ASAA as Content Based. ...4

    1. The district court's reliance on *Brown* was misplaced. ...6

    a. The law in *Brown* targeted express content while the ASAA regulates only commercial apps with harmful design features regardless of content. ...6

    2. The district court erred in holding that the exemptions in the ASAA automatically render it content based. ...12

    3. The district court ignored the many precedents supporting laws with exemptions as content neutral. ...19

    4. The district court could not even identify the specific idea, message, or topic the ASAA allegedly targeted. ...22

    5. *Reed* is easily distinguishable on additional grounds. ...23

| VI. | CONCLUSION | 27 |
| CERTIFICATE OF SERVICE | | 29 |
| CERTIFICATE OF COMPLIANCE | | 30 |

**<u>TABLE OF AUTHORITIES</u>**

**PAGE(S)**

**CASES**

*Ashcroft v. ACLU*, <u>542 U.S. 629</u> (1968) ...................................................................12

*Brown v. Entertainment Merchants Association*, <u>564 U.S. 786</u> (2011) .......... passim

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, <u>447 U.S. 557</u> (1980) ............................................................................................ 4, 10, 30

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, <u>596 U.S. 61</u> (2022) .......6, 28

*City of Ladue v. Gilleo*, <u>512 U.S. 43</u> (1994) ...................................................... 24, 29

*City of Renton v. Playtime Theatres, Inc.*, <u>475 U.S. 41</u> (1986) .................................3

*Comput. & Commc'ns Indus. Ass'n v. Paxton*, <u>747 F. Supp. 3d 1011</u> (W.D. Tex. 2024) ...............................................................................................................17

*Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, <u>2025 WL 3458571</u> (11th Cir. 2025) ........................................................................................................3, 7, 8, 14

*FCC v. Beach Communications, Inc.*, <u>508 U.S. 307</u> (1993) ...................................................................................... 5

*Free Speech Coalition v. Paxton*, <u>606 U.S. 461, 471</u> (2025) ...................... 3, 16, 24

*Free Speech Coalition, Inc. v. Paxton*, <u>95 F.4th 263</u> (5th Cir. 2024), *aff'd*, <u>606 U.S. 461</u> (2025) ....................................................................................... passim

*Glass v. Paxton*, <u>900 F.3d 233</u> (5th Cir. 2018) .......................................................................................... 5

*Members of City Council of Los Angeles v. Taxpayers for Vincent*, <u>466 U.S. 789</u> (1984) ............................................................................................... 22, 23

*Moody v. NetChoice*, <u>603 U.S. 707</u> (2024).......................................... 12, 13, 14, 15

*NetChoice, LLC v. Bonta*, <u>113 F.4th 1101</u> (9th Cir. 2024)....................................17

*NIFLA v. Becerra*, <u>585 U.S. 755</u> (2018)...............................................................16

vi

*Packingham v. North Carolina*, 582 U.S. 98 (2017) ........................................ 27, 28

*Parham v. J.R.*, 442 U.S. 584 (1979) ..................................................................22

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ................................................ passim

*Students Engaged in Advancing Texas ("SEAT") v. Paxton*, 814 F. Supp. 3d 769
   (W.D. Tex. 2025) ........................................................................ passim

*TikTok Inc. v. Garland*, 604 U.S. 56 (2025) ................................................ 3, 26, 27

*Town of Ball v. Rapides Parish Police Jury*, 746 F. 2d 1049 (5th Cir. 1984)
.................................................................................................................. 5

*Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994) ............... 23, 24, 27

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) .................................... 2, 6, 26

*Zauderer v. Off. of Disciplinary Couns. Of Supreme Ct. of Ohio*, 471 U.S. 626
   (1985) ...................................................................................... 32, 33

## STATUTES

13 Tex. Admin. Code § 16.6 .....................................................................................20

15 U.S.C.A § 6501 ...................................................................................................31

15 U.S.C.A. §6502 ...................................................................................................31

16 C.F.R. § 312.3(a) .................................................................................................31

16 C.F.R. § 312.5(c) .................................................................................................31

18 U.S.C.A. § 1470 ..................................................................................................32

18 U.S.C.A. § 1591(b) .............................................................................................32

18 U.S.C.A. § 2241(c) ..............................................................................................32

18 U.S.C.A. § 2243 ..................................................................................................32

18 U.S.C.A.§ 2244(c) ...............................................................................................32

19 Tex. Admin. Code § 155.39 ................................................................................22

22 Tex. Admin. Code § 801.44 ..................................................................20

25 Tex. Admin. Code § 229.406 ................................................................20

26 Tex. Admin. Code § 320.7 ....................................................................21

26 Tex. Admin. Code § 356.1318 ..............................................................21

26 Tex. Admin. Code § 356.2018 ..............................................................21

26 Tex. Admin. Code § 550.901 ................................................................21

26 Tex. Admin. Code § 749.4 ....................................................................21

Tex. Educ. Code Ann § 26.001 .......................................................... 19, 22

Tex. Educ. Code Ann. § 26.009 ................................................................19

Tex. Fam. Code Ann. § 32.101 .................................................................19

Tex. Fam. Code Ann. § 34.002 .......................................................... 19, 21

Tex. Fam. Code Ann. § 35.005 .................................................................22

Tex. Labor Code Ann. § 51.0145 ..............................................................20

