# United States Court of Appeals

*for the*

# Fifth Circuit

Case No. 25-51073

STUDENTS ENGAGED in Advancing Texas; M. F., by and through next friend VANESSA FERNANDEZ; Z. B., by and through next friend S.B.,

*Plaintiffs-Appellees,*

v.

KEN PAXTON, in his official capacity as the Texas Attorney General,

*Defendant-Appellant.*

consolidated with

Case No. 26-50001

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION,

*Plaintiff-Appellee,*

v.

KEN PAXTON, in his official capacity as Attorney General of Texas,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS, AUSTIN, IN NOS. 1 :25-CV-1662 AND
1 :25-CV-1660, HONORABLE ROBERT L. PITMAN, U.S. DISTRICT JUDGE

## *AMICUS* BRIEF OF THE INSTITUTE FOR FAMILY STUDIES

JOEL THAYER
*Attorney for Amicus Curiae The Institute*
  *for Family Studies*
1255 Union Street NE, 7th Floor
Washington, DC 20002
(760) 668-0934

CP COUNSEL PRESS    (800) 4-APPEAL • (393393)

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Students Engaged in Advancing Texas, *et al.*, Plaintiffs—Appellees

Ken Paxton, Defendant—Appellant

Institute for Family Studies, *Amicus Curiae*.

Joel Thayer is counsel for *Amicus Curiae.*

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(c), and 5th Circuit Rule 28.2.1, it is hereby certified that *Amicus Curiae* is a 501(c)(3) organization and no person or entity owns it or any part of it.

*/s/ Joel Thayer*

Joel Thayer
Attorney of Record for *Amicus Curiae*

**TABLE OF CONTENTS**

                                                                            **Page**

CERTIFICATE OF INTERESTED PERSONS ........................................................i

TABLE OF AUTHORITIES ........................................................................ iii

IDENTITY OF *AMICUS*, INTEREST IN THIS MATTER, AND
          SOURCE OF AUTHORITY TO FILE ............................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................1

ARGUMENT ...............................................................................................3

      I.     Mobile Apps's Erosion of Parental Authority and Current
                  Federal Laws Either Exacerbate the Problem or Are
                  Ineffective ................................................................................3

     II.    The Growing Evidence that Filters Are Not Enough and that
                  Age Verification is a Modest Burden Given Technological
                  Advancements .........................................................................11

     III.   S.B. 2420 Should be Upheld Because Preserving Parental
                  Authority is a Compelling Government Interest ...............................15

CONCLUSION ..........................................................................................22

**TABLE OF AUTHORITIES**

Page(s)

**Cases:**

*Anderson v. TikTok*,
116 F.4th 180 (3d Cir. 2024)..................................................................6

*Bellotti v. Baird*,
443 U.S. 622 (1979)...................................................................11, 19

*Brown, et al. v. Entertainment Merchants Ass'n, et al.*,
564 U.S. 786 (2011)..................................... 16, 17, 18, 20, 21

*Computer & Communications Industry Ass'n v. Paxton*,
814 F.Supp.3d 787 (W.D. Tex. 2025) ...................................... 16, 21

*Erznoznik v. Jacksonville*,
422 U.S. 205 (1975)..................................................................20

*Force v. Facebook, Inc.*,
934 F.3d 53 (2d Cir. 2019) .......................................................6

*Free Speech Coalition, Inc. v. Paxton*,
606 U.S. 461 (2025)..................................... 2, 13, 15, 22

*Ginsberg v. New York*,
390 U.S. 629 (1968)..................................................... 19, 20

*Gonzalez v. Google*, LLC,
2 F.4th 871 (9th Cir. 2021)......................................................6

*Pierce v. Society of Sisters*,
268 U.S. 510 (1925)..................................................................19

*Roper v. Simmons*,
543 U.S. 551 (2005)..................................................................20

*U.S. v. Musical.ly*,
2019 WL 134086 (C.D. Cal. 2019) .........................................7

*Washington v. Glucksberg*,
521 U.S. 702 (1997)..................................................................18

*Wisconsin v. Yoder*,
406 U.S. 205 (1972)..................................................................19