Tex. Pen. Code Ann § 22.04(c) .................................................................32

## OTHER AUTHORITIES

Bruce Goldman, *Addictive potential of social media, explained*, STAN. MED. SCOPE (Oct. 29, 2021), https://med.stanford.edu/news/insights/2021/10/addictive-potential-of-social-media-explained.html ...............................................................................11

Kyle Langvardt, *Regulating Habit-Forming Technology*, 88 FORDHAM L. REV. 129 (2019) ...................................................................................................8

*Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory*, OFFICE OF THE SURGEON GENERAL (2023), https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-media-advisory.pdf .......................................................................................... 11, 12

Stan. Med. SCOPE (Oct. 29, 2021),
https://med.stanford.edu/news/insights/2021/10/addictive-potential-of-social-media-explained.html ....................................................................................... 9

## I.   <u>INTEREST OF AMICUS CURIAE</u>

The National Center on Sexual Exploitation ("NCOSE") exists to prevent sexual abuse and exploitation including exploitation and abuse of children on the internet. With roots going back more than sixty years, NCOSE is a leading nonpartisan and nonsectarian nonprofit dedicated to combating all forms of sexual abuse and exploitation, including sex trafficking, child sexual abuse and grooming, the distribution of child sexual abuse material (CSAM), and sexual exploitation and abuse of children. Technological advances have intensified the urgency of NCOSE's work. The modern internet has contributed to an explosion in sexual exploitation and NCOSE has identified commercial business practices of online apps and app stores as major contributors to this problem. This includes manipulative algorithms targeting minors, the execution of "contracts" with children without parental consent or knowledge, and misrepresentation of app age ratings that expose young users to products suitable only for much older teens or adults. The legislation at issue represents a necessary and meaningful step toward addressing these harms.

## II.   <u>PARTIES CONSENT TO FILING AMICUS CURAE BRIEF</u>

Counsel for the *Amicus* has contacted counsel for the Students Engaged In Advancing Texas; M.F., by and through Next Friend Vanessa Fernandez Z.B., by and through Next Friend S.B., Computer & Communications Industry

Association, and Ken Paxton, in his official capacity as Attorney General of Texas, respectively, and they indicated that they consent to the filing of this brief.

## III.     STATEMENT PURSUANT TO FED. R. APP. 29(a)(4)E

The amicus states that: (1) a party's counsel did not author this brief in whole or in part; (2) a party or party's counsel did not contribute money that was intended to fun preparing or submitting this brief; and (3) no person—other than NCOSE, its members, or its counsel—contributed money that was intended to fund preparing or submitting this brief.

## IV.     SUMMARY OF ARGUMENT

The First Amendment's content-neutrality doctrine asks a single question: did the government regulate speech because of disagreement with its message? *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The App Store Accountability Act (ASAA) does not come close to triggering that concern, and the district court's contrary holding was error.

The district court's reliance on *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011) was misplaced. The California content-based law in *Brown,* which singled out certain video games for children—those containing violence—was a classic content-based restriction. The ASAA by contrast does not bar or restrict any content. It is merely a parental consent law that applies to apps

2

with design features that harm children, regardless of the subject matter, message, or topic communicated.

The district court erred in holding that narrow, nonprofit apps—for SAT prep and emergency services—exempted from the ASAA's scope, made it content based. The exempted apps lack the harmful design features designed to addict children through targeted algorithms, push notifications, and endless scrolling. The Supreme Court routinely permits exemptions in laws that restrict expression where the exemptions do not cause the problem being addressed by the law. *See e.g.*, *Free Speech Coalition v. Paxton*, 606 U.S. 461, 471 (2025); *TikTok Inc. v. Garland*, 604 U.S. 56, 73 (2025); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986). And here no speech is even banned.

Further, unlike the regulation of noncommercial speech in *Brown*, the ASAA regulates a commercial transaction, the purchase and downloading of apps by children without parental consent. Thus, it warrants only intermediate scrutiny. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980).

The Eleventh Circuit recently rejected the identical argument against a materially similar Florida statute, holding the law was facially content-neutral because it targeted addictive platform design, not expressive content. *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, 2025 WL 3458571, at *4 (11th Cir. 2025)

3

("HB3 is likely content neutral and therefore subject to the more forgiving intermediate scrutiny.") This Court should reach the same conclusion.

The district court's holding that the parental signoff requirement makes the law unconstitutional was error as parental consent is a bedrock principle that is routinely required by the legislature and routinely upheld by courts for children's activities including many implicating expression, such as tattooing or using children for donation solicitations. See *infra*. At bottom, the ASAA passes constitutional muster because no message, content, or topic is censored, making the law content neutral.

## V. **ARGUMENT**

### **A. The District Court Erred in Treating the ASAA as Content Based.**

The district court conceded "[T]here is a compelling interest in protecting the physical and psychological well-being of minors," and acknowledged "Texas's interest in preventing social media addiction." *Students Engaged in Advancing Texas (SEAT) v. Paxton*, 814 F. Supp. 3d 769, 782 (W.D. Tex. 2025) (cleaned up). The court further conceded that "mental health professionals have raised the alarm that children are spending too much time on their phones, scrolling social media, or playing games that are designed to encourage prolonged use, instead of interreacting with life, playing with siblings and friends, getting outside, working on schoolwork,

or experiencing boredom." *Id.* at 777 (emphasis added). The court "recognize[d] the broad support for protecting children" when they "use apps." *Id.*[1]

Nevertheless, the court erroneously held the ASAA unconstitutional because, in its view, it regulated apps on the basis of content, not on the basis of their harmful design features, and brought within its ambit apps with protected speech. *Id.* at 781, 783. The district court's holding was flawed because it conflated expressive content with apps that cause harm to children through design features regardless of their content.