**Statutes & Other Authorities:**

Fed. R. App. P. 29(a) ..................................................................................1

Tex. Bus. & Com. Code Ann. § 121.021(a) (West 2026) .........................................14

Children's Online Privacy Protection Rule, 16 C.F.R. Part 312 ...............................7

## IDENTITY OF *AMICUS*, INTEREST IN THIS MATTER, AND SOURCE OF AUTHORITY TO FILE

Pursuant to Fed. R. App. P. 29(a), amicus The Institute for Family Studies is a 501(c)(3) nonprofit whose mission is to strengthen marriage and family life and advance the welfare of children through research and public engagement. Known for its objective and incisive studies that attract attention and respect from across the ideological spectrum, the Institute's programs and platforms focus on marriage, fertility, child well-being, family formation, parenting, and the role of technology in family life. In particular, its Family First Technology Initiative specializes in researching the effects of digital technology on the wellbeing of families and children, studying the attitudes of families, parents, voters, and other demographics towards digital technology, and developing constitutional technology policy that strengthens the family. Amicus houses some of the nation's leading experts in family and technology policy.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Central to the District Court's analysis of and decision to preliminary enjoin S.B. 2420, the App Store Accountability Act, is the assumption that speech to minors (and minors' speech to others) that bypasses their parents or legal guardians is a protected class of speech under the First Amendment.

However, this presupposition does not align with an originalist interpretation of the First Amendment or the Supreme Court's historic precedent on the matter.

In its original context, as understood by the Founders, the First Amendment was never intended to grant individuals or minors a right to speech that bypasses parents, i.e., abrogate parental authority. Likewise, while the Court has recognized that children enjoy some meaningful First Amendment protections with respect to speech, they have historically recognized that states can pass laws that aid parents and others responsible for the well-being of children, such as teachers, in carrying out their rightful duties and responsibilities to children. The Court fails to grapple with the Supreme Court's treatment of speech to minors and minors' speech, and its general support of laws that support parental authority and parental rights.

Additionally, the District Court has failed to consider the context and evolution of contemporary digital technology and its effects on parental authority, e.g., parent's lack of ability to effectively safeguard their kids. As the Supreme Court most recently maintained in *Free Speech Coalition v. Paxton*, digital technology has rapidly evolved in the last 20 years, posing serious challenges to the ability of parents to ensure the well-being of their children. And given that the majority of minors own or use smartphones or tablets, mobile apps especially present unique challenges, as they lack adequate parental controls to mitigate harms to minors, are inaccurately age-rated, and involve complex contract agreements (i.e., terms of services and privacy policies) and are not simply reducible to "content" (contrary to the District Court's analysis).

Insofar as these modern digital technologies undermine parental authority, Texas is within its right to aid and strengthen parents in carrying out their responsibilities to their children through the App Store Accountability Act.

**ARGUMENT**

I. **Mobile Apps's Erosion of Parental Authority and Current Federal Laws Either Exacerbate the Problem or Are Ineffective**

The lower court comparing an app store to a bookstore is a false analogy. Indeed, no bookstore requires their patrons to sign a term of service agreement and cede privacy rights over to it before entering the store. Nor is there a store that requires you to sign publishers' terms of service when purchasing one of their published works.

Worse, mobile app stores have degraded the integrity of parental authority by allowing children to download any app they want surreptitiously. Mobile apps present new and unique challenges for parents today. For years, parents have expressed concern and exhaustion when it comes to digital devices and kids. According to a 2020 Pew report, 66% of parents of one or more children under the age of 18 believe that parenting is harder today than 20 years ago, citing technology in general, and social media in particular, as the chief cause. Brooke Auxier, et al, *Parenting Children in the Age of Screens*, Pew Research Center (Jul. 28, 2020), https://www.pewresearch.org/internet/2020/07/28/parenting-children-in-the-age-of-screens/. Another more recent Pew study found that, as of 2025, 86% of

parents consider managing their child's screen time a priority when it comes to raising their kids. Coleen McClain, et al, *How Parents Manage Screen Time for Kids*, Pew Research Center (Oct. 8, 2025), https://www.pewresearch.org/internet/2025/10/08/how-parents-manage-screen-time-for-kids/. Nevertheless, despite parent's efforts to monitor and limit their teen's digital activity, however, most remain worried about the harmful impacts of digital technology on their kids' social skills, academic performance, or extracurriculars. Monica Anderson, *How Parents Feel – and Manage – Their Teens' Online Behavior and Screen Time*, Per Research Center (Mar. 22, 2019), https://www.pewresearch.org/short-reads/2019/03/22/how-parents-feel-about-and-manage-their-teens-online-behavior-and-screen-time/.