"The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech *because* of disagreement with the message it conveys." *Ward*, 491 U.S. at 791 (emphasis added). Stated differently, "[a] regulation of speech is facially content based under the First Amendment if it

---

[1] The district court's statement that the law was enacted to target apps because their content and not on the basis of their harmful design features is belied by the language in the law itself, which applies to apps with harmful design features and not to non-profit apps for emergency services and college applications that do not. *Infra*. The court recognized amici's "arguments about the negative health impacts of social media on youth," which was adopted by the Texas Attorney General as the reason for the enactment of the law. *SEAT*, 814 F. Supp. 3d at 777 n. 1. This is all beside the point because the ASAA is not content based. The court is not to second guess legislative exemptions or line drawing. *If any conceivable rationale exists to support the line drawing, it is presumed to have been in the mind of the legislators. FCC v. Beach Communications, Inc.*, 508 U.S. 307, 314-315 (1993); *Glass v. Paxton*, 900 F.3d 233, 245 (5th Cir. 2018)("Parties attacking the presumption of validity extended to legislative classifications have the burden to negative every conceivable basis which might support it.")(cleaned up); See *Town of Ball v. Rapides Parish Police Jury*, 746 F. 2d 1049, 1060-61 (5th Cir. 1984)(same)

'target[s] speech based on its communicative content'—that is, if it 'applies to *particular speech* because of the *topic* discussed or the *idea or message* expressed.'"" *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (emphasis added) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).

As shown below, the ASAA regulates certain apps on the basis of their harmful design features, not on the basis of disagreement with the messages, ideas, or viewpoints expressed. Thus, it is content neutral.

1. The district court's reliance on *Brown* was misplaced.

    a. The law in *Brown* targeted express content while the ASAA regulates only commercial apps with harmful design features regardless of content.

In holding that the ASAA is a content-based restriction on speech the district court erroneously relied heavily on *Brown*. True, both laws condition minors' access to certain apps or games on parental consent. But that procedural similarity is where the resemblance ends. The law in *Brown* was content-based because the state itself decided which content was off-limits for minors—violent video games—and then banned it. The ASAA makes no such content judgment. It restricts no category of speech and bans nothing.

Thus, it is a huge stretch to extrapolate that a law mandating parental signoff for an app store account—where there is no reference to a subject matter of speech— is governed by *Brown*. The law here concerns the entire universe of commercial apps

6

with such dangerous features, not a specific type of message or subject matter of expression as in *Brown*. Put another way, unlike *Brown*, the ASAA is concerned with a minor's access without parental awareness to a type of *design* feature—not a message. Minors can still have endless access to the internet and all the information it contains through their browser. Regulating access to apps based on their *design features* and how they *function* is not a content-based regulation as it is not based on the message, content, or expressed ideas.[2]

For example, recently the Eleventh Circuit considered a Florida law similar to the Texas ASAA that "requires social media platforms that employ certain addictive features to prohibit those under 14 years old from creating accounts and to require parental consent for 14- and 15-year-old account holders." *Uthmeier*, 2025 WL 3458571, at *1. *Uthmeier* is squarely on point. The Florida Attorney General argued that the law "'does not *directly* regulate expression; it simply prohibits platforms that use addictive features from contracting with certain children,' and that contracting 'is commercial activity that has been regulated since the Founding.'" *Uthmeier*, 2025 WL 3458571 at *3. The Eleventh Circuit agreed, holding the law

---

[2] *See* Kyle Langvardt, *Regulating Habit-Forming Technology*, 88 FORDHAM L. REV. 129, 141, 144, 183 (2019) ("Tech developers, like slot machine designers, strive to maximize the user's 'time on device.' They do so by designing habit-forming products—products that draw consciously on the same behavioral design strategies that the casino industry pioneered. The predictable result is that most tech users spend more time on device than they would like, about five hours of phone time a day, while a substantial minority develop life-changing behavioral problems similar to problem gambling.") (explaining how social media developers seek to maximize the user's "time on device" akin to a slot machine developer).

was "facially content neutral" because it "restricts social media platforms' ability to contract with children under a certain age if those platforms include certain addictive features." *Id.* at *4. As here, there was nothing in the "legislature's justification" "related to the suppression of speech or disagreement with certain topics or viewpoints." *Id.* The court found the law was content neutral because the state "could offer content neutral justifications" such as "'the use of push notifications, infinite scroll, auto-play video, live-streaming, and displays of personal interactive metrics … addictive to children and caus[ing] them to spend more time on platforms than is healthy.'" *Id.* at *5. As here, the law's reach did not turn on an app's content but design features that hurt children. The Eleventh Circuit held the law content neutral and noted that the state's interest in protecting children's well-being would satisfy even a more demanding standard. *Id.* at *6. The Eleventh Circuit concluded, "the district court erred in citing cases centered on impermissible content-based restrictions" such as *Brown* because they do not apply to laws about harmful design features and algorithms rather than the suppression of topics, ideas, or messages. *Id.* at *7.