According to a May 2026 report by our Institute (based on a survey of almost 24,000 U.S. parents of over 40,000 children, including 2,600 teenagers), 60% of 6-year-olds are using tablets. Michael Toscano, et al., *High Tech, Low Play: The Life of American Children*, Institute for Family Studies (2026), https://ifstudies.org/report-brief/high-tech-low-play-the-life-of-american-children. By age 11, 60% of minors own smartphones, with almost 90% of them owning a smartphone by 16. *Id.* The report also found that the majority of them also use devices without parental controls. *Id.* At most, for children 10 and older, only 45% of parents require a password for app store purchase, 40% of parents set content

restrictions, and 35% of parents set time limits on device usage, with the percentage of parents who use each of these restrictions decreasing as the child gets older.

While parental controls may be widely underutilized, even those who may be trying their best to protect their kids are still at a loss. For one, setting up parental controls can be complex, often involving countless steps. *See* Protect Young Eyes, *The Complete Guide to Setting up an iPhone or iPad for Your Child*, Report (May 14, 2026), https://docs.google.com/document/d/1m1nD5e-N5o-cNbuyH1C8pMhv9ttaxe96S0UR5d1fQFM/mobilebasic; *see* also, Family IT Guy, iPhone Set Up for Kids: A Step-by-Step Guide, https://www.familyitguy.com/iphone-masterclass. Secondly, the controls parents are offered have routinely been found to be ineffective at protecting kids. For example, TikTok was found to have released a tool to reduce screen time that it knew was ineffective at reducing users' actual time spent on the app. *See* Bobby Allyn, et al., *TikTok Executives Know About App's Effect on Teens, Lawsuit Documents Allege*, NPR (Oct. 11, 2024), https://www.npr.org/2024/10/11/g-s1-27676/tiktok-redacted-documents-in-teen-safety-lawsuit-revealed. Lastly, even if parents use parental controls, including those offered by Apple's App Store, countless apps are inaccurately rated. According to a *Wall Street Journal* investigative report, researchers found that over a quarter of apps tested had

inaccurate age-ratings, based on the actual in-app experience. Aaron Tiley, *Apple's App Store Puts Kids a Click Away from a Slew of Inappropriate Apps*, the Wall Street Journal (Dec. 22, 2024), https://www.wsj.com/tech/apples-app-store-puts-kids-a-click-away-from-a-slew-of-inappropriate-apps-dfde01d5.

Current laws have either made matters worse or are unhelpful in ensuring parents can protect their children online. As to the former, Section 230 of the Communications Decency Act continues to grant sweeping immunities to online service providers, *e.g.*, *Force v. Facebook, Inc.*, 934 F.3d 53, 65-67 (2nd Cir. 2019) (claiming to not be liable for hosting Hamas Facebook pages because of its interactive computer services status); *Gonzalez v. Google*, LLC, 2 F.4th 871 (9th Cir. 2021) (claiming to not be liable for its YouTube hosting terrorist propaganda because of its interactive computer services status), to thwart any liability for the harms their platforms cause children. *Anderson v. TikTok*, 116 F.4th 180, 185 (3rd Cir. 2024) (Matey, J. concurring). Armed with these protections, Third Circuit Judge Paul Matey poignantly stated that Big Tech "[s]muggles constitutional conceptions of a 'free trade in ideas' into a digital cauldron of illicit loves' that leap and boil with no oversight, no accountability, no remedy." *Id.*

Worse, we have well-intended, but ultimately toothless, child safety laws, like the Children's Online Privacy Protection Act ("COPPA") that is easily circumvented by the fact that the law does not require age verification while courts

require plaintiffs to show "actual knowledge" that a child is on a platform. *U.S. v. Musical.ly*, 2019 WL 134086 at 4-5 (C.D. Cal. 2019); Children's Online Privacy Protection Rule, 16 C.F.R. Part 312.