Further, the law in *Brown* was treated as a regulation on noncommercial expression. Here, to the extent the ASAA implicates any expression indirectly, it regulates commercial speech, as the purchase of apps by children is a commercial transaction. Under *Central Hudson*, the Constitution affords far less protection to

commercial speech than the type of expression regulated by the California law in

*Brown*. 447 U.S. at 561-62. *See, e.g.*, *Free Speech Coalition, Inc. v. Paxton*, 95 F.4th

263, 283 (5th Cir. 2024), *aff'd*, 606 U.S. 461 (2025) (upholding Texas age

verification law where, as here, it regulated expression deemed commercial,

rejecting Appellees' strict scrutiny analysis.).

So too here: the harm the ASAA targets stems from the isolating and addictive

nature resulting from certain commercial media platform's business practices that

exploit the developing brains of minors—a content-neutral aspect of the platforms.

Deliberate design features of these platforms relate to dopamine pathways involved

in motivation, reward, and addiction.[3] Users get a dopamine hit whenever they get a

"like" or notifications. Dopamine is highly addictive and keeps people coming back

to the platform for more.[4] The scrolling features are addictive, like slot machines,

and they are meant to be. The more time children spend on these sites, the less time

they spend in the real world, making real connections and developing the necessary

social skills to live a fulfilling life. This creates a massive gap in children's social

---

[3] *See* Bruce Goldman, *Addictive potential of social media, explained*, STAN. MED. SCOPE (Oct. 29, 2021), https://med.stanford.edu/news/insights/2021/10/addictive-potential-of-social-media-explained.html.
[4] *See Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory*, OFFICE OF THE SURGEON GENERAL, at 9 (2023), https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-media-advisory.pdf (explaining how social media exposure can trigger the reward center in the brain similar to addiction pathways).

development at a time when their brains are still developing. Increased time spent online is positively correlated with depression and anxiety in children.[5]

The harms the government was trying to resolve in cases like *Brown* and *Ashcroft v. ACLU*, 542 U.S. 629 (2004) were different from the fundamental health concerns addressed here. The Court acknowledged as much in *Moody v. NetChoice*: "[T]oday's social media pose dangers not seen earlier: No one ever feared the effects of newspaper opinion pages on adolescents' mental health." 603 U.S. 707, 733 (2024). Justice Alito's concurrence likewise acknowledged the concern over children's mental health. *Moody*. 603 U.S. at 766 (Alito, J., concurring). Protecting adolescent mental health is a compelling interest, distinguishable from the ambiguous harm of corrupting "moral development" articulated by the state in *Brown*. *See Brown*, 564 U.S. at 804.

Without any meaningful analysis, the district court concluded that because the ASAA targets commercial apps with design features that harm children, it *ipso facto* regulates particular topics, ideas, and messages. *SEAT*, 814 F. Supp. 3d at 781-82. But no authority supports the conclusion that commercial media platforms engage in protected expression whenever they decide how to operate their platforms, such as by employing certain addictive algorithms.

---

[5] *See Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory*, OFFICE OF THE SURGEON GENERAL, at 6 (2023), https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-media-advisory.pdf.

The district court failed to understand that design features and business practices are not co-extensive with protected speech. For example, in *Moody*, the Court found that the curation of Facebook's newsfeed and YouTube's homepage—deciding which posts to promote, demote, or arrange—constitutes protected editorial discretion analogous to a newspaper editor's judgments, and, therefore, speech. 603 U.S. at 717-719. Most importantly, *Moody* explained that although commercial media platforms might at times engage in some protected speech, that does not mean that every function qualifies as protected expression. *Id.* at 710.[6] Thus, expressive acts are distinct from operational acts. Providing parents with signoff authority over children downloading apps that have harmful design features is hardly impinging on curation and editorial discretion.

Push notifications, infinite scroll, and autoplay algorithms are not editorial judgments about *which ideas* to promote —they are engineering choices about *how to maximize time on device*, choices driven by commercial incentives rather than any expressive purpose. The district court erred in stretching *Moody*'s holding on editorial curation to immunize commercial design practices unrelated to the expression of ideas.

---

[6] "Not every potential action taken by a social media company will qualify as expression protected under the First Amendment." *Moody*, 603 U.S. at 748 (Jackson, J., concurring).

Any argument to the contrary turns common sense on its head. Tightening age-restriction practices and applying longstanding state contract law requirements for minors does not automatically implicate a platform's expressive speech. Curation choices may be expressive speech, but having a completely unfettered ability to enter into private contracts with minors is not. Nothing in the ASAA limits what platforms may say, publish, or curate. The only thing it restricts is the formation of a contract with a minor without parental consent—a commercial act, not an expressive one. No court can countenance the radical idea of removing parents *in toto* from decision-making for their child in this context.

    2.  The district court erred in holding that the exemptions in the ASAA automatically render it content based.

The district court asserted that the ASAA is axiomatically content based because it excludes application to apps of "nonprofits" used for "emergency services," "standardized test[s]," or "support applications for admission to … educational institution[s]." *SEAT*, 814 F. Supp. 3d at 781. But this non-contextual reading of the case law is overly broad and based on an incorrect reading of the Supreme Court's ruling in *Moody*. It also ignores the numerous cases where the Supreme Court determined that exemptions in a regulation implicating speech was not content based. *See supra* section I(A)(1)(a).