Thus, in the digital age, parental authority has rapidly eroded and floundered as the quantity of information and the number of digital avenues by which users and their data can be accessed have multiplied and outpaced the creation of tools or policies needed to effectively manage such information or access. The powerlessness of parents in the face of complex technologies that are rapidly changing and whose workings remain opaque marks a new era of family life not experienced by previous generations of parents or children.

This is especially true when it comes to mobile apps. As a 2025 Federal Trade Commission complaint against Apple has outlined, it is estimated that 90% of smartphone internet usage today occurs through mobile apps. Digital Childhood Institute, Complaint to the Federal Trade Comm'n at p.7 (Aug. 19, 2025), www.digitalchildhoodinstitute.org/wp-content/uploads/2025/08/FTC-Complaint-Against-Apple_25.pdf ("DCA FTC Complaint"). Despite the District Court's categorization of mobile apps as content not unlike the content accessed by means of the internet, their usage involves more than simply access to and consumption of content (i.e., speech). Prior to downloading or using any app, users agree to a contract, i.e., terms of service and privacy policy agreements, which outlines the

terms and rights of users as well as what personal data can be accessed, including photos, contact lists, exact locations, as well as microphone and camera use. *Id.* at 12.

Despite the fact that children are generally acknowledged within contract law as lacking the maturity and technical knowledge to understand such contracts or their potential risks, app developers have been permitted to contract with minors without parental involvement or consent. In many cases, an app's access to such personal data compounds risks to child well-being. For example, mobile apps make it easier for predators to prey on children. Shelby County, Alabama, *Apps Child Predators Use*, Presentation (last visited May 21, 2026), https://www.shelbyal.com/DocumentCenter/View/1503/Apps-to-Know-About?bidId=. In one case, a 13-year-old Minnesota girl was sexually assaulted by a man almost four times her age, who found her through her SnapChat location. Andy Brownell, *Rochester Man Admits to Sex Assault of Girl He Met on Snapchat*, KROC-AM News (Jan. 7, 2025), https://krocnews.com/rochester-man-admits-raping-girl-he-contacted-through-snapchat/.

Some companies, like Character.AI, have tried to enforce these contracts against minors. Michael Marks, *Texas Parents Sue After AI Chatbots Suggests Self-Harm to Child*, Texas Public Radio (Dec. 16, 2024), https://www.tpr.org/technology-entrepreneurship/2024-12-16/texas-parents-sue-

after-ai-chatbot-suggests-self-harm-to-child. A Texas mother's son who, after physically maiming himself at the chatbot's behest, was only entitled to 100 dollars in damages—as expressly outlined in the company's terms of services. Ashley Belanger, *After Child's Trauma, Chatbot Maker Allegedly Forced Mom to Aribration for $100 Payout*, ArsTechnica (Sep. 17, 2025), https://arstechnica.com/tech-policy/2025/09/after-childs-trauma-chatbot-maker-allegedly-forced-mom-to-arbitration-for-100-payout/.

However, the harms enabled by free-flowing access to apps offered in app stores are not limited to those well-known products. Indeed, seemingly innocuous apps, too, have detrimental effects on child safety. For instance, YouVersion's Bible app gave parents a false sense of security that the app was only outlining bible verses. However, predators were using the app's "community features" to engage directly with minors. Clare Morell, *The Tech Exit*, Forum Books, pg. 31 (2025). The app is still available on both Apple and Google app stores. YouVersion Bible App, Google Play (last visited May 21, 2026), https://play.google.com/store/apps/details?id=com.sirma.mobile.bible.android&hl=en_US; Bible, Apple App Store (May 21, 2026), https://apps.apple.com/us/app/bible/id282935706.