Under the district court's extreme reasoning, any law implicating online design features would necessarily create impermissible speaker-based distinctions

12

that would be treated as content-based and subject to heightened strict scrutiny. This would subject all internet platform regulations to a strict scrutiny analysis resulting in virtually automatic invalidation. The Texas legislature narrowly tailored the law to exclude apps that do not have such features. The district court flipped that on its head to argue it automatically makes the law content based. The district court's logic defeats itself: the very act of tailoring a law to address only the apps that cause harm—and exempting those that do not—becomes the proof of unconstitutionality. That is not First Amendment doctrine; it is a logical fallacy that would make narrowly tailored legislation impossible. "The First Amendment requires greater judicial sensitivity both to the Amendment's expressive objectives and to the public's legitimate need for regulation than a simple recitation of categories, such as 'content discrimination' and 'strict scrutiny,' would permit." *Reed*, 576 at 175-76 (Breyer, J., concurring); *cf. Paxton*, 606 U.S. at 484-85 (rejecting application of strict scrutiny to all age verification requirements as it would go too far); *see also, NIFLA v. Becerra*, 585 U.S. 755, 781-82 (2018) (Breyer, J., dissenting, joined by Ginsburg, J., Sotomayor, J., and Kagan, J.) (The over application of strict scrutiny to any regulation implicating speech will invite "litigation over the constitutional validity of much, perhaps most, government regulation.").

Importantly, the legislature narrowly tailored the legislation by exempting the non-profit apps for emergency services and signing up for the SAT for college,

because they obviously do not present the same harms caused by the large for-profit commercial media apps with their predatory algorithms, addiction design, and infinite scrolling. There is no danger of teen addiction and social isolation from the design features of the 911 app or the SAT app. These exemptions reinforce that the ASAA is content-neutral because it is not *what* they say (the apps' subject matter) that exempts them but *how* they function. These apps do not utilize the predatory design features that justify the compelling interest behind the statute. Notably, if the ASAA had included such apps within its regulatory framework, the plaintiffs doubtlessly would have challenged it for overbreadth as they have elsewhere.[7] The First Amendment is not a blunt instrument mechanically foreclosing *in toto* any reasonable and measured legislation designed to protect children from online abuses. *See Reed,* 576 U.S. at 177 (2015) (Breyer, J, concurring) ("Regulatory programs almost always require content discrimination. And to hold that such content discrimination triggers strict scrutiny is to write a recipe for judicial management of ordinary government regulatory activity.").

Ignoring these distinctions, the district court erroneously held that exempting these "non-profit" apps automatically rendered the law content based. *SEAT*, 814 F.

---

[7] *See e.g.*, *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011 (W.D. Tex. 2024) (challenging regulation for overbreadth designed to protect minors from harmful online social media); *NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024) (challenging statute designed to reign in app abuses for overbreadth); *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, No. 25-11881, 2025 WL 3458571 (11th Cir. 2025) (challenging Florida law similar to Texas ASAA on overbreadth and under-inclusivity).

14

Supp. 3d at 781. But singling out for regulation the large commercial media apps that cause the harm does not mean they are being regulated because of their content. Carving out exceptions for certain limited non-profit apps that do *not* cause the harm does not mean that the ASAA is seeking to regulate large commercial media platforms as a proxy for content. In fact, large, for-profit commercial social media apps contain much of the same content as the exempted "non-profit" apps. This hardly supports an argument that Texas intended to censor content on large commercial apps. On the contrary, the ASAA is attempting to regulate on the basis of apps that are hooking children and making them veritable zombies,[8] not using their harmful design as a proxy for subject matter censorship.

The district court makes much of the fact that in some instances the ASAA reaches apps such as certain health care apps that may not "use addictive algorithms." *SEAT*, 814 F. Supp. 3d at 783. But this does not by itself make the law content based or trigger strict scrutiny. As the Fifth Circuit pointed out in *Paxton*, simply because the "'girlie magazines' of *Ginsberg's* day had a substantial amount of content that was non-sexual" and protected expression does not invalidate the law "where the target of the regulation contains a substantial amount of content that" causes the harm to children. *Paxton*, 95 F.4th at 277.

---

[8] *See supra* notes 1-4.

15

Further, the districts court's ruling that parents can so easily be eliminated from oversight of their children's internet contract choices is dispelled by numerous Texas laws that place primary responsibility of children squarely upon the parents:

1. School Activities and Health Services

   • Written parental consent is required before a school district employee or contractor may conduct psychological or psychiatric examinations, tests, or treatments; make or authorize videotapes or voice recordings (with exceptions); disclose health or medical information; collect, use, store, or disclose biometric identifiers; or provide health care services, procedures for a child. Tex. Educ. Code Ann. § 26.009 (West).

   • Parents have the right to direct their child's education and consent to medical, psychiatric, and psychological treatment. Tex. Educ. Code Ann § 26.001 (West).

2. Medical Treatment and Immunization

   • Parental consent is generally required for a child's immunization. Tex. Fam. Code Ann. § 32.101 (West).