Even weather apps impose onerous terms and broad allowances to track their users. Take the Weather Channel's app by way of example. According to the App

Store, the app "track[s] [users] across apps and websites owned by other companies." The Weather Channel – Radar, Apple App Store (last visited May 21, 2026), https://apps.apple.com/us/app/the-weather-channel-radar/id295646461. It also collects data "linked to your identity," which include, but are not limited to, purchases, contact information, search history, location, and user content. *Id.*

Children's privacy and safety are at risk in other ways, too. Many apps on Apple's App Store disclose that they share sensitive data with foreign adversaries such as China, potentially allowing a child's information to be sent abroad via app stores without any parental awareness. *E.g.*, Shenzhen Qianhai Happy Tour Inc., Privacy Policy (updated Apr. 14, 2026), https://privacy.biggerlens.cn/app/privacy?name=knockout-google&os=android&language=en (saying in its privacy policy, user information is stored in China); *see also* Wearfit Pro Privacy Statements, Privacy Policy (updated Aug. 4, 2023), https://h5.iwhop.com/login/privacy_policy/privacy_policy_en.html (hosting China-based wellness app Wearfit Pro that claims to access data from Apple's HealthKit and openly discloses that the "data will be stored in the territory of the People's Republic of China."). Worse, most parents are likely not aware that Article 7 of China's National Intelligence Law of 2017 creates "a legal obligation for those entities to turn over data collected abroad and domestically to the" Chinese government. U.S. Dep't. Homeland Security, *Data Security Business*

*Advisory*, Report (last visited May 21, 2026),

https://www.dhs.gov/sites/default/files/publications/20_1222_data-security-

business-advisory.pdf. Such breaches of privacy put children at serious risk of

being tracked and harmed by foreign adversaries without so much as notifying

parents.

These conditions confirm what media critic and philosopher Neil Postman

observed back in the 1990s: "A family that does not or cannot control the

information environment of its children is barely a family at all." Neil Postman,

*Technopoly: The Surrender of Culture to Technology* (1st ed. 1992). Or, to put it in

the language of the courts, if parental authority is one of the "basic

presuppositions" of individual liberty, *Bellotti v. Baird*, 443 U.S. 622, 639 (1979),

then its rapid erosion in the digital age is a matter of grave concern for elected and

appointed officials concerned about Americans' freedom and flourishing.

Without S.B. 2420, kids are able to access all of these apps without any

parental review or approval and Apple and Google can continue to provide parents

a false sense of security with their faulty app ratings system.

## II. The Growing Evidence that Filters Are Not Enough and that Age Verification is a Modest Burden Given Technological Advancements

In recent years, the Supreme Court has begun to reconsider its earlier

assessments of digital technology. Last year, in its *Paxton v Free Speech Coalition*

decision, the Supreme Court finally changed course. In oral arguments, multiple

judges from the bench acknowledged the unique hardships of parenting in the digital age and the inadequacies of filtering software. As Justice Barret, a mother of seven, acknowledged:

It's been 20 years since *Ashcroft.* The iPhone was introduced in 2007, and Ashcroft was decided in 2004. I mean, kids can get online porn through gaming systems, tablets, phones, computers. It's—let me just say that content filtering for all those different devices, I can say from personal experience—[it's] difficult to keep up with. [And] I think that the explosion of addiction … to online porn has shown that content filtering isn't working. Transcript of Oral Argument at 9-10, *Free Speech Coalition v. Paxton*, No. 23-1122 (U.S. Jan. 15, 2025).

And Justice Alito:

There's a huge volume of evidence that filtering doesn't work. We've had many years of experience with it. We now have many, many states who have adopted age verification requirements. …[W]hy are they doing that if the filtering is so good? *Id*. at 12.

Similar acknowledgements were made by the majority in its decision. Acknowledging that since *Ashcroft,* "the 'technology of the Internet' has continued to 'evolv[e] at a rapid pace.' … With the rise of the smartphone and instant streaming, many adolescents can now access vast libraries of video content—both

12

benign and obscene—at almost any time and place, with an ease that would have been unimaginable at the time of *Reno* and *Ashcroft II*." *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461, 478 (2025). Because of this technology's rapid evolution in the past two decades, the Court acknowledged that, with respect to the potential harm to minors resulting from content that is obscene for minors, "[t]he need for age verification online is even greater." *Id.* at 482. The Texas law simply adapted a "traditional approach to the digital age" by implementing age verification methods that are "plainly legitimate." *Id.* at 496-97. Thus, the Court upheld Texas's law requiring age verification for pornography websites.