   • Parents may authorize an adult caregiver to consent to medical, dental, psychological, or surgical treatment and immunization of the child through an authorization agreement. Tex. Fam. Code Ann. § 34.002 (West).

3. Tattooing and Body Piercing

   • A person under 18 may not be tattooed except to cover an existing tattoo deemed inappropriate, and only with parental or guardian consent, which must be documented and the parent or guardian must be present. Body piercing of a minor also requires written and notarized parental or guardian consent and the parent or guardian must be present. 25 Tex. Admin. Code § 229.406.

16

• Studios must maintain records of parental consent for tattooing and body piercing of minors, including identification and consent documentation. 25 Tex. Admin. Code § 229.406.

4. Employment and Solicitation

• Employment of a child to solicit (sell goods/services, request donations, distribute items) requires signed parental consent, a map of the solicitation route, supervisor information, and adult supervision. Tex. Labor Code Ann. § 51.0145 (West).

5. Juvenile Volunteer Programs

• Juvenile volunteers (ages 12-18) participating in state historic site programs must have written parental or guardian authorization and waiver of liability. For minors under 12, the parent or guardian must be present and supervise the minor at all times. 13 Tex. Admin. Code § 16.6.

6. Mental Health Services

• Before providing therapy services to a minor, a licensee must obtain appropriate consent and review any custody agreement or court order affecting parental rights. 22 Tex. Admin. Code § 801.44.

• In mental health facilities, the parent or conservator of a minor has the right to participate in treatment planning and must give or withhold informed consent for certain treatments and procedures. 26 Tex. Admin. Code § 320.7.

7. Day Care and Health Care Centers

• Centers must provide notification and obtain signatures from the minor's parent regarding services and must obtain parental consent for changes in care plans, except in emergencies. 26 Tex. Admin. Code § 550.901.

8. Foster Care and Child-Placing Agencies

17

• A parent or legal guardian is the person legally authorized to give consent for a child in care, including for participation in activities and medical treatment. 26 Tex. Admin. Code § 749.43.

9. Release of Minor's Information

• For Release of Information minors, release of program participant information requires a properly executed release of information form from the parent. 26 Tex. Admin. Code §§ 356.2018, § 356.1318.

10. Authorization Agreements for Care

• Parents may enter into agreements with adult caregivers to authorize the caregiver to perform a wide range of activities for the child, including medical treatment, school enrollment, extracurricular activities, employment, and obtaining identification documents. Tex. Fam. Code Ann. § 34.002.

11. Temporary Authorization for Care

• Courts may grant temporary authorization for care of a child to a nonparent if no parent, conservator, or guardian is available to give necessary consent. This authorization includes consent for medical, dental, psychological, and surgical treatment, school enrollment, and participation in activities. Tex. Fam. Code Ann. § 35.005.

12. Special Education and Health Education

• Parents have rights to consent to certain school activities on behalf of their children, including sexual education, health education, and special education services. 19 Tex. Admin. Code § 155.39; Tex. Educ. Code Ann. § 26.001 (West).

Parents even have the rights to commit their child to a state mental facility over their child's objection. *Parham v. J.R.*, 442 U.S. 584, 603 (1979) (rejecting

18

argument that "governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect children.").

      3.  The district court ignored the many precedents supporting laws with exemptions as content neutral.

Inexplicably, the district court ignored that the Supreme Court has frequently declined to apply strict scrutiny when generally applicable regulatory laws carve out exemptions. For example, in *Members of City Council of Los Angeles v. Taxpayers for Vincent*, the Court declined to apply strict scrutiny to a municipal ordinance that exempted address numbers and markers commemorating "historical, cultural, or artistic event[s]" from a generally applicable limit on sidewalk signs. 466 U.S. 789, 791 n.1 (1984) (listing exemptions within the ordinance). The Court found "not even a hint of bias or censorship in the City's enactment or enforcement." *Id*. at 804. "The ordinance curtails no more speech than is necessary to accomplish its purpose." *Id* at 810. Similarly, the Court in *City of Renton* applied intermediate scrutiny to a zoning law that facially distinguished among movie theatres based on content because it was "designed to prevent crime, protect the city's retail trade, … maintain property values," and "not to suppress the expression of unpopular views." 475 U.S. at 48.

In *Turner Broadcasting System, Inc. v. FCC*, the Court rejected the argument that exemptions for certain companies engaged in expression under the federal "must-carry" law were content based because, as here, the regulation was "unrelated

to the content of speech." 512 U.S. 622, 642 (1994). Even when exemptions exist, "laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." *Id*. at 643. *Turner Broadcasting*'s lesson applies here: Laws that favor one set of speakers over another are subject to strict scrutiny *only* if they reflect "[g]overnment's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say.)" *Id.* at 658.

Again, in *City of Ladue v. Gilleo*, the Court assumed *arguendo* that a sign ordinance exempting address signs and for-sale signs did not trigger strict scrutiny. 512 U.S. 43, 46, 47 n.6, 53 (1994). If exempting address signs and for-sale signs from a sign ordinance does not raise constitutional concerns, neither does exempting emergency-services apps and SAT-prep apps.