The Court is absolutely correct. Age verification technologies have also rapidly evolved since the internet's inception and are more technically feasible, reliable, affordable, and privacy protecting than ever. Age Verification Providers Ass'n as Amicus Curiae at 30, *Free Speech Coalition v. Paxton*, 606 U.S. 461 (2025) (No. 23-1122). As our Institute has shown, there are a variety of ways for tech companies to verify a user's age, especially at the app store layer. Perhaps the most reliable and privacy protecting method is what is known as a "zero-knowledge proof," which can be performed by a third party, which involves the encryption of age data and would simply verify that a user is of age or not without disclosing any age data (e.g., birth date, social security number, driver's license number, etc). John Ehrett & Clare Morell, *Age Verification: Policy Ideas for*

*States*, Institute for Family Studies (Jun. 13, 2023), https://ifstudies.org/ifs-admin/resources/briefs/ifs-eppc-ageverificationpolicybrief.pdf. Put another way, a zero-knowledge proof shares that a given fact is true, such as that a person is an adult, without disclosing the details of that fact, like the user's precise age.

Even where age verification may involve some form of a government issued ID, a zero-proof knowledge method would not disclose any personal identification information, making it arguably more privacy protecting than in-person ID checks. There are a variety of other commercially available means to verify a user's age, as well. Clare Morell, *Making Smartphones and App Stores Safe for Kids*, Ethics and Public Policy Center & Institute for Family Studies (Nov. 6, 2023), https://ifstudies.org/ifs-admin/resources/briefs/ifs-eppc-smartphonesappstoresbrief-nov23.pdf ("Morell Study").

In the case of S.B. 2420, the law requires any commercially reasonable method. Tex. Bus. & Com. Code Ann. § 121.021(a) (West 2026) ("When an individual in this state creates an account with an app store, the owner of the app store shall use a commercially reasonable method of verification to verify the individual's age category under Subsection (b)."). Such methods may rely "on public or private transactional data, such as credit cards or bank information, to verify the age of the person attempting to access the material." Morell Study at p. 10. In the case of app stores, such data is readily accessible and already integrated,

making age verification an easy lift. For example, in certain cases, such as when a person applies for an Apple credit card, Apple uses Apply Pay as a means to verify age. Moreover, Apple also has the ability to securely share user's data with app developers through its Declared Age Range Application Programming Interface, developed last year. Apple, *Helping Protect Kids Online*, White Paper (2025), https://developer.apple.com/support/downloads/Helping-Protect-Kids-Online-2025.pdf. As of today, Apple Pay is the most popular digital wallet within the United States, with more than 1 in 5 Americans aged 14+ using Apple Pay in 2025. CapitalOne Shopping, *Apple Pay Statistics*, Research (Jan. 28, 2026), https://capitaloneshopping.com/research/apple-pay-statistics/.

Given today's technology, the requirements imposed by S.B. 2420 leverage already existing and widely used technologies, thus posing a minimal burden on users and app stores alike. Though a different context, this aligns with the Court's recognition in *Paxton* that digital age verification measures are "plainly legitimate." *Free Speech Coalition, Inc.*, at 498.

### III. S.B. 2420 Should be Upheld Because Preserving Parental Authority is a Compelling Government Interest

The District Court claims that the Act is a content-based regulation that directly impinges on speech protected by the First Amendment, thus triggering strict scrutiny. It claims this is so (1) due to the Act's exclusion of various apps associated with emergency services and post-secondary education admissions and

(2) due to arguments made in hearings that, in the court's opinion, that this law is principally designed to "shield minors from certain Speech the state deems objectionable or harmful, which is a content-based justification." *Computer & Communications Industry Ass'n v. Paxton*, 814 F.Supp.3d 787, 800 (W.D. Tex. 2025).