*Paxton* shows that regulatory distinctions that implicate expression are not automatically to be treated as content based. In *Paxton*, the law required age verification and applied it to "any 'commercial entity that knowingly and intentionally publishes or distributes material on an internet website … *more than one-third of which is sexual material harmful to minors*.'" 606 U.S. at 467 (quotation omitted) (emphasis added). This law exempted websites that distributed "sexual material harmful to minors" when such material was less than "one third" of their content. *Id.* Though such platforms engaged in the same harmful expressive

20

activities, they were given a free pass in the law, exempted from age-gating. The Supreme Court did not blink at this distinction. Before the Fifth Circuit, the plaintiffs had argued, as here, that since the law exempted certain "search engines … and social media platforms … that display the same content" the law was unconstitutionally under-inclusive. *Paxton*, 95 F.4th at 277. The Fifth Circuit flatly rejected the argument, stating that under-inclusivity at best is only "a signal that the state *may* be engaged in viewpoint discrimination." *Id.* The exemption did not render the law unconstitutional. Where "the exemptions are driven by something else … such as making a reasonable *policy choice to avoid* the legal concerns that accompany attempts to regulate the 'entire universe of cyberspace,' the state is not pursuing viewpoint discrimination.'" *Id.* at 278 (citation omitted). As in *Paxton*, here, reasonable policy choices were made to avoid legal concerns of regulating the entire universe of apps, such as apps without the design features that cause the problems the law intended to address. *Id.* at 277-78.

The district court also ignored the recent decision, *TikTok, Inc. v. Garland*, where the Court upheld a regulation with exemptions against an allegation of content discrimination. The federal law required TikTok be shut down or divest to a new owner not under the control of the Chinese government. As here, TikTok argued the law was content based and subject to strict scrutiny because it exempted apps "whose primary purpose is to allow users to post product reviews, business reviews, or travel

information and reviews." *TikTok*, 604 U.S. at 67. As here, the government asserted a "content-neutral justification": it prevented "China from collecting vast amounts of sensitive data from 170 million U.S. TikTok users." *Id.* at 72. The law, it asserted, was "content agnostic" and did not "reflect[] disagreement with the message such speech conveys." *Id.* The Court agreed, holding that "[b]ecause the … justification reflects a 'purpos[e] unrelated to the content of expression,' it is content neutral." *Id.* (citation omitted). "[S]crutiny 'is unwarranted when the differential treatment is justified by some special characteristic of the particular [speaker] being regulated.'" *Id.* at 73 (citation omitted). These words apply directly to the ASAA which, as noted, is targeted at apps with harmful design features. Finally, the Court emphasized "the 'latitude' we afford the Government to design regulatory solutions to address content-neutral interests," *id.* at 77 (quoting *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 213 (1997)), acknowledging "the difficulty in assessing precisely which categories" to exempt. *Id.* at 79.

4. The district court could not even identify the specific idea, message, or topic the ASAA allegedly targeted.

As further proof that the ASAA does not target speech, neither the plaintiffs nor the district court identified any message the law would be targeting. The messages on social media platforms remain unaffected by this law. *Cf. Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) ("Social media offers …

22

'communication of all kinds.'") (quoting *Reno v. Am. C.L. Union*, <u>521 U.S. 844, 870</u> (1997)). No particular "message", no "idea", and no "topic" is targeted. *See Reed*, <u>576 U.S. at 156-157</u>. Indeed, the plaintiffs never attempted to pinpoint the precise subject matter that is allegedly intended to be regulated. Nor did the district court. At most, the district court points to the few exempted "non-profit" service-oriented sites as representing favored content. *SEAT*, <u>814 F.3d at 781</u>. But this still does not describe the specific targeted content of the regulated apps as it is impossible to do so. A law is content based when it "applies to particular speech *because of the topic discussed or the idea or message expressed." Reed,* <u>576 U.S. at 163</u> (emphasis added). But this telltale marker is entirely absent here. Furthermore, the Supreme Court has warned against holding a regulation as content-based merely because to apply the regulation a reader must ask who is speaking. *Packingham*, <u>582 U.S. at 106</u>; *see also City of Austin*, <u>596 U.S. at 69</u> (A regulation is not content based merely because an inquiry must be made as to who is the speaker.).

     5.  *Reed* is easily distinguishable on additional grounds.

The district court's reliance on *Reed*'s exemption analysis is completely misplaced for other obvious reasons. *Reed* involved a town sign ordinance that permitted temporary political and ideological signs but banned church signs. *Reed*, <u>576 U.S. at 159-160</u>. The Court correctly held that the ordinance was content based on its face since church signs were banned on the basis of their express message. *Id*.

23

at 164. But here there is no banned message or content. Yes, it applies to certain apps and not others. But the distinguishing element is that it applies to the apps with design features that harm children using those apps. It does not apply to the benign non-profit apps whose design features do no harm. *See, e.g.*, *Reed*, 576 U.S. at 171 ("[A] speech regulation is content based if the law applies to particular speech *because of the topic discussed or the idea or message expressed*.") (emphasis added). The ASAA regulates apps with certain harmful design features regardless of their content, message or ideas. As *Reed* stated: "Not 'all distinctions' are subject to strict scrutiny, only *content-based* ones are." *Id.* at 172. Indeed, the Court in *Reed* observed that the town could regulate "many aspects of signs that have nothing to do with a sign's message: size, building materials, lighting, moving parts, and portability," or "'other problems that legitimately call for regulation.'" *Id.* at 173 (quoting *City of Ladue*, 512 U.S. at 48). The ASAA concerns how apps are built, not what they say. Under *Reed*, that ends the inquiry.