However, even assuming protected speech is implicated here (we contend there is not), the First Amendment has never been read to allow corporations the right to undermine their parents' ability to have oversight over their content. Central to the District Court's reasoning is the assumption that "it is far from clear that Texas has a compelling interest in preventing minors' access to every single category of speech restricted by SB 2420." *Id.* at 801. It's unlikely that the Court is right in its interpretation of the Act as a content-based regulation that triggers strict scrutiny. Yet even should the District Court, for the sake of argument, be right in its judgment that this law is a content-based restriction, it has failed to adequately reckon with the way courts have typically differentiated between the ways in which States are permitted to regulate the speech of adults versus minors.

Supreme Court Justice Clarence Thomas, following longstanding jurisprudence, made this clear in his dissent in *Brown v. Entertainment Merchants Association* (2011). Justice Thomas writes:

The historical evidence shows that the founding generation believed parents had absolute authority over their minor children and expected parents to use that authority to direct the proper development of their children. It would be absurd to suggest that such a society understood "the freedom of speech" to include a right to speak to minors (or a corresponding right of minors to access speech) without going through the minors' parents…The founding generation would not have considered it an abridgment of "the freedom of speech" to support parental authority by restricting speech that bypasses minors' parents. *Brown, et al. v. Entertainment Merchants Ass'n, et al.*, 564 U.S. 786 (2011) (Thomas, J. dissenting).

During the Founding, attitudes of children and parenthood were in flux. America was shifting from a more Puritan perspective of the child as "innately sinful" and the parent's primary goal as "suppressing their children's natural depravity" to a more Lockean view of the children as "blank slates requiring careful and deliberate development." *Id*. at 824-26. This shift, however, did not lead to a reduced or a weaker view of parental authority. Despite meaningful differences, the former laid the foundation for a strong view of American parental authority and duty which the latter, in many ways, preserved and strengthened.

Indeed, the Lockean idea of the child actually increased society's investment in the formation of children. As one scholar cited by Thomas noted, "the Revolution enhanced the importance of childrearing and education in ensuring social stability." *Id*. at 836. Both through social pressure and legal pressure, "teachers and schools came under scrutiny, and children's reading material was carefully supervised." *Id*. at 836.

Thus, as this shift occurred, the "same overarching principles remained" and, "[p]arents continued to have both the right and duty to ensure the proper development of their children…including control over the books that [they] read." *Id*. at 826. Indeed, these overarching principles continued to be reflected in laws supporting "parental authority and the sense that children were not fit to govern themselves." *Id*. Parents remained entitled, by law, to "the custody of their [children], "the value of th[e] [children's] labor and services" until they reached the age of majority, and "the right to the exercise of such discipline as may be requisite for the discharge of their sacred trust." *Id*. at 834 (internal quotes omitted) (citing *Washington v. Glucksberg*, 521 U.S. 702, 712 (1997). Likewise, in the Founding Era, children were not allowed to enlist in the military or be married under the age of 21 without parental consent.

Such a robust view of parental authority was not limited to the Founding Era. It has long been acknowledged by court precedent. The Supreme Court

declared that "[t]his primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). The state has an interest in preserving that fundamental right. A child's First Amendment right is particularly limited when it compares to the fundamental right to parent. As the Supreme Court acknowledged, "the child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Pierce v. Society of Sisters*, 268 U.S. 510 (1925). Indeed, the Supreme Court has found that parents have a fundamental right "in the companionship, care, custody, and management" of their children. *Id.* Further, the Court stated "[t]his primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Yoder*, 406 U.S. at 233. Given this, the Act's requirement that controls be made available to parents is perfectly acceptable.

Courts have long recognized that "legislature[s] [can] properly conclude that parents and others, teachers for example, who have … primary responsibility for children's well-being are entitled to the support of laws designed to aid discharge of that responsibility." *Ginsberg v. New York*, 390 U. S. 629, 639 (1968); *see also Bellotti v. Baird*, 443 U. S. 622, 635 (1979) (opinion of Powell, J.) To this end, "a State or municipality can adopt more stringent controls on communicative

materials available to youths than on those available to adults." *Erznoznik v. Jacksonville*, 422 U. S. 205, 212 (1975).