Further, the district court is radically overly broad in interpreting *Reed's* use of "distinctions." *Reed* found it objectionable when the government distinguishes between different types of speech, such as the message – "come to church" versus political and ideological messages. *Reed*, 576 U.S. at 173 ("The signs at issue in this case … are facially content based."). But the district court expands that to say whenever a law distinguishes between anything (here dangerous apps versus not)

24

that it flunks *Reed*. Such a position is both legally wrong and would mean that no law could survive because to avoid overbreadth, legislators must draw distinctions. Under the district court's reasoning, such distinctions would make them automatically content based.

*Reed* is also distinguishable because the law there regulated categories of noncommercial speech that warranted the strongest First Amendment protections. *Reed* applies the well-established rule that strict scrutiny applies to a content-based restriction of noncommercial speech. By contrast, to the extent the ASAA implicates speech, it is commercial, not political, ideological, or religious messages as in *Reed*. The expression implicated by the ASAA is commercial speech—and that type of speech is typically tested under intermediate scrutiny. *See, e.g.*, *Cent. Hudson*, 447 U.S. at 562-63; *Paxton*, 95 F.4th at 283 (holding that Texas age verification law regulated commercial speech and applying *Central Hudson*'s intermediate scrutiny test).

Finally, the district court erroneously concluded that ASAA "imposes new duties on" the appellees to "implement the State's prescribed age rating system …." *SEAT*, 814 F.3d at 778. The age categories set forth in the ASAA are child (younger than 13), younger teenager (at least 13 and younger than 16), older teenager (at least 16 and younger than 18), and adult (at least 18). *Id.* at 778-79. Contrary to the appellees' claims, these age distinctions are not "new" as they align with existing

25

legal and operational thresholds that already govern how minors are treated in the digital marketplace. For example, the federal Children's Online Privacy Protection Act (COPPA) creates a brightline rule for children under 13 triggering specific legal obligations for website and online service providers. 15 U.S.C.A §§ 6501, 6502 (West). It is illegal for such entities to collect certain personal information from such child and requires them to "provide notice on the website or online service of what information it collects from children." 15 U.S.C.A. §6502; 16 C.F.R. § 312.3(a). Most importantly, as here, COPPA imposes verifiable parental consent requirement before "any collection, use, or disclosure of personal information from a child." 16 C.F.R. § 312.5(c).

Moreover, age distinctions are routinely used in federal and Texas law.

- 18 U.S.C.A. § 1470 (West) - prohibits the transfer of obscene material to kids under 16 years old.

- 18 U.S.C.A. § 1591(b) (West) - sex trafficking; penalties are different based on victim's age (if a child); age groups are under 14 years old, and then 14 to 18 years old.

- 18 U.S.C.A. § 2241(c) (West) - aggravated sexual abuse; includes age categories of under 12, and 12-16

- 18 U.S.C.A. § 2243 (West) - sexual abuse of a minor; includes age category for 12-16 (and under 12, its aggravated sexual abuse)

- 18 U.S.C.A.§ 2244(c) (West) - abusive sexual contact; higher penalties for sexual contact with a victim who is under 12 years old

- Tex. Pen. Code Ann § 22.04(c) defines "child" as anyone under 14, and that definition is used throughout the penal code.

The district court also overlooked the Supreme Court's holding in *Zauderer v. Off. of Disciplinary Couns. Of Supreme Ct. of Ohio*, 471 U.S. 626 (1985), where the Court upheld a regulation requiring lawyers to *affirmatively provide commercial information* to dissipate consumer confusion or deception that clients might be liable for litigation costs if their lawsuits were unsuccessful. That regulation is analogous to the ASAA requiring that accurate age rating information be provided to parents due to deceptive and potentially misleading app descriptions that matched young children with apps appropriate for older teens or adults. The Court held that, as here, "an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." *Zauderer*, 471 U.S. at 651.

## VI.   CONCLUSION

The districts court's holding that the ASAA is content based and subject to strict scrutiny was clearly flawed. The district court's invalidation of the ASAA should be reversed.

Respectfully submitted,

*/s/ Harvey Brown*
Harvey Brown: Bar #03130500
The Lanier Law Firm
10940 West Sam Houston Pkwy N
Suite 100

27

Houston, TX 77064
Tel.: (713) 659-5200
Harvey.Brown@LanierLawFirm.com

*Counsel for Amicus Curiae*
*National Center on Sexual Exploitation*

Dated: May 26, 2026

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Harvey Brown
Harvey Brown
*Counsel for Amicus Curiae*
*National Center on Sexual Exploitation*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of <u>Fed. R. App. P. 29(a)(5)</u> because it contains 6500 words, excluding the parts of the brief exempted by Fed. R. App. 32(f).

This brief also complies with the typeface requirements of <u>Fed. R. App. P. 32(a)(5)(A)</u> and the type style requirements of <u>Fed. R. App. P. 32(a)(6)</u> because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14.

*/s/ Harvey Brown*
Harvey Brown
*Counsel for Amicus Curiae National Center on Sexual Exploitation*