However, one need not be an originalist to adopt this view. Justice Stephen Breyer argued in his dissent in *Brown* that the Supreme Court had long recognized minors possess "'lack of maturity' and are 'more vulnerable or susceptible to negative influences and outside pressures,' and that their 'character . . . is not as well formed as that of an adult.'" *Brown*, 564 U.S. at 851 (Breyer, J. dissenting) (citing *Roper v. Simmons*, 543 U. S. 551, 569–570 (2005)). Because of this, there is "compelling interest in protecting the physical and psychological well-being of minors," and the "'regulatio[n] of communication addressed to [children] need not conform to the requirements of the [F]irst [A]mendment in the same way as those applicable to adults.'" *Ginsberg v. New York*, 390 U. S. at 638, n. 6 (1968).

As mentioned above, the District Court's assessment of this Act as a content-based restriction that is subject to strict scrutiny rests upon the presupposition that speech to minors (including a minor's speech) that bypasses parents is protected under the First Amendment. Such a presupposition, however, contradicts what the founders intended, and what the Supreme Court has historically maintained regarding speech to minors and of minors that bypasses their parents—namely, that it is not protected under the First Amendment in the same way that adults' speech is protected.

Thus, what is in question is not simply whether the state has "free-floating power to restrict the ideas to which children may be exposed," *Brown*, at 795—that is, whether the state has a compelling interest in restricting speech via S.B. 2420—but, more fundamentally, whether app stores and app developers have the right to speak to minors, and vice versa, without a parent present. Based on these findings, the answer can only be a resounding, "No," both from an originalist perspective and the historic precedent of the Supreme Court.

The District Court appears to have misunderstood what the Texas's App Store Accountability Act sought to accomplish. The law simply requires that any speech made to or by minors be done so in a manner that does not circumvent parents, but, rather, includes them. Ultimately, the law does not prohibit a minor from accessing any mobile app with the help of a parent. And, as noted above, it requires age verification methods that depend on data and technologies already in place, marking only a modest burden in any incidental encroachment upon adults' speech.

Furthermore, the state has a compelling interest in aiding parents in carrying out their duties by requiring app stores and app developers to perform age verification and acquire verifiable parental consent, especially when the digital context is one that disempowers parents. While the Supreme Court did not expressly address parental authority in its reasoning in *Paxton*, the justices

acknowledged (as already noted) that the character of technology today has become such that obscene content (from a minor's perspective) has become so accessible that it is unable to be sufficiently monitored and stopped by even the most tech-savvy parents. *Free Speech Coalition*, 606 U.S. at 496-97. As explained above, mobile apps similarly encroach on the meaningful ability of parents to carry out their responsibilities regarding the well-being of their children. By seeking to empower parents in a context that has eroded their authority, this Act represents a constitutionally legitimate exercise of state authority.

Beyond the digital sphere, courts have allowed states to safeguard children from these detrimental practices and uphold parental authority to oversee the relationships their children maintain with companies, without triggering First Amendment concerns. Indeed, the Supreme Court outlined a litany of them in *Paxton*. *Id.* at 478-80. It is bizarre that online contracts are somehow exempt from this traditional state power. Indeed, it should not be the case.

## CONCLUSION

For the following reasons, the Court should rule in favor of Defendant—Appellant.

*/s/ Joel Thayer*

JOEL L. THAYER
Counsel of Record
THAYER, PLLC
1255 Union Street NE
Seventh Floor
Washington D.C. 20009
(760) 668-0934
jthayer@thayer.tech
Attorney for *amicus curiae*

# CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2026, a true and correct copy of the foregoing Brief of Amici Curiae was served via electronic filing with the Clerk of Court and all registered ECF users.

May 26, 2026

/s/ Joel L. Thayer

JOEL L. THAYER
Counsel of Record
THAYER, PLLC
1255 Union Street NE
Seventh Floor
Washington D.C. 20009
(760) 668-0934
jthayer@thayer.tech
ATTORNEY FOR *AMICI CURIAE*

# CERTIFICATE OF COMPLIANCE

This brief has been prepared using 14-point, proportionately spaced, serif typeface, in Microsoft Word. Excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 4844 words.

/s/ Joel L. Thayer

JOEL L. THAYER
Counsel of Record
THAYER, PLLC
1255 Union Street NE
Seventh Floor
Washington D.C. 20009
(760) 668-0934
jthayer@thayer.tech
ATTORNEY FOR *AMICI CURIAE*