**No. 26-50001**

# In the United States Court of Appeals for the Fifth Circuit

No. 25-51073

STUDENTS ENGAGED IN ADVANCING TEXAS; M. F., BY AND THROUGH NEXT FRIEND VANESSA FERNANDEZ; Z. B., BY AND THROUGH NEXT FRIEND S.B.,

*Plaintiffs-Appellees*

*v.*

KEN PAXTON, IN HIS OFFICIAL CAPACITY AS THE TEXAS ATTORNEY GENERAL,

*Defendant-Appellant*

*consolidated with*

No. 26-50001

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION,

*Plaintiff-Appellee*

*v.*

KEN PAXTON, IN HIS OFFICIAL CAPACITY AS THE TEXAS ATTORNEY GENERAL,

*Defendant-Appellant*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

## RESPONSE BRIEF FOR PLAINTIFF-APPELLEE CCIA

ELIZABETH B. PRELOGAR
EPHRAIM A. MCDOWELL
JOSHUA REVESZ
  *Cooley LLP*
  *1299 Pennsylvania Ave., NW*
  *Washington, DC 20004*

BRIAN M. WILLEN
  *Counsel of Record*
LAUREN GALLO WHITE
EDWARD P. PERCARPIO
  *Wilson Sonsini*
  *Goodrich & Rosati, PC*
  *31 W. 52nd Street, Fifth Floor*
  *New York, NY 10019*
  *bwillen@wsgr.com*

LAURA LEE PRATHER
CATHERINE L. ROBB
MICHAEL J. LAMBERT
REID PILLIFANT
  *Haynes and Boone, LLP*
  *98 San Jacinto Blvd., Suite 1500*
  *Austin, Texas 78701*

DENO HIMONAS
ELIZABETH W. SHARKEY
  *Wilson Sonsini*
  *Goodrich & Rosati, PC*
  *95 S. State St., Ste. 1000*
  *Salt Lake City, UT 84111*

*Counsel for Computer & Communications Industry Association*

# CERTIFICATE OF INTERESTED PERSONS

## No. 26-50001

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. Plaintiff-Appellee CCIA has no parent corporation and no publicly held corporation owns 10% or more of their respective stock. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiff-Appellee:**
Computer & Communications Industry Association, a 501(c)(6) non-stock Virginia Corporation doing business as CCIA

**Counsel for CCIA Plaintiff-Appellee:**
Brian M. Willen (lead counsel)
Deno Himonas
Lauren Gallo White
Edward P. Percarpio
Elizabeth W. Sharkey
WILSON SONSINI GOODRICH & ROSATI

Elizabeth B. Prelogar
Ephraim A. McDowell
Joshua Revesz
COOLEY LLP

Michael Lambert
Reid Pillifant
Laura Lee Prather
Catherine Lewis Robb
HAYNES AND BOONE, LLP

i

**Defendant-Appellant:**
Ken Paxton, in his official capacity as Attorney General of Texas

**Counsel for Defendant-Appellant:**
Jeffrey A. Stephens
Zachary Berg
OFFICE OF THE ATTORNEY GENERAL

/s/   *Brian M. Willen*
Brian M. Willen

Attorney of Record for
Plaintiff-Appellee in 26-50001

ii

## STATEMENT REGARDING ORAL ARGUMENT

CCIA agrees with Defendant that oral argument would aid the Court in resolving the issues presented in this appeal.

**TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTERESTED PERSONS ..........................................i

STATEMENT REGARDING ORAL ARGUMENT ............................. iii

INTRODUCTION ......................................................................... 1

JURISDICTIONAL STATEMENT ................................................4

ISSUE PRESENTED ...................................................................4

STATEMENT OF THE CASE ......................................................4

I.    Background ...................................................................... 4

       A.    CCIA's App Store and App Developer Members
             Create and Facilitate Vast Amounts of Protected
             Speech............................................................................ 4

       B.    App Stores Disseminate Vast Amounts of
             Protected Speech and Information ............................... 5

       C.    CCIA Members Provide Numerous Protections for
             Parents and Children, Including Parental
             Controls and Age Ratings ............................................. 6

II.   SB2420 Restricts Speech at Three Chokepoints ................... 8

       A.    Chokepoint 1: Verification and Parental
             Tethering at Account Creation ..................................... 9

       B.    Chokepoint 2: Parental Consent for Each App
             Download ...................................................................... 10

       C.    Chokepoint 3: Ongoing Parental Consent for In-
             App Purchases and Significant Changes to App
             Terms........................................................................... 11

       D.    Age Rating and Display Requirements ....................... 13

       E.    Statutory Violations.................................................... 14

III.  Procedural History ............................................................. 15

SUMMARY OF ARGUMENT ................................................... 17

STANDARD OF REVIEW........................................................21

ARGUMENT ................................................................................22

I.    CCIA Is Likely to Succeed on the Merits of its First
      Amendment Challenge............................................................22

      A.    The Act's Verification and Consent Requirements
            Violate the First Amendment .....................................22

            1.    SB2420 Burdens Access to an
                  Unprecedented Amount of Protected Speech .....22

            2.    SB2420 Burdens Far More Than
                  Commercial Speech..............................................27

            3.    SB2420 Triggers Strict Scrutiny ........................33

                  a)    SB2420 is Content Based in its
                        Justification .............................................34

                  b)    The Parental Consent Requirements
                        are Content Based on their Face ...............37

            4.    The Verification and Consent Requirements
                  Cannot Withstand Any Form of Heightened
                  Scrutiny ...........................................................40

                  a)    Texas Has Made No Evidentiary
                        Record to Carry its Burden.......................42

                  b)    Whether Designed to Protect Against
                        Harmful Content or Promote Data
                        Privacy, SB2420 Is Not Appropriately
                        Tailored ....................................................43

                  c)    SB2420 Is Not Narrowly Tailored
                        Even to Provide Parental Control .............48

      B.    The Verification and Consent Requirements
            Cannot Be Severed.......................................................50

      C.    SB2420's Remaining Substantive Requirements
            are Separately Unconstitutional ................................53

            1.    SB2420's Age Rating Disclosure
                  Requirements Unconstitutionally Compel
                  Speech .............................................................53

a)    The Age Rating Requirements Trigger Strict Scrutiny.............................53

b)    The Age Rating Requirements Fail Under Any Form of Heightened Scrutiny....................................55

2.    SB2420's Age-Rating and Significant-Change Provisions Are Void for Vagueness. ......57

a)    The Age-Rating Provisions Are Vague......57

b)    The Significant-Changes Provision is Vague.........................................58

II.    The Scope of the Preliminary Injunction is Proper..............60

A.    Despite the State's Forfeiture, the District Court Conducted the Analysis Required by *Moody*...............60

B.    The Preliminary Injunction Does Not Violate *CASA*. .............................................................65

C.    The Remaining Factors Favor CCIA. ...........................65

CONCLUSION ...............................................................................67

CERTIFICATE OF SERVICE..............................................................69

CERTIFICATE OF COMPLIANCE........................................................69

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*303 Creative LLC v. Elenis,*
600 U.S. 570 (2023) ........................................................ 18, 23, 29

*Am. Acad. of Implant Dentistry v. Parker,*
860 F.3d 300 (5th Cir. 2017) ........................................................ 56

*Ashcroft v. ACLU,*
542 U.S. 656 (2004) ........................................................ 37

*Barr v. Am. Ass'n of Pol. Consultants, Inc.,*
591 U.S. 610 (2020) ........................................................ 38, 39, 40

*Bd. of Educ. v. Pico,*
457 U.S. 853 (1982) ........................................................ 24

*Bd. Trustees of State Univ. of N.Y. v. Fox,*
492 U.S. 469 (1989) ........................................................ 29

*Bolger v. Youngs Drug Products Corp.,*
463 U.S. 60 (1983) ........................................................ 29

*Book People, Inc v. Wong,*
692 F. Supp. 3d 660 (W.D. Tex. 2023) ........................................................ 59

*Book People, Inc. v. Wong,*
91 F.4th 318 (5th Cir. 2024) ........................................................ *passim*

*Boos v. Barry,*
485 U.S. 312 (1988) ........................................................ 37

*Brown v. Ent. Merchs. Ass'n,*
564 U.S. 786 (2011) ........................................................ *passim*

*Builder Recovery Servs., LLC v. Town of Westlake,*
650 S.W.3d 499 (Tex. 2022) ........................................................ 51, 53

*CCIA v. Paxton,*
814 F. Supp. 3d 787 (W.D. Tex. 2025) ........................ 43, 44, 63, 64

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv.*
*Comm'n of New York,*
447 U.S. 557 (1980) ....................................................................56

*Cincinnati v. Discovery Network, Inc.,*
507 U.S. 410 (1993) ....................................................................34

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
596 U.S. 61 (2022) ......................................................................41

*City of Ladue v. Gilleo,*
512 U.S. 43 (1994) .......................................................... 27, 45, 48

*Dairyland Cnty. Mut. Ins. Co. v. Roman,*
498 S.W.2d 154 (Tex. 1973)........................................................46

*Ent. Software Ass'n v. Blagojevich,*
469 F.3d 641 (7th Cir. 2006) ......................................................54

*Free Speech Coal. Inc. v. Paxton,*
606 U.S. 461 (2025) ............................................................ *passim*

*Free Speech Coal. v. Paxton,*
95 F.4th 263 (5th Cir. 2024)............................................ 43, 55, 57

*Ginzburg v. United States,*
383 U.S. 463 (1966) ....................................................................29

*Hines v. Pardue,*
117 F.4th 769 (5th Cir. 2024)......................................................41

*Joseph Burstyn, Inc. v. Wilson,*
343 U.S. 495 (1952) ....................................................................23

*Masterpiece Cakeshop v. Colo. Civil Rights,*
584 U.S. 617 (2018) ....................................................................55

*McClelland v. Katy Indep. Sch. Dist.,*
63 F.4th 996 (5th Cir. 2023)........................................................57

*McCullen v. Coakley*,
573 U.S. 464 (2014) ........................................................................ 41

*Moody v. NetChoice LLC*,
603 U.S. 707 (2024) ............................................................. *passim*

*Nat'l Inst. of Family & Life Advocates ("NIFLA") v. Becerra*,
585 U.S. 755 (2018) ................................................................ 40, 53

*NetChoice v. Carr*,
789 F. Supp. 3d 1200 (N.D. Ga. 2025) .................................... 33, 59

*Netchoice, LLC v. Fitch*,
34 F.4th 799 (5th Cir. 2025) ................................................... 62, 63

*NetChoice v. Yost*,
778 F. Supp. 3d 923 (S.D. Ohio 2025) ........................................... 33

*Nken v. Holder*,
556 U.S. 418 (2009) ....................................................................... 67

*Packingham v. N. Carolina*,
582 U.S. 92 (2017) ............................................................. 6, 24, 45

*Randall v. Sorrell*,
548 U.S. 230 (2006) ...................................................................... 40

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ................................................. 18, 35, 37, 38

*Reno v. ACLU*,
521 U.S. 844 (1997) .................................................................. 5, 65

*Renton v. Playtime Theatres, Inc.*,
475 U.S. 41 (1986) ........................................................................ 34

*Riley v. Nat'l Fed. Of the Blind of N.C., Inc.*,
487 U.S. 781 (1988) ...................................................................... 54

*Robinson v. Ardoin*,
37 F.4th 208 (5th Cir. 2022) ......................................................... 17

*Rollins v. Home Depot USA, Inc.,*
  8 F.4th 393 (5th Cir. 2021)................................................................. 61

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
  592 U.S. 14 (2020) ............................................................................66

*Smith v. California,*
  361 U.S. 147 (1959) ..........................................................................24

*Sorrell v. IMS Health Inc.,*
  564 U.S. 552 (2011) ................................................................. *passim*

*Spiritual Psychic Science Church v. City of Azusa,*
  39 Cal.3d 501 (1985)..........................................................................31

*State v. Biden,*
  10 F.4th 538 (5th Cir. 2021)............................................................. 68

*Texans for Free Enter. v. Texas Ethics Comm'n,*
  732 F.3d 535 (5th Cir. 2013) ........................................................... 67

*Trump v. CASA, Inc.,*
  606 U.S. 831 (2025) .......................................................... 21, 60, 65

*Turner Broad Sys., Inc. v. FCC,*
  520 U.S. 180 (1997) ................................................................. 41, 44

*United States v. Cotton,*
  535 U.S. 625 (2002) ......................................................................... 61

*United States v. Playboy Ent. Grp.,*
  529 U.S. 803 (2000) ......................................................................... 37

*United States v. Virginia,*
  518 U.S. 515 (1996) ................................................................. 18, 42

*Va. Pharmacy Bd. v. Va. Consumer Council,*
  425 U.S. 748 (1976) .........................................................................29

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
455 U.S. 489 (1982) ...................................................................... 57

*Villas v. City of Farmers Branch*,
726 F.3d 524 (5th Cir. 2013) ......................................................... 51

*Washington v. Associated Builders & Contrs. of S. Tex.*,
621 S.W.3d 305 (Tex. App. 2021) ................................................. 51

*X Corp. v. Bonta*,
116 F.4th 888 (9th Cir. 2024) ........................................................ 54

## STATUTES

15 U.S.C. § 6501 ............................................................................. 8

15 U.S.C. § 6501(2)(A) ................................................................. 47

15 U.S.C. § 6502 ............................................................................. 8

15 U.S.C. § 6503 ............................................................................. 8

15 U.S.C. § 6504 ............................................................................. 8

15 U.S.C. § 6505 ............................................................................. 8

28 U.S.C. § 1292(a)(1) ................................................................... 4

28 U.S.C. § 1331 ............................................................................. 4

28 U.S.C. § 1343(a) ........................................................................ 4

Tex. Bus. & Com. Code § 121.002 ....................................... *passim*

Tex. Bus. & Com. Code § 121.021 ............................... 9, 14, 38

Tex. Bus. & Com. Code § 121.022 ....................................... *passim*

Tex. Bus. & Com. Code § 121.023 ........................................... 14

Tex. Bus. & Com. Code § 121.024 ........................................... 11

Tex. Bus. & Com. Code § 121.025 .................................... 9, 33, 52

Tex. Bus. & Com. Code § 121.026 ................................................ *passim*

Tex. Bus. & Com. Code § 121.051 ...................................................... 5, 8

Tex. Bus. & Com. Code § 121.052 ................................................. 14, 53

Tex. Bus. & Com. Code § 121.053 ............................................ 13, 52, 59

Tex. Bus. & Com. Code § 121.054 ................................................. 11, 52

Tex. Bus. & Com. Code § 121.055 ................................................. 33, 52

Tex. Bus. & Com. Code § 121.056 ....................................... 14, 15, 33, 52

Tex. Bus. & Com. Code § 541.101(a)(4) ............................................. 46

Texas Data Privacy And Security Act ............................................ 8, 47

## RULES

16 C.F.R. § 312.3 ............................................................................ 46

## INTRODUCTION

This case is about Texas's attempt to age-gate an entire ecosystem of speech because it fears children may be exposed to content the State deems harmful. Texas Senate Bill 2420 ("SB2420") imposes a sweeping age-verification and parental-consent mandate on mobile app stores and nearly all mobile apps. The law restricts access to expressive content; it does not regulate contracts, data privacy, or commercial speech. Where, as here, a statute is justified by the State's desire to regulate speech and contains content-based exemptions, it is subject to strict scrutiny. SB2420 cannot survive that review—or any form of heightened scrutiny.

Imagine a brick-and-mortar analog to SB2420: a state law that required every bookstore, library, movie theater, video rental store, record shop, concert hall, arcade, and newsstand to verify the age of every patron at the door and then required parental consent before those under 18 could enter. Once inside, the parent would have to separately provide consent for every item the minor wished to buy, be it a book by Ernest Hemingway or J.K. Rowling, a Taylor Swift album, or a subscription to National Geographic. That law would be unconstitutional: the Supreme Court has squarely held that the First Amendment prohibits states from

1

enacting laws "to prevent children from hearing or saying anything without their parents' prior consent." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011) (emphasis omitted).

Yet that is exactly what Texas has done here. Under SB2420, everyone in Texas with a smartphone will have to submit to age verification before they can download a single app—be it a newspaper, digital library, Bible study guide, music streaming or podcasting platform, weather forecaster, calculator, or anything else. And any user under 18 must link his account to a verified parent's account and obtain the parent's express consent for *any* app download or *any* in-app purchase—every audiobook, every movie, and so on—without any possibility of blanket consent.

Whether justified as protecting minors from harmful content or from data-privacy concerns, SB2420's blunderbuss mandates are perhaps the most indiscriminate conceivable way of advancing either goal. The Act does not target unprotected speech or apps purportedly harmful to minors. Nor does it regulate the provisions that app stores or developers can include in their contracts or the data that they can collect and use as part of their regular operations.

Texas offers no plausible justification for the law's overbreadth. It built no evidentiary record to justify the law's utter lack of tailoring or its extensive burdens on app stores, developers, and users—as is its burden. In fact, in the district court, the State admitted that its approach does not stem from any legislative judgment that all apps are harmful or raise privacy concerns, but instead was crafted as a legal dodge, because the bill's sponsor sought to evade strict scrutiny. Even still, SB2420 is inescapably content-based, given both the justifications for the law and its preferential treatment for apps involving emergency services and standardized tests. And it does not pass First Amendment muster, no matter whether strict of intermediate scrutiny applies.

The district court was correct to preliminarily enjoin enforcement of the law. And the statute is not severable: the constitutional defect lies in the overbroad age verification and parental consent provisions, without which the Act could not function. In addition, the law's other substantive provisions—an age-rating mandate and a notice requirement—are vague and unconstitutionally compel speech. Finally, Texas has forfeited its objections to the scope of Appellee's challenge, which are in any event meritless.

3

This Court should affirm.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## ISSUE PRESENTED

Whether the District Court abused its discretion in preliminarily enjoining Defendant from enforcing SB2420.

## STATEMENT OF THE CASE

### I.    Background

#### A.    CCIA's App Store and App Developer Members Create and Facilitate Vast Amounts of Protected Speech

CCIA is a trade organization whose members include popular mobile app stores and leading app developers, who create and offer mobile apps for download in app stores. ROA.26-50001.392-93 ¶¶ 3, 5-6, ROA.26-50001.398-99 ¶ 28.

An app store is a digital publishing service where software developers can upload apps, and users can discover and download those apps onto their devices. ROA.26-50001.415 ¶ 6. The app stores operated by CCIA members that are regulated by SB2420 are: (1) Google Play; (2)

the Apple App Store; and (3) the Amazon Appstore. ROA.26-50001.392-98 ¶¶ 5-27; ROA.26-50001.414 ¶ 2.

CCIA's app developer members operate apps that include email apps like Gmail, video-viewing and sharing apps like YouTube, e-book or audiobook apps like Kindle and Audible, and apps that allow users to communicate and obtain information on a wide variety of topics (e.g., IMDb, Goodreads, Twitch). ROA.26-50001.392 ¶¶ 4-5, ROA.26-50001.395 ¶ 14, ROA.26-50001.397 ¶ 21.

The Act regulates both CCIA's member app stores (Tex. Bus. & Comm. Code § 121.002(2)) and CCIA's member developers (§ 121.051). ROA.26-50001.392-99 ¶¶ 5-28, ROA.26-50001.411-12 ¶¶ 49-53.

## B. App Stores Disseminate Vast Amounts of Protected Speech and Information

Apps are to smartphones what websites are to computers: mediums for speech "as diverse as human thought." *Reno v. ACLU*, 521 U.S. 844, 870 (1997) (citation omitted); ROA.26-50001.400-01 ¶ 31 (discussing how Google Play and Apple App Store are used by billions of users in over 175 regions worldwide); ROA.26-50001.416-20 ¶¶ 10-16 (discussing speech-facilitating apps in Google Play with billions of downloads). Mobile apps allow users to access, create, and exchange an enormous quantity of

5

speech and protected expression: news and political material; religious material; scientific material; educational content; social media; personal writing; expressive media such as books, magazines, movies, television, short-form video, and music; as well as art, games, and much more. ROA.26-50001.399-400 ¶¶ 29-30; ROA.26-50001.416-17 ¶ 10.

As browsers do for websites, app stores make all this speech possible. They are curated publishing services where users find, review, and securely download the mobile apps that best suit their interests. ROA.26-50001.416-19 ¶¶ 8, 12-15. App stores provide a gateway for millions of developers to disseminate content to reach their audiences. ROA.26-50001.419-22 ¶¶ 16-20. In this way, app stores offer a "relatively unlimited, low-cost capacity for communication of all kinds . . . to users engaged in a wide array of protected First Amendment activity on any number of diverse topics." *Packingham v. N. Carolina*, 582 U.S. 92, 98 (2017) (cleaned up); *see also* ROA.26-50001.420-22 ¶¶ 18-20.

### C. CCIA Members Provide Numerous Protections for Parents and Children, Including Parental Controls and Age Ratings

Parents have many ways to control their children's online experiences. That includes through various tools voluntarily created by

CCIA's member app stores, which enable parents to control their children's exposure to apps and content. For example, app stores offer granular controls that allow parents to lock their children's screens for bedtime, block unwanted apps, filter accessible content by age category, and set up an approval process for purchases and downloads, among other tools. *See* ROA.26-50001.404-05 ¶ 37; ROA.26-50001.425-26 ¶ 31.

CCIA's member app stores provide additional protections for apps primarily directed to users under the age of 13. The stores require that those apps contain only age-appropriate content, protect children's data, and implement parental gates to link out of the app, request permissions, or make in-app purchases. ROA.26-50001.403-05 ¶¶ 36-37. App stores also have adopted policies to ascribe age ratings for apps based on their content. ROA.26-50001.401-02 ¶ 34. For instance, Apple requires developers to fill out a questionnaire about an app's content themes, and then sets an age rating using its own rating system. ROA.26-50001.401-02 ¶ 34; ROA.26-50001-342. Google Play requires the same of developers, and uses the International Age Rating Coalition's rating system. ROA.26-50001.426-27 ¶ 33.

7

Similarly, many apps themselves offer robust parental controls—including content filters, screen time limits, and supervised accounts. *See* ROA.26-50001.405 ¶ 38; ROA.26-50001.436-37 ¶¶ 8-12.

On top of these voluntary measures, other laws—such as the federal Children's Online Privacy Protection Act ("COPPA") and the Texas Data Privacy and Security Act ("TDPSA")—impose additional disclosure, parental-consent, and data-protection requirements on app stores and app developers that collect and process children's personal data. 15 U.S.C. §§ 6501–6505.

## II.    SB2420 Restricts Speech at Three Chokepoints

SB2420 regulates (1) "[a]pp [s]tores," defined as "publicly available . . . software application[s] . . . that distribute[] software applications from the owner or developer of an [app] to the user of a mobile device," § 121.002(2); and (2) "software application developers" defined as "developer[s] of [] software application[s] that the developer makes available to users in [Texas] through an app store," § 121.051. The Act imposes distinct but overlapping requirements on app stores and developers to restrict access to apps, centered around age verification and parental consent. These access gates restrict speech at three chokepoints.

### A. Chokepoint 1: Verification and Parental Tethering at Account Creation

*Age verification.* Before any person—whether they are 13, 35, or 60—can create an account to access an app store, the app store must "use a commercially reasonable method of verification to verify the individual's age category." § 121.021(a). App stores must sort account holders into designated "age categories," § 121.021(b), and protect the personal data collected through this process, *see* § 121.025.

*Parental identity verification and account tethering.* Next, if a user cannot sufficiently prove that he is over 18 at the age-verification step, SB2420 forces the user to link his account to that of a parent or guardian. The parent or guardian must then prove that they (1) are an "adult," i.e., over 18 years old, and (2) have legal authority over the minor. § 121.022(b)(1)-(2).

The law does not make clear how app stores are supposed to verify that an "adult" seeking affiliation with a minor's account is a parent or legal guardian. Parents often have different last names than their children and may have a different address, and most children do not have government IDs. Moreover, children in foster care or nontraditional family situations may not have a legal guardian who is able or willing to

be linked to the child's account. *See* ROA.26-50001.409 ¶ 46; ROA.26-50001.429-30 ¶ 41. These children will be barred from accessing app-based speech and using apps to engage in their own speech. ROA.26-50001.428-29 ¶ 39; ROA.26-50001.431-32 ¶¶ 44, 47.

## B. Chokepoint 2: Parental Consent for Each App Download

The age and parental-verification requirements at the first chokepoint power the Act's ongoing parental consent requirements, which are triggered "for each individual download" of any app, regardless of whether that download is free. § 121.022(d)-(e). The Act expressly forbids app stores from allowing parents to provide blanket consent for multiple purchases or downloads, § 121.026(a)(3).

The Act provides two content-based exceptions to this parental consent requirement for certain apps favored by the State: (1) apps that "provide[] … direct access to emergency services" and that meet additional criteria, and (2) nonprofit-affiliated apps that develop, sponsor, or administer standardized testing for post-secondary education. § 121.022(h).

Apart from these two exceptions, parents must review and approve the download of all apps—even if they directly implicate protected speech.

Thus, parents must approve a 17-year-old's download of the Audible app, which provides access to countless audiobooks and podcasts, or apps facilitating Bible study or providing information about current events. *See* ROA.26-50001.437 ¶¶ 13-17; ROA.26-50001.411-12 ¶¶ 50, 53. This process is especially cumbersome because parents must separately authorize the download of every individual app and cannot provide blanket consent for certain categories of apps.

Further, SB2420 requires app stores to share age category and parental-consent data with app developers, who are then required to "create and implement a system" to verify (1) the age category assigned to app users, and (2) for minor users, whether parental consent has been obtained. §§ 121.024, 121.054(a)-(b). These provisions necessitate the sharing of users' personal data with a wide range of developers who have varying levels of digital security and sophistication. ROA.26-50001.431 ¶ 45; ROA.26-50001.437 ¶¶ 12, 17.

### C.    Chokepoint 3: Ongoing Parental Consent for In-App Purchases and Significant Changes to App Terms

SB2420 further requires app stores to obtain parental consent for all minor users for every in-app purchase within every single app. § 121.022(e)(1). This interjects ongoing parental consent for continued

11

access to speech within apps that parents already approved. It imposes a particularly outsized burden on apps whose models of speech dissemination rely on in-app purchases. ROA.26-50001.435 ¶ 4, ROA.26-50001.437-38 ¶¶ 13, 18. For example, minors must request parental consent every time they want to purchase a new book from the Kindle app, rent movies on Prime Video, or subscribe to certain authors on Substack—as well as make purchases within thousands of innovative apps with offerings ranging from language courses to guided museum tours to meditation instruction. *See* ROA.26-50001.420-22 ¶ 18. Again, blanket consent is forbidden, so the Act prevents parents from choosing their preferred level of supervision over their teen's engagement with content, or providing consent on a category-based level—functionalities that existing parental controls offer. ROA.26-50001.432-33 ¶ 48.

Additionally, whenever a developer makes a "significant change" to its app or to its terms of service or privacy policy, the app store must pause the minor's access to the app until the parent renews consent. §§ 121.022(g), 121.053. A "significant change" is one that (1) changes the "type or category of personal data" the developer collects, stores, or shares; (2) changes the app's age rating or the content or elements that led to the

12

rating; (3) adds new monetization features (including "new opportunities to make a purchase" or "new advertisements" in the app); or (4) makes "material[] changes" to the app's "functionality or user experience." § 121.053(a)-(b).

This requirement imposes onerous burdens on app stores and developers. Section 121.053(a)(2) requires developers to perform continuous content and age rating assessments. Each notice from a developer renders the parent's prior consent stale, and requires app stores to then notify all minor users' parents and obtain renewed consent before those users can "continue[] [to] use" the app. § 121.022(g).

### D.    Age Rating and Display Requirements

In addition to the three speech chokepoints imposed by the verification and consent provisions, the Act imposes further duties (and costs) on developers and app stores to implement an age rating system and display it to users. *See* ROA.26-50001.410 ¶ 47; ROA.26-50001.438-39 ¶¶ 19-31. Developers must assign an age rating to every app—and every item available for purchase within every app—based on four age categories: (1) younger than 13 ("child"); (2) at least 13 and younger than 16 ("younger teenager"); (3) at least 16 and younger than 18 ("older

teenager"); and (4) at least 18 ("adult"). §§ 121.052(a), 121.021(b). The Act provides no further guidance on how to determine or implement age ratings.

Developers must then provide app stores with their designated ratings and the "specific content or other elements that led to each rating[.]" § 121.052(b). That means, for example, that Audible seemingly would have to rate the age-appropriateness of the million-plus audiobooks available for purchase on its app and explain its rationale for each one. And notwithstanding the absence of guidance and requirement to rate third-party content, developers are liable if they "knowingly misrepresent[] an age rating or reason for that rating." § 121.056(a)(2). The Act compels app stores to disclose the age rating assigned by the developer and the specific content that led to the rating. §§ 121.023(a)-(b); 121.022(f)(1).

### E.    Statutory Violations

Any violation of SB2420 constitutes "a deceptive trade practice" under the Texas Deceptive Trade Practices Act enforceable by the Texas Attorney General's Office, in addition to "any other action or remedy provided by law." §§ 121.101-102. Parents may also sue for violations of

14

the Act and obtain injunctive relief, actual and punitive damages, and attorneys' fees and costs. *Id.* Additionally, the Act forbids app stores and developers from: (1) enforcing "a contract or a provision of a terms of service agreement against a minor that the minor entered into or agreed to without consent," §§ 121.026(a)(1), 121.056(a)(1); (2) knowingly misrepresenting "information disclosed" to parents and guardians regarding apps and purchases, §§ 121.026(a)(2), 121.056(a)(2); and (3) sharing or disclosing personal data obtained for purposes of verification or consent, §§ 121.026(a)(4), 121.056(a)(3).

## III.   Procedural History

SB2420 was slated to go into effect on January 1, 2026. ROA.26-50001.546. On October 16, 2025, CCIA sued to enjoin SB2420's enforcement. ROA.26-50001.16-62. CCIA simultaneously moved for a preliminary injunction, backed by declarations attesting to the robust First Amendment activity on CCIA's members' app stores and apps and how the Act would burden access to and dissemination of speech for app stores, developers, and users. ROA.26-50001.327-82. The State opposed CCIA's motion, but declined to introduce any evidence to support the constitutionality of the Act or respond to CCIA's evidence.

On December 16, 2025, the District Court held a hearing on CCIA's motion for a preliminary injunction. The State again declined to introduce any evidence, admitted the purpose of the Act was to protect children from harmful content that might be found in certain apps, and "conceded . . . CCIA has standing to bring its challenge against SB 2420." ROA.26-50001.1161, ROA.26-50001.1295:24-1296:13.

On December 23, 2025, the District Court preliminarily enjoined the State from enforcing the Act, concluding that CCIA was likely to succeed on the merits of its First Amendment claims. The Court made several factual findings, including, as "Texas acknowledged at the hearing," that "SB2420 specifically sought to shield minors from certain speech the State deems objectionable or harmful." ROA.26-50001.1162. The Court further explained that the record was devoid of "any evidence connecting the Act's goals to its methods." ROA.26-50001.1167.

Texas appealed, though it then waited several weeks to seek a stay of the ruling from the District Court, which that court denied. On June 4, 2026, a motions panel of this Court granted Texas's motion to stay the preliminary injunction pending appeal, allowing the Act to go into immediate effect. ECF No. 91-1 at 10-11. The motions panel's rulings "do

16

not bind the merits panel." *Robinson v. Ardoin*, <u>37 F.4th 208, 232</u> (5th Cir. 2022).

## SUMMARY OF ARGUMENT

**I.** The District Court correctly found that CCIA is likely to succeed on the merits of its First Amendment challenge.

**A.** Texas accepts that SB2420 burdens protected speech but argues that intermediate scrutiny applies because the Act merely regulates commercial speech. Not so. Commercial speech "does no more than propose a commercial transaction" and involves "[e]xpression related solely to the economic interests of the speaker and its audience." *Book People, Inc. v. Wong*, <u>91 F.4th 318, 339</u> (5th Cir. 2024) (cleaned up). Creating and disseminating mobile apps, which encompass a vast range of protected speech—from news, political, and social commentary, religious instruction, factual information, and expressive and creative material of all kinds—is nothing like the advertising or solicitation that counts as commercial speech. *Cf. id.* Nor does that activity become commercial speech merely because some of those apps are offered for payment. *See, e.g.*, *303 Creative LLC v. Elenis*, <u>600 U.S. 570, 594</u> (2023).

17

Instead, strict scrutiny applies to the entire Act because the law has a content-based justification—to protect minors from mobile apps that the state deems harmful because of their expressive content. *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015). Additionally, strict scrutiny applies to the verification and consent provisions because they contain content-based exceptions and directly burden protected, non-commercial speech. Strict scrutiny also applies to the age rating provisions because they compel non-commercial speech of state-dictated content.

**B.** Neither SB2420 nor its verification and consent provisions can withstand any form of heightened scrutiny (whether strict or intermediate).

Texas has built no record whatsoever to meet its "burden of justification" demonstrating that its regulation of speech is appropriately tailored to serve its purported interests. *United States v. Virginia*, 518 U.S. 515, 533 (1996).

By contrast, the record is replete with evidence of the law's massive burdens on protected speech and the availability of less restrictive and equally (indeed more) effective legislative and technical alternatives. If Texas sought to protect children from certain apps it thinks potentially

18

harmful, to regulate the terms of commercial contracts, or to enhance minors' data-privacy, it could have tailored its law to address those specific concerns—rather than imposing a blunderbuss mandate that broadly restricts access to virtually the entire world of mobile apps and in-app content. And if Texas sought to provide parental controls over children's access to apps, it should have made a record that an actual gap needed to be filled—notwithstanding the existing voluntary tools that do exactly that. Instead, SB2420's onerous verification and consent requirements deprive parents of choice in favor of "what the State thinks parents *ought* to want." *Brown*, 564 U.S. at 803-04. On top of its rampant overbreadth, the Act is underinclusive by blocking only *mobile* apps while doing nothing to prevent minors from accessing the same services and content—and entering into terms of service and sharing personal data— via a web browser on a mobile device (or a web browser or app on a non-mobile device).

Severability principles do not save SB2420. Severing the content-based exceptions would not cure the Act's content-based justification. The age-verification and parental-consent requirements violate any form of heightened scrutiny and are not severable from each other or from the

19

Act as a whole. And, without those central provisions, the remainder of the Act could not function.

**C.** Aside from the verification and consent provisions, SB2420's remaining substantive duties also violate the First Amendment.

The age-rating requirements unconstitutionally compel speech by forcing app developers to rate the age-appropriateness of their apps and all in-app purchases based on their content and according to the State's prescribed age categories. Because the age-rating provisions are content-based, they trigger strict scrutiny. Regardless, they cannot withstand even intermediate scrutiny because Texas has not justified displacing the robust industry solutions already in place with its new age-rating system. *Book People*, 91 F.4th at 340-41 (striking down age-rating requirement for book sellers).

Separately, the District Court correctly found that the age-rating and notice-of-significant-changes provisions are unconstitutionally vague.

**II.A.** The District Court correctly enjoined enforcement of the Act in its entirety. Texas did not argue below that CCIA's facial challenge to the provisions targeting app stores failed to satisfy *Moody*, thus forfeiting

that argument on appeal. Regardless, the District Court correctly applied *Moody* in finding that the law's unconstitutional applications substantially outweighed the constitutional ones. The app store provisions target a discrete set of services and impose on those stores an across-the-board age-verification and parent-content requirement that burdens speech in a wholly untailored way. That mandate is unconstitutional as applied to any app store, and the state identifies no constitutional application.

**B.** The District Court's preliminary injunction is not an impermissible "universal injunction" under *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). Texas did not raise this argument below, but regardless, no narrower injunction could "provide complete relief" to CCIA's app store and developer members. *Id.* at 861.

**C.** The remaining preliminary injunction factors favor affirmance given the burdens that SB2420 places on app stores and developers and Texas's nonexistent interest in enforcing an unconstitutional law.

## STANDARD OF REVIEW

This Court "review[s] the district court's grant of preliminary injunction for abuse of discretion, reviewing underlying factual findings

21

for clear error and legal conclusions de novo." *Book People*, <u>91 F.4th at 328</u> (cleaned up).

## ARGUMENT

### I.    CCIA Is Likely to Succeed on the Merits of its First Amendment Challenge

CCIA is likely to succeed on the merits. SB2420 burdens an unprecedented amount of protected, non-commercial speech. Because it is content-based in its justification and on its face, SB2420 triggers strict scrutiny. Yet SB2420 would fail even under intermediate scrutiny: The government has made no record to show that this overbroad and underinclusive law is appropriately tailored to serve its purported interests.

### A.    The Act's Verification and Consent Requirements Violate the First Amendment

#### 1.    SB2420 Burdens Access to an Unprecedented Amount of Protected Speech

"All manner of speech—from pictures, films, paintings, drawings, and engravings, to oral utterance and the printed word—qualify for the First Amendment's protections; no less can hold true when it comes to speech … conveyed over the Internet." *303 Creative*, <u>600 U.S. at 587</u> (cleaned up). This list is by no means exhaustive: the Court has also

recognized that video games, social media, and information to inform marketing efforts constitute protected speech. *Brown,* 564 U.S. at 790; *Moody v. NetChoice LLC*, 603 U.S. 707, 728 (2024); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). And "whatever the challenges of applying the Constitution to ever-advancing technology, 'the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary' when a new and different medium for communication appears." *Brown*, 564 U.S. at 790 (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952)).

The mobile apps developed by CCIA's members embody protected expression in their own right and facilitate an immense volume of protected speech created by others. *See supra* Section I; ROA.26-50001.399-401 ¶¶ 29-32. Texas does not contest that mobile apps, including those provided by CCIA's members, enable a "wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Packingham*, 582 U.S. at 105. Users of mobile apps and app stores are also protected by the First Amendment when they produce speech on apps (e.g., publishing a blog on Substack or a video on YouTube) and when they access any one of the types of constitutionally

23

protected speech discussed above. *Free Speech Coal. Inc. v. Paxton*, 606 U.S. 461, 482-83 (2025); *Brown*, 564 U.S. at 799.

Nor does Texas contest that app stores themselves have First Amendment rights as the distributors of a vast range of expression. The Supreme Court has long recognized that both "the creation and dissemination of information are speech." *Sorrell*, 564 U.S. at 570; *accord Bd. of Educ. v. Pico,* 457 U.S. 853, 867 (1982) (plurality op.) ("The right of freedom of speech and press ... embraces the right to distribute literature"). For much the same reason that bookstores receive First Amendment protection for distributing books, app stores receive protection for distributing mobile apps. *See Smith v. California,* 361 U.S. 147, 150 (1959) ("publication and dissemination of books and other forms of the printed word furnish very familiar applications of these constitutionally protected freedoms").

That is all the more so because app stores exercise judgment over what third-party apps to include and distribute through their services, including when disseminating lawful speech to minors. *See* ROA.26-50001.403-05 ¶¶ 36-37; *Moody*, 603 U.S. at 731-32. In turn, the government may only "bar [that] public dissemination of protected

24

materials" to "minors" "in relatively narrow and well-defined circumstances." *Brown*, 564 U.S. at 794 (cleaned up). "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.* at 795.

SB2420 burdens the speech rights of app stores, developers and their users. The core of the Act—its interlocking series of age verification, parental identity verification, and parental consent requirements—burdens large swaths of constitutionally protected speech. These mandates are very different from—and far more onerous than—the age-gate on porn sites that the Supreme Court addressed in *Free Speech Coalition*, 606 U.S. at 466, which targeted speech that was *unprotected* for minors. Unlike the focused law in *Free Speech Coalition*, SB2420 targets all speech on virtually all apps–the vast majority of which will be *protected* for minors.

In multiple ways, SB2420's preclearance regime seriously restricts the ability of stores and developers to disseminate protected speech through apps and in-app content, and it blocks users from speaking and accessing protected speech through apps.

*First*, the Act's age-verification provision burdens access by *all* users to *all* speech within app stores by requiring them to verify their age before being able to download *any* app. *Free Speech Coalition* makes clear that when someone has a constitutional right to access certain forms of speech, "submitting to age verification is a burden on the exercise of that right." *Id.* at 483. And, of course, "lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content." *Sorrell*, 564 U.S. at 566 ("content-based burdens must satisfy the same rigorous scrutiny as . . . content-based bans"); *accord Free Speech Coal.*, 606 U.S. at 493 n.12 ("for *fully protected speech*, "the distinction between bans and burdens makes no difference to the level of scrutiny") (citation omitted).

*Second*, the Act imposes further burdens on minors' rights to access protected speech by requiring them to obtain parental consent before being able to download an app or purchase any in-app content. *Brown*, 564 U.S. at 795 n.3. Those requirements apply to virtually all apps and in-app content. That burden is additionally imposed on parents, who must verify their relationship to their minor children (the Act does not specify how) and then individually approve every single app and in-app

purchase to facilitate access to that speech. Notably, blanket approval is not permitted—meaning that a 17-year-old voracious reader would need to obtain parental consent each time she purchases a book.

*Third*, minors' access rights are further burdened through the provision requiring developers to notify app stores of so-called "significant changes," as app stores must then effectively pause the minor's already-approved access to speech until the parent renews consent. ROA.26-50001.433 ¶ 49.

In short, SB2420 directly regulates access to and the dissemination of all manner of fully protected speech. And where, as here, a law "foreclose[s] an entire medium of expression," it raises "particular concern" under the First Amendment. *City of Ladue v. Gilleo*, 512 U.S. 43, 55 (1994); *see id.* (citing cases). Indeed, although "prohibitions foreclosing entire media may be completely free of content or viewpoint discrimination, the danger they pose to the freedom of speech is readily apparent." *Id.*

### 2. SB2420 Burdens Far More Than Commercial Speech

Texas's central argument is that the law regulates only commercial speech, and therefore intermediate scrutiny should apply. Br. 17-23. The

theory is that the Act regulates account-creation on app stores and that "app store transactions are commercial in nature." Br. 18. The motions panel agreed, reasoning that even apps downloaded for free receive "payment" in the form of "access to user data and private information." ECF No. 92 at 3.

This approach fundamentally misunderstands and misapplies commercial-speech principles. Commercial speech is a narrow category of speech that "does no more than propose a commercial transaction," and involves "[e]xpression related solely to the economic interests of the speaker and its audience." *Book People*, 91 F.4th at 339 (cleaned up). Thus, recognizing that "[s]ome of our most valued forms of fully protected speech are uttered for a profit," the Supreme Court has consistently distinguished "speech for a profit," which is fully protected, from "speech that proposes a commercial transaction, which is what defines commercial speech." *Bd. Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482 (1989)); *accord Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 67 (1983) ("[T]he fact that Youngs has an economic motivation for mailing the pamphlets would clearly be insufficient by itself to turn the materials into commercial speech."). In *303 Creative*, for example, the

Court made clear that it was irrelevant to the First Amendment analysis that a website designer "offers her speech for pay" or otherwise "seeks profit." 600 U.S. at 594, 600. The Court explained that these principles underlie "cases involving everything from movie producers to book publishers to newspapers." *Id*. at 594.

Simply put, "commercial activity, in itself, is no justification for narrowing the protection of expression secured by the First Amendment." *Ginzburg v. United States*, 383 U.S. 463, 474 (1966) ("No weight is ascribed to the fact that petitioners have profited from the sale of publications"); *accord Va. Pharmacy Bd. v. Va. Consumer Council*, 425 U.S. 748, 761 (1976) ("speech does not lose its First Amendment protection … even though it may involve a solicitation to purchase or otherwise pay or contribute money"). The fact that expressive material is offered for sale does not make laws limiting access to that material commercial-speech regulation.

The Supreme Court's decision in *Brown* confirms that the law here does not regulate commercial speech. There, the Court applied strict scrutiny to a law prohibiting stores from *selling* or *renting* certain video games to minors. 564 U.S. at 794. Texas argues that *Brown* is irrelevant

because it "does not discuss commercial speech." B<u>r. 20</u>. But that is exactly the point. *Brown* makes clear that even laws targeting only commercial transactions with minors are subject to strict scrutiny where what is being sold is protected speech.

That principle decides this case. That apps sometimes cost money (or request personal data) does not make them commercial speech or allow the State to evade full First Amendment scrutiny when it restricts access to the expression and other protected information that apps offer. Accepting Texas's approach would flout decades of precedent and erode core First Amendment protections. It would suggest that states could invoke commercial-speech doctrine to impose sweeping limits on access to movie theaters, art galleries, theaters, book stores, newspapers—and any other businesses that distribute expressive products for profit (or indeed, for any consideration). That result "would be unprecedented and untenable." *Spiritual Psychic Science Church v. City of Azusa*, <u>39 Cal.3d 501, 511</u> (1985) (rejecting a theory that would treat as commercial speech "a lecture for or against Marxism, abortion, nuclear power, or racial supremacy" simply because "people paid an admission charge to hear it").

The State's commercial speech argument is also inconsistent with the Supreme Court's decision in *Free Speech Coalition*. That case applied intermediate scrutiny to an age-verification requirement for "commercial entit[ies]" that distributed pornographic material. 606 U.S. at 467. But the Court did so *not* because the requirement applied to commercial speech, but because it targeted only speech that was unprotected as to minors. *Id.* at 482-83. Here, in sharp contrast, the Act is not limited to some category of unprotected speech. It instead limits minors' access to virtually all speech—including broad swaths of material that minors have every right under the First Amendment to access, from newspaper apps, to Wikipedia articles, to free YouTube content, to library books accessed through the Libby app. This regime goes well beyond any plausible concept of commercial speech regulation.

*Free Speech Coalition* also supports strict scrutiny in another way: central to the ruling was the idea that courts evaluating internet-access regulations should consider their analog in a brick-and-mortar context. *Id.* at 466, 483-84. Because stores may require proof of age before allowing customers to access pornography, the Court suggested, the same should be true online. *Id.* at 480-84. But that principle cuts decisively

31

against Texas here. There is no tradition (and certainly no constitutionally approved tradition) of legally requiring age verification, parental verification, or parental consent for the brick-and-mortar equivalent of app stores—general purpose malls, movie theaters, libraries, bookstores, and museums. *Cf. Brown*, 564 U.S. at 795 n.3 (explaining that laws prohibiting minors from attending political rallies or receiving religious tracts without parental consent would be unconstitutional). The logic of *Free Speech Coalition* thus only underscores the need for strict scrutiny here.

Texas also argues that "the contracts entered into when downloading an app propose commercial transactions related to children's data and privacy rights that far exceed access to the app." Br. 20-21. But that is a misdirection: SB2420 does nothing to regulate app stores' privacy protections or how they can collect and use personal data[1]—other than with respect to new categories of age-verification data that the Act itself brings into existence, §§ 121.025; 121.026(a)(1), (3);

---

[1] Texas has other laws that actually regulate online privacy and data-collection. *E.g.*, TDPSA §§ 541.001, *et seq*. The contrast between these statutes and SB2420 is obvious.

121.055; 121.056(a)(1), (3). Had SB2420 merely limited the extent to which companies can monetize minors' data, enter into arbitration agreements with minors, or engage in targeted advertising to minors (Br. 18-19), this would be a different case. But that is not how the Act works. SB2420 requires age verification for app-store account creation—no matter what the stores' agreements say or what their data collection practices are. And it requires parental-consent for downloading all apps and purchasing all in-app content—no matter whether and how apps use minors' personal data. This is not privacy regulation; it is a direct impediment to accessing fully protected speech.[2]

### 3.     SB2420 Triggers Strict Scrutiny

"A law can regulate the content of protected speech, and thereby trigger strict scrutiny, either on its face or in its justification." *Free Speech Coal.*, 606 U.S. at 482 (quotation omitted). SB2420 does both.

---

[2] For similar reasons, courts have rejected similar efforts to characterize expansive internet regulations as mere "contracting" or "commercial conduct" laws. *E.g.*, *NetChoice v. Yost*, 778 F. Supp. 3d 923, 947-50 (S.D. Ohio 2025); *NetChoice v. Carr*, 789 F. Supp. 3d 1200, 1221 (N.D. Ga. 2025).

### a)     SB2420 is Content Based in its Justification

If a statute cannot be "justified without reference to the content of the regulated speech," it is not content neutral. *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986); *accord Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429-30 (1993) ("absence of a neutral justification" prevents government from defending law "as content neutral"). Thus, even if a "measure on its face appeared neutral as to content and speaker, its purpose to suppress speech and its unjustified burdens on expression would render it unconstitutional." *Sorrell*, 564 U.S. at 566.[3] That is exactly the case here.

The record of SB2420's content-based purpose begins with the *very first sentence* of the sponsor's statement of intent in the Senate Committee Report, which notes "[g]rowing concerns regarding the rise of social media and its pervasiveness in the lives of children and teens." ROA.26-50001.542. Further supporting testimony at a Senate Committee Hearing stated that "[m]obile applications have become a

---

[3] While (contra Texas) SB2420 is not a commercial-speech regulation, *Sorrell* makes clear that "commercial speech is no exception" to this rule. 564 U.S. at 566 (explaining that a "consumer's concern for the free flow of commercial speech often may be far keener than his concern for urgent political dialogue").

gateway to harm, exposing minors to *inappropriate content . . . .*" ROA.26-50001.486:19-21 (emphasis added). Just like the statute in *Sorrell*, the "premise of [SB2420] is that the force of speech can justify the government's attempts to stifle it." 564 U.S. at 77. Thus, because the law quite literally "cannot be justified without reference to the content" of the speech the legislature intended to regulate, it is not content-neutral and must satisfy strict scrutiny. *Reed*, 576 U.S. at 164 (cleaned up).

The Attorney General has conceded the Act's content-based justification. The State's PI briefing explained the Act was passed to shield minors from "unsuitable" and "objectionable" "material". ROA.26-50001.571, ROA.26-50001.573. Texas reiterated this point at the PI hearing. ROA.26-50001.1162, ROA.26-50001.1288:1-9. And when pressed, it elaborated on the specific types of content it had in mind, including "social media websites" and "mobile gaming." ROA.26-50001.1298:15-22.

The motions panel ignored this content-based justification in its order granting the state's motion to stay the preliminary injunction. ECF No. 92. Yet to drive the point home, after the motions panel issued the

administrative stay, Texas's Attorney General *immediately* doubled down on Texas's content-based justification, saying: "Parents deserve to know what their children are downloading and to have the ability to stop them from accessing harmful or inappropriate content." Press Release, *Attorney General Ken Paxton Secures Major Victory Protecting Children Online by Requiring Age Verification and Parental Approval for Minors' App Downloads* (June 1, 2026), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-secures-major-victory-protecting-children-online-requiring-age (last visited June 9, 2026).

Citing no authority, the State's brief asserts it is immaterial that the legislature expressed "[c]oncern that many of the millions of apps offered by the app stores are also particularly harmful to minors." Br. 12. That assertion defies established law: because the State acknowledges that SB2420 is justified by "the direct impact that speech has on its listeners," strict scrutiny applies. *Boos v. Barry*, 485 U.S. 312, 320-21 (1988); *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 811-12 (2000); *Ashcroft v. ACLU*, 542 U.S. 656, 670 (2004).

### b)  The Parental Consent Requirements are Content Based on their Face

The parental consent requirements—the core of the Act and the heart of CCIA's challenge—are content-based on their face. As Texas recognizes (Br. 6), the Act exempts certain types of apps from the parental consent requirement, namely, those providing emergency services and standardized testing. § 121.022(h). Thus, whereas a minor would need to obtain parental consent before downloading a news app— or virtually every other app in an app store—he would not need to obtain such consent before downloading an app providing practice SAT exams or access to a crisis hotline. Exceptions like these, which "single out specific subject matter for differential treatment" and "depend entirely on the communicative content," trigger strict scrutiny. *Reed*, 576 U.S. at 156, 164.

Texas (at 29) argues that the standardized-testing exception is not content-based but speaker-based. But adding a speaker-based component to a content-based provision does not allow a law to escape strict scrutiny. To the contrary, a law "favoring some speakers over others" "demand[s] strict scrutiny when the legislature's speaker preference reflects a content preference." *Reed*, 576 U.S. at 170; *accord Barr v. Am. Ass'n of*

*Pol. Consultants, Inc.*, <u>591 U.S. 610, 619-20</u> (2020) (controlling plurality op.) (evaluating content- and speaker-based exception to robocall statute under strict scrutiny). Here, Texas exhibited a content preference for apps that provide access to standardized tests.

The same logic undercuts the motions panel's reasoning that the emergency-services exception is "not likely content-based" because it "focuses on why the service is needed, not what is being communicated." ECF No. 92 at 6. The legislature's "speaker preference" for emergency service providers "reflects a content preference" for "9-1-1 emergency services", "crisis hotline[s]" or "emergency assistance service[s]." § 121.021(g)(1)(A)(i)-(iii); *Barr*, <u>591 U.S. at 619-20</u>. The panel's focus on how emergency calls "protect[] the safety and welfare of Americans," ECF No. 92 at 6, goes at most to the *application* of scrutiny, not what level of heightened scrutiny is triggered.

*Barr* cuts directly against the State here. *Barr* found that an exception to a robocall ban for government-debt collectors was content-based and applied strict scrutiny. In reaching that conclusion, the Court emphasized that "collecting government debt is no doubt a worthy goal[.]" <u>591 U.S. at 621</u>. But that consideration—the focus on why the service

was needed—was relevant only to the Court's analysis of whether the exception survived strict scrutiny. And even then, the government "ha[d] not sufficiently justified the differentiation between government-debt collection speech and other important categories of robocall speech, such as political speech, charitable fundraising, issue advocacy, commercial advertising, and the like." *Id.*

So too here. While providing people access to emergency services or educational testing services is "no doubt a worthy goal," the State makes no effort to differentiate those exemptions from apps that provide other categories of valuable speech, such as news, religious texts, or educational materials. While an emergency services exception could potentially survive strict scrutiny, the Court must apply that level of scrutiny, and the State bears the burden of justification. Where the record is deficient, as here and in *Barr*, those exceptions cannot stand.

Again relying on *Barr*, both Texas and the motions panel suggest that these exceptions can be severed. But *Barr* concerned a discrete amendment enacted *24 years* after the original statute, whose single content-based exception created First Amendment concerns of unequal treatment. 591 U.S. at 616. And while severing that single provision

39

cured the First Amendment issue there, that solution is not viable where, as here, the age-verification and parental-consent provisions at the core of the statute are also unconstitutional and cannot be severed. *See id.* at 628-34; *see also infra* Section I.B. Rather than rewrite the Act, the Court should "leav[e] [it to] the legislature" to address "the constitutional difficulties [the court has] identified." *Randall v. Sorrell*, 548 U.S. 230, 262 (2006).

### 4. The Verification and Consent Requirements Cannot Withstand Any Form of Heightened Scrutiny

Laws triggering strict scrutiny "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Nat'l Inst. of Family & Life Advocates ("NIFLA") v. Becerra*, 585 U.S. 755, 766 (2018) (citation omitted). Texas does not argue that SB2420 would survive strict scrutiny.

But even if Texas's commercial-speech argument were correct, the Act would not satisfy even intermediate scrutiny. "[T]o survive intermediate scrutiny, a restriction on speech or expression must be narrowly tailored to serve a significant governmental interest." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 76 (2022)

(cleaned up). The statute must "advance[] important governmental interests unrelated to the suppression of free speech" and must "not burden substantially more speech than necessary to further those interests." *Turner Broad Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997). Although the standard is less exacting than strict scrutiny, it is still "demanding" and "no gimme for the government[.]" *Hines v. Pardue*, 117 F.4th 769, 779 (5th Cir. 2024). "By demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrific[ing] speech for efficiency.'" *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (cleaned up).

SB2420 purports to serve two governmental interests. *First*, the law seeks to protect children from accessing harmful content, be that social media, gambling sites, or something else. *See supra* Section I.A.3(a); Br. 12. *Second*, the law purportedly promotes parents' rights to direct the upbringing of their children by "allowing parents the opportunity to consent to their minor children accepting terms of service and data collection practices." Br. 24. While the motions panel addressed only the second justification, ECF No. 92 at 3-4, SB2420 is not narrowly tailored to serve either interest.

41

### a)    Texas Has Made No Evidentiary Record to Carry its Burden

As a threshold matter, Texas has made no record to establish its "demanding" "burden of justification." *Virginia*, 518 U.S. at 533. Texas could have provided declarations, expert testimony, or studies to demonstrate that its interests are important and that the law is narrowly tailored to serve them. But it did not. As a result, the District Court found that SB2420 would not withstand intermediate scrutiny because "Texas has not offered any evidence connecting the Act's goals to its methods." ROA.26-50001.1167.

Texas now argues that no showing was necessary because "[a]s in *Free Speech Coalition, Inc. v. Paxton* . . . the Court can, without specific evidence, make a determination that a provision of law survives intermediate scrutiny." Br. 23. But in *Free Speech Coalition*, Texas submitted significant evidence, including three expert declarants, one fact declarant, and several scientific studies—all supporting the State's interest in shielding minors from pornography and attesting to the effectiveness of the law's methods of doing so. *See* Texas's Response to Mot. For Prelim. Inj., *Free Speech Coal. v. Paxton*, 1:23-cv-917, ECF No. 27 (W.D. Tex., filed Aug. 21, 2023); *cf.* 95 F.4th 263, 278 (5th Cir. 2024)

("[t]he record is replete with examples of the sort of damage that access to pornography does to children").

Texas's evidentiary failure is particularly glaring because the state interests here are far less apparent than those in *Free Speech Coalition*. For instance, "the State does not cite evidence to substantiate the assertion that downloading an app of any kind without parental permission poses a health hazard to minors." *CCIA v. Paxton*, <u>814 F. Supp. 3d 787, 800</u> (W.D. Tex. 2025). Texas also offered no evidence that it has an important "interest in requiring age-verification and parental permission to mitigate an overall mental- or physical-health effect of mobile phone app use." *Id.* And it did not show that "some or most of the apps covered cause mental- or physical-health detriments for youth." *Id.* at 801. No wonder, then, that the District Court found that Texas did not satisfy its burden to withstand intermediate scrutiny.

### b) Whether Designed to Protect Against Harmful Content or Promote Data Privacy, SB2420 Is Not Appropriately Tailored

Whatever the State's purported interest, SB2420 is not tailored in any meaningful way and thus burdens "substantially more speech than necessary" to further its interests. *Turner*, <u>520 U.S. at 189</u>. The Act is at

once dramatically overbroad and strikingly underinclusive. It also ignores existing less restrictive alternatives, both legal and technical. Independently and together, these deficiencies condemn the law even under intermediate scrutiny.

*Harmful Content.* Texas argued below that it has an interest in regulating products "which pose health hazards, or which may be addictive" to minors, akin to alcohol and cigarettes. *CCIA*, 814 F. Supp. 3d at 800; ROA.26-50001.542; ROA.26-50001.565. It backs away from that justification on appeal, for good reason: it is hard to conceive of a less tailored solution. The sheer volume of protected speech subject to SB2420's scheme is unparalleled, covering newspaper content, sports coverage, religious worship, basic information services such as maps, and other benign and protected speech. Even under intermediate scrutiny, the law "burden[s] substantially more speech than is necessary to further" Texas' interest in restricting minors' access to the alleged online analogues to alcohol and cigarettes. *Free Speech Coal.*, 606 U.S. at 496 (citation omitted); *see also Packingham*, 582 U.S. at 106.

When asked why the law did not target the content it considered harmful, Texas explained that the sponsor was concerned that such a law

44

would trigger strict scrutiny. ROA.26-50001.1304:20-1305:3, ROA.26-50001.1300:21-1301:2. That is not a justification for a broad speech burden, but an admission that no such justification exists. Broadly targeting *all app content*, harmful or not, in an attempt to evade strict scrutiny just confirms the Act's overbreadth and lack of appropriate tailoring under *any* form of heightened scrutiny. *See City of Ladue*, 512 U.S. at 55 n.13 ("[T]he First Amendment prohibits not only content-based restrictions . . . but also content-neutral restrictions that unduly constrict the opportunities for free expression.").

**Data Privacy.** On appeal, the State mainly justifies SB2420 based on an asserted interest in "ensuring parental consent for minor children to enter into contracts involving their data and privacy." Br. 24. That argument fails. To begin, in Texas, contracts with persons under 18 are voidable under longstanding contract law principles. *See, e.g., Dairyland Cnty. Mut. Ins. Co. v. Roman*, 498 S.W.2d 154, 158 (Tex. 1973). Thus, SB2420 adds little beyond existing common-law protections—and yet does so at the expense of burdening vast quantities of protected speech.

In addition, Texas's purported data-privacy interest is already served by far more tailored state and federal statutes. For example, the

Texas Data Privacy and Security Act provides Texas residents with a suite of rights over their data, "establishes privacy protection safeguards," and prohibits companies from "processing the data of a known child without first obtaining parental consent." *Texas Data Privacy And Security Act*, Texas AG (eff. July 1, 2024) https://www.texasattorneygeneral.gov/consumer-protection/file-consumer-complaint/consumer-privacy-rights/texas-data-privacy-and-security-act (last accessed June 15, 2026); Tex. Bus. & Com. Code § 541.101(a)(4); *accord* 16 C.F.R. § 312.3 (federal regulations under COPPA prohibiting operators of websites and online services from "collecti[ng], us[ing], or disclos[ing] personal information from children" without parental consent).

But that is not how SB2420 works. The Act does not target or even address how app stores and developers could collect, use, or disclose user data. Nor is the Act tailored to businesses or other entities that process or sell personal data for commercial purposes. *Cf.* TDPSA § 541.002(a), COPPA, 15 U.S.C. § 6501(2)(A) (requiring covered websites and online services to operate "for commercial purposes"). Even more to the point, it does not impose any new restrictions on how app stores or developers

may use the data about minors that they collect in the course of their regular business. And it does not give minors or parents any new rights to control use of their personal data. Indeed, as noted above, the only data privacy or security provisions in SB2420 merely limit how app stores and developers can use the age-verification and parental-consent data the Act itself requires them to create and transmit. The State may not bootstrap a data-privacy justification on data that would not otherwise be collected but for SB2420 itself. Simply put, SB2420 advances no state interest regarding minors' data or privacy because that is not what it is trying to do in the first place.

But even if it were, the law would be impermissibly overbroad in its approach. Requiring parental consent for all app downloads and in-app purchases is not a logical, much less tailored, way of limiting how data from minors can be collected and used. It is the equivalent of requiring parental consent for all book purchases by teens out of concern that bookstores collect information about who buys what books. This is the epitome of an overbroad regulation, one that burdens far more speech than necessary to further the State's asserted interest.

47

In addition to being overbroad, SB2420 is also wildly underinclusive. By targeting only *mobile* apps, § 121.002(2), the Act does nothing to prevent minors from accessing apps on non-mobile devices (like SmartTVs) or the same services on a web browser (including via a mobile device). These loopholes "raise[] serious doubts about whether the government is in fact pursuing the interest it invokes." *Brown*, 564 U.S. at 802. Under strict scrutiny, the fact that the Act is "wildly underinclusive when judged against its asserted justification . . . is alone enough to defeat it." *Id*. And even under intermediate scrutiny, this underinclusivity "diminish[es] the credibility of the government's rationale for restricting speech in the first place." *City of Ladue*, 512 U.S. at 52.

### c)   SB2420 Is Not Narrowly Tailored Even to Provide Parental Control

SB2420 is also not tailored even to the general goal of empowering parents. As a threshold issue, that goal cannot sustain the statute, as there is no "historical warrant or compelling justification" for a law that "prevent[s] children from hearing or saying anything without their parents' prior consent." *Brown*, 564 U.S. at 795 n.3. Texas's asserted interest in forcing parents to superintend minors' choices is thus not

"unrelated to the suppression of free speech." *Free Speech Coal.*, 606 U.S. at 495-96. Even taken at face value, Texas has offered no evidence that there is a gap that needs to be filled, much less via a "solution" that broadly burdens parents by requiring their constant consent and oversight. *See Brown*, 564 U.S. at 803 ("[f]illing the remaining modest gap in concerned parents' control can hardly be a compelling state interest" given existing voluntary measures). Instead, Texas has acknowledged that "[a]pp stores . . . already provide tools that enable parents to limit what apps children are able to download or make purchases in." ECF No. 36 at 20; *accord* ROA.26-50001.401-05 ¶¶ 33-38; ROA.26-50001.425 ¶ 30. As in *Brown*, the State has presented no evidence that its *less robust* version of controls that app stores have already voluntarily developed "meet[s] a substantial need of parents who wish to restrict their children's access to [apps] but cannot do so." *Brown*, 564 U.S. at 803.

Moreover, SB2420's prohibition on blanket consent actually deprives parents of choice. §§ 121.022(e), 121.026(3). ROA.26-50001.432-33 ¶ 48. The State expressly precludes app stores from allowing parents to pre-authorize app downloads or purchases and instead forces them to

49

individually approve every single individual app download and purchase (and then to renew that consent on an ongoing basis), no matter how unobjectionable.

This onerous requirement overrides the preferences of parents who trust their children, wish to let them make their own choices, or favor a different parenting philosophy. *See Brown*, 564 U.S. at 805 (violent video game ban was "seriously overinclusive because it abridge[d] the First Amendment rights of young people whose parents . . . think violent video games are a harmless pastime"). As in *Brown*, Texas's "purported aid to parental authority is vastly overinclusive" because while it may support "what some parents of the restricted children actually want, its entire effect is only in support of what the State thinks parents *ought* to want." *Id*. at 804.

## B.    The Verification and Consent Requirements Cannot Be Severed

Texas argues that any unconstitutional provision should be severed from the Act. But even where a statute has an express severability provision, the Court should invalidate other provisions "essentially and inseparably connected in substance" to a provision that was deemed unconstitutional. *Washington v. Associated Builders & Contrs. of S. Tex.*,

621 S.W.3d 305, 322 (Tex. App. 2021) (no pet.) (citation omitted); *accord Builder Recovery Servs., LLC v. Town of Westlake*, 650 S.W.3d 499, 507 (Tex. 2022) (Act cannot be severed if "all the provisions are connected in subject-matter, dependent on each other, operating together for the same purpose, or otherwise so connected in meaning that it cannot be presumed the legislature would have passed the one without the other.") (citations omitted); *Villas v. City of Farmers Branch*, 726 F.3d 524, 537 (5th Cir. 2013) (state law applies when determining whether a state statute is severable).

SB2420's core age-verification and parental-consent mandates are "essentially and inseparably interconnected in substance" to SB2420's remaining provisions. For example, the age rating provisions are designed to force developers and app stores to disclose information to parents in connection with their (mandatory) approval of all app downloads or in-app purchases. § 121.022(f)(1). Without the mandatory verification and consent regime, these compelled disclosures—and related provisions, such as the penalties for knowingly misrepresenting an age rating (§§ 121.056(a)(2), 121.026(a)(2))—would no longer serve that purpose. Nor would app stores need to protect personal data

51

gathered during the age verification and consent process (§ 121.025), because that data would not exist. It would also be impossible to require developers to verify age (given the lack of data) (§ 121.054), and irrelevant to restrict developers from using personal information obtained for verifying age or parental consent (§ 121.055). Finally, the requirement that developers notify app stores of significant changes (§ 121.053) would also become meaningless because the purpose of such notifications is to allow for renewed parental consent, § 121.022(g). With all of these provisions inoperable, the bulk of app-store-related violations will also be rendered moot. *See* §§ 121.026(1) (violation if app store enforces a contract against a minor without parental consent); 121.026(3) (violation if app store obtains blanket consent); 121.026(4) (violation if app store discloses age verification or parental consent data).

Simply put, without the core verification and parental-consent provisions, it "cannot be presumed the legislature would have passed" SB2420 in the first place. *Builder Recovery Servs.*, 650 S.W.3d at 507 (citations omitted). The District Court properly invalidated the Act in its entirety, leaving it to the people's representatives whether to enact a different, constitutional statute.

**C.    SB2420's Remaining Substantive Requirements are Separately Unconstitutional**

Even if the verification and consent provisions could somehow be severed, the Act's remaining substantive obligations are independently unconstitutional.

### 1.    SB2420's Age Rating Disclosure Requirements Unconstitutionally Compel Speech

#### a)    The Age Rating Requirements Trigger Strict Scrutiny

SB2420's age-rating provisions compel app developers to speak about the age-appropriateness of their apps and in-app purchases. § 121.052(b)(2). Those provisions trigger strict scrutiny because they require developers to make decisions based on the "specific content or other elements that led to each rating." *Id.*; *see* ROA.26-50001.438-39 ¶¶ 22, 25-31; *NIFLA*, 585 U.S. at 766. They separately trigger strict scrutiny by "mandating speech that a speaker would not otherwise make," in the form of new age ratings for in-app purchases not currently required by app stores like Google and Apple. *Riley v. Nat'l Fed. Of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). The State cannot escape strict scrutiny by claiming that the speech it compels is simply commercial, factual, or uncontroversial.

This circuit and others have recognized that content-based age ratings compel "neither factual nor uncontroversial" speech. *Book People*, 91 F.4th at 340; *accord X Corp. v. Bonta*, 116 F.4th 888, 901-03 (9th Cir. 2024); *Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006). Determining whether, for instance, the New York Times app (which may include graphic war imagery) is appropriate for a 13- to 15-year-old, or a 16- to 17-year-old, is not a "factual" or "uncontroversial" determination. *See* ROA.26-50001.438-39 ¶¶ 22-31; *Book People*, 91 F.4th at 340 (statute that required parties to "pass judgment or express a view on the material's appropriateness for children . . . is anything but the mere disclosure of factual information."). These questions—and countless others that will arise when determining the age-appropriateness of literature, religious apps, and all manner of in-app content—raise all sorts of questions that are "subject to good-faith scientific or evidentiary dispute" and are "an integral part of a live, contentious political or moral debate." *Free Speech Coal.*, 95 F.4th at 281-82.

Here again, the fact that some apps are offered for purchase and some apps collect information from users does not turn SB2420 into a commercial-speech regulation. As Justice Thomas has explained, the

Supreme Court "has repeatedly rejected the notion that a speaker's profit motive gives the government a freer hand in compelling speech." *Masterpiece Cakeshop v. Colo. Civil Rights*, 584 U.S. 617, 662 (2018) (Thomas, J., concurring).

### b) The Age Rating Requirements Fail Under Any Form of Heightened Scrutiny

Even if intermediate scrutiny applied (which it does not), SB2420's age rating and display requirements would still be unconstitutional. The requirements are overbroad, unclear, and unnecessarily override the existing voluntary rating schemes used by app developers and app stores—which are *more* narrowly tailored and *less* burdensome than those now mandated by the State. ROA.26-50001.401-02 ¶ 34, ROA.26-50001.410 ¶ 47; ROA.26-50001.426-27 ¶ 33. The Act's requirements certainly cannot withstand the latter two prongs of the *Central Hudson* test, which require that the "regulation advance[] the governmental interest asserted" and that the law "not [be] more extensive than is necessary to serve that interest." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 599 (1980); *Am. Acad. of Implant Dentistry v. Parker*, 860 F.3d 300, 306 (5th Cir. 2017).

Texas's failure here is illustrated by the age rating provisions' effect on CCIA member apps that rely on in-app purchases to host third-party content. Audible, for instance, does not currently age-rate specific audiobooks. ROA.26-50001.438-39 ¶¶ 24, 31. Yet to comply with SB2420, Audible will have to come up with an age rating for "more than 1 million titles" on its service. ROA.26-50001.438 ¶ 24. The same goes for apps that offer movies and TV shows for rent or purchase on the app, which must use Texas's classification standards rather than the widely established content rating systems already in place for such material.

These concerns are only amplified at the app store level. As discussed, Google and Apple employ voluntary age-rating systems for all their apps and rely on entirely different age categories than SB2420. ROA.26-50001.401-02 ¶ 34, ROA.26-50001.410 ¶ 47; ROA.26-50001.426-27 ¶ 33. Mandating that these services upend their existing infrastructure and instead use Texas's arbitrarily broader age rating categories "do[es] not advance the governmental interest asserted" and is far "more extensive than is necessary to serve that interest." *Free Speech Coal.*, 95 F.4th at 283 (citations omitted).

56

Because Texas has presented no evidence, it cannot meet its burden of showing that its goal is "substantial" and the cost is "carefully calculated" relative to existing age-rating systems used by the app stores. *Free Speech Coal.*, 95 F.4th at 283.

### 2. SB2420's Age-Rating and Significant-Change Provisions Are Void for Vagueness.

As the District Court held, the Act's age-rating and significant-change provisions are also unconstitutionally vague because they are "so unclear that people of common intelligence must necessarily guess at [their] meaning and differ as to [their] application." *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023) (cleaned up). If a law, like SB2420, interferes with the right of free speech or of association, "a more stringent vagueness test should apply." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982). Texas's attempt to explain these vague provisions only reveals the constitutional problem.

### a) The Age-Rating Provisions Are Vague

SB2420 holds developers (and app stores) liable for knowingly misrepresenting an age rating, but does not provide any meaningful guidance to determine the proper ratings. To the contrary, the Act affirmatively requires that developers align their apps' age ratings with

57

undefined age categories that clash with other standards. Texas's insistence that this provision is not vague because developers need only "use[] widely adopted industry standards" (Br. 36) is divorced from what the Act purports to require. The Act's age categories do not align with industry standards, ROA.26-50001.401-02 ¶ 34, ROA.26-50001.410 ¶ 47; ROA.26-50001.426-27 ¶ 33, so developers *cannot* rely on those standards to comply with the Act.

Lacking any guidance from the Act, developers must make their best guesses and risk being subject to liability if those guesses are incorrect. For example, if a developer believes a certain word or concept is appropriate for all audiences, will the developer be held liable for rating the app in the lowest category? The law is silent on this question— and essentially any question a developer may have when trying to rate apps.

### b)    The Significant-Changes Provision is Vague

Furthermore, the Act requires renewed parental consent whenever an app makes a "material[] change[]" to a  mobile app's "functionality or user experience" or offers a "new opportunit[y] to make a purchase" (§ 121.053(b)).  But the meaning of those provisions is likewise entirely

unclear. Texas faults the District Court for asking whether a developer could be held liable for failing to provide notice "for each new song added to Apple Music or when a new category of content is made available, such as when Spotify added podcasts," Br. 37, but the State notably refuses to provide its view on whether such additions would actually require notice. Such wide-ranging interpretive windows create opportunities for selective enforcement. *See Book People, Inc v. Wong*, 692 F. Supp. 3d 660, 695 (W.D. Tex. 2023); *NetChoice v. Carr*, 789 F. Supp. 3d 1200, 1231 (N.D. Ga. 2025). Indeed, Texas only creates further uncertainty by tying this provision to the mental state of any minor's parent, noting that the question is whether the change "is one that has the capacity to influence" the decision of a minor's parent. Br. 37. That only underscores the problem.

Texas is wrong to assert that these requirements cannot be unconstitutionally vague because similar language can be found in contracts and miscellaneous procedural regulations. Br. 37-38. These cases hardly shed light on what it means to "materially change[]" a mobile app's "functionality or user experience." And of course, a party that enters into a private contract and allegedly breaches a contract term

is not exposed to governmental enforcement posing crippling civil penalties and punitive damages. *See supra* Section II.E.

## II.    The Scope of the Preliminary Injunction is Proper

Finally, Texas's attempts to challenge the scope of the preliminary injunction are unavailing. First, with respect to *Moody*, Texas forfeited any argument that CCIA failed to establish facial unconstitutionality as to the app store provisions, and the District Court correctly held SB2420 is facially unconstitutional. Second, Texas's attempt to frame the District Court's order as a universal preliminary injunction misapplies the Supreme Court's decision in *CASA*. Finally, the equities strongly favor an injunction against Texas's unconstitutional law.

### A.    Despite the State's Forfeiture, the District Court Conducted the Analysis Required by *Moody*.

As an initial matter, Texas's attempt to raise a *Moody* argument for the first time on appeal is improper. "A party forfeits an argument by failing to raise it in the first instance in the district court—thus raising it for the first time on appeal[.]" *Rollins v. Home Depot USA, Inc.*, 8 F.4th 393, 397 (5th Cir. 2021). Here, Texas did not raise any *Moody* argument against CCIA's facial challenge in any of its briefing in the District Court. ROA.26-50001.553-80, ROA.26-50001.1183-90. Nonetheless, Texas now

60

argues that CCIA "did not provide evidence to meet [its] burden to show the number of apps with content to which SB2420 could and could not be applied." Br. 33-34 (citing *Moody*, 603 U.S. at 744). If Texas had presented that argument in a timely fashion, then CCIA could have addressed it in the District Court. Texas instead remained silent, thereby forfeiting its *Moody* argument.

No exception to the forfeiture rule applies here. The viability of a facial First Amendment challenge is not an issue of subject-matter jurisdiction. *United States v. Cotton*, 535 U.S. 625, 630 (2002). "Nor is there manifest injustice to correct here—nothing prevented [Texas] from [raising *Moody*] in the district court." *Rollins*, 8 F.4th at 399.

But even if the Court were to allow Texas to belatedly raise a *Moody* argument, the District Court properly determined that SB2420's app store provisions are facially unconstitutional. Significantly, Texas disregards the fact that CCIA brought a facial challenge with respect to *app stores*, rather than developers. ROA.26-50001.348-49. As to those stores, the Act requires universal age verification at the time a user creates an account and parental consent for any minor app downloads or in-app purchases. CCIA provided uncontested evidence to establish that

61

CCIA's app store members constitute the universe of mobile app stores SB2420 was intended to regulate. *See* ROA.26-50001.560, ROA.26-50001.456:10-20, ROA.26-50001.459:23-460:1, ROA.26-50001.508:25-509:2. Accordingly, a ruling as to CCIA member app stores is effectively a ruling about all real-world applications of the Act to app stores.

Because Texas has never identified any app store to whom the Act's requirements would impose a lesser First Amendment problem, Texas's attempt to compare the District Court's analysis to the analyses conducted in *Moody* and *Fitch* is unavailing. In *Moody*, the Supreme Court noted that the laws at issue "might apply to, and differently affect, other kinds of websites and apps," and thus instructed the lower courts to consider the laws' application to "every covered platform or function." 603 U.S. at 717-18, 725. Similarly, in *Netchoice, LLC v. Fitch*, this Court took issue with the district court's cursory assessment of the law's scope at *Moody* step one, and questioned whether services like Uber, Google Maps, or Microsoft Teams should be covered by the Act. 134 F.4th 799, 808-09 (5th Cir. 2025). Here, in contrast, the District Court properly considered the application of SB2420 to the relevant regulated actors: the

app stores, which are far fewer in number and face materially similar burdens based on the age-verification and parental-consent requirements.

With this proper framing, the District Court engaged in the exact analysis required by *Moody* and correctly concluded CCIA carried its burden. At step one, the District Court properly considered "[w]hat activities, *by what actors*, . . . the law[] prohibit[s] or otherwise regulate[s.]" *Moody*, 603 U.S. at 724 (emphasis added); *see CCIA*, 814 F. Supp. 3d at 804. As Texas acknowledged, CCIA's members (and specifically Google and Apple) are "the primary, near exclusive, source of downloadable apps," i.e., app stores covered by SB2420. *See* ROA.26-50001.560. The District Court correctly analyzed the obligations imposed on those app stores, which captured virtually all of the applications of SB2420's app store provisions. *See* ROA.26-50001.1161-67.

At step two, the District Court then properly "decide[d] which of the laws' applications violate the First Amendment" and "measure[d] them against the rest," considering "every covered platform," i.e., every *app store*. *Moody*, 603 U.S. at 725. The court determined that SB2420 "exclusively target[s] speech, only a small portion of which falls outside First Amendment coverage," and so "only in the vast minority of

63

applications would SB2420 have a constitutional application to unprotected speech not addressed by other laws." *CCIA*, 814 F. Supp. 3d at 804. That holding is correct: As already explained, the verification and parental-tethering requirements present a unitary, across-the-board problem. As to parental consent, CCIA identified a vast sweep of applications where requiring such consent would burden core protected speech, and explained that the Act made no effort to tailor its requirements to any more targeted category of apps.[4] Nor did the State even identify any category of apps for which parental consent would be constitutionally permissible and that is not otherwise regulated by existing Texas laws. Thus, the District Court properly found that unconstitutional applications of SB2420 necessarily outweigh the constitutional applications.

---

[4] Of course, Texas already has a law requiring age verification and walling off minors from pornography websites. *See Free Speech Coal.*, 606 U.S. at 466. There is every reason to think that this provision applies to mobile apps as well, and even if it doesn't, Texas could enact such a targeted measure. But the goal of protecting minors from unprotected pornography does not remotely justify the sweeping mandate of SB2420 to require age-verification and parental consent for *all* apps and in-app purchases, much less avoid a facial challenge to those mandates. That is the definition of an overbroad speech mandate that "burn[s] the house to roast the pig." *Reno*, 521 U.S. at 882.

### B.    The Preliminary Injunction Does Not Violate *CASA*.

For the first time on appeal, Texas suggests that an injunction preventing enforcement of SB2420 could constitute a universal injunction barred by *CASA,* 606 U.S. at 847. Like the *Moody* issue, the scope of an injunction is a non-jurisdictional argument that Texas has forfeited. And regardless, the State's argument fails.

The District Court's preliminary injunction satisfied *CASA* because no narrower order could "provide complete relief to" CCIA's app store and developer members. *Id.* at 861. If, for instance, the injunction protected only CCIA's app stores and developers, then third-party developers would need CCIA's member app stores to engage in age verification and parental consent to comply with the Act. But that is precisely what the injunction is supposed to protect CCIA's member app stores from having to do. Relief as to CCIA's app store members in practice necessitates relief as to all developers.

### C.    The Remaining Factors Favor CCIA.

With the merits correctly assessed, the remaining factors strongly favor a preliminary injunction.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath.*

*Diocese of Brooklyn v. Cuomo*, <u>592 U.S. 14, 19</u> (2020) (citation omitted). As the District Court correctly found, "CCIA has submitted declarations attesting to their chilled speech because of SB 2420, which suffices to show irreparable harm." <u>ROA.26-50001.1171</u>. "[N]o further showing of irreparable harm is necessary." *Book People,* <u>91 F.4th at 341</u>. But if more were needed, SB2420 imposes unrecoverable compliance costs on CCIA and its members. While CCIA put on ample evidence establishing this burden, *see* <u>ROA.26-50001.407-10</u> ¶¶ 43-47; <u>ROA.26-50001.428-31</u> ¶¶ 38-39, 41, 43; <u>ROA.26-50001.437-40</u> ¶¶ 17-18, 20, 22, 24, 26, 32-33, the State offered no contrary evidence of its own. Instead, on appeal, Texas now relies on an assertion in one amicus brief that the law is "workable," and contends that the many steps app stores and developers *already take* to protect children somehow lightens the burden of adopting the State's different requirements. B<u>r. 42-43</u>. These conclusory assertions cannot overcome the ample evidence that CCIA introduced in the District Court.

Finally, the balance of equities and public interest favor enjoining SB2420 because the First Amendment rights of CCIA and its members will be infringed absent an injunction. <u>ROA.26-50001.411-12</u> ¶¶ 49-55; <u>ROA.26-50001.416-17</u> ¶¶ 9-10; <u>ROA.26-50001.428-33</u> ¶¶ 38-50; <u>ROA.26-</u>

50001.437-39 ¶¶ 13-16, 20, 31. *See also Nken v. Holder*, 556 U.S. 418, 435 (2009) (the final two factors "merge" when, like here, the government is the opposing party). The District Court thus properly found "that an injunction is in the public interest" because "CCIA has shown a substantial likelihood of success on the merits of their First Amendment claims." ROA.26-50001.1171; *see Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) ("[I]njunctions protecting First Amendment freedoms are always in the public interest.") (citation omitted). By contrast, neither Texas nor the public have any interest in enforcing an unconstitutional law. *State v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021).

## CONCLUSION

CCIA respectfully requests that the Court affirm the preliminary injunction.

Respectfully submitted,

*/s/ Brian M. Willen*
Brian M. Willen

June 17, 2026

BRIAN M. WILLEN
  *Counsel of Record*
LAUREN GALLO WHITE
EDWARD P. PERCARPIO
  *Wilson Sonsini*
  *Goodrich & Rosati, PC*
  *31 W. 52nd Street, Fifth Floor*
  *New York, NY 10019*
  *bwillen@wsgr.com*

DENO HIMONAS
ELIZABETH W. SHARKEY
  *Wilson Sonsini*
  *Goodrich & Rosati, PC*
  *95 S. State St., Ste. 1000*
  *Salt Lake City, UT 84111*

ELIZABETH B. PRELOGAR
EPHRAIM A. MCDOWELL
JOSHUA REVESZ
  *Cooley LLP*
  *1299 Pennsylvania Ave., NW*
  *Washington, DC 20004*

LAURA LEE PRATHER
CATHERINE L. ROBB
MICHAEL J. LAMBERT
REID PILLIFANT
  *Haynes and Boone, LLP*
  *98 San Jacinto Blvd., Suite 1500*
  *Austin, Texas 78701*

*Counsel for CCIA Plaintiff-Appellee*

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I also certify that service will be accomplished on all registered CM/ECF users by the appellate CM/ECF system, that any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13, and that the document has been scanned and is free of viruses.

Dated: June 29, 2026                    /s/ *Brian M. Willen*
                                        Brian M. Willen

                                        *Counsel for Plaintiff-Appellee*

**CERTIFICATE OF COMPLIANCE**

I certify the following in compliance with Federal Rule of Appellate Procedure 32(a): The foregoing motion is in 14-point, proportionally-spaced serif font (Century Schoolbook) and contains 12,692 words, excluding the parts of the document exempted by Rule 32(f).

Dated: June 29, 2026                    /s/ *Brian M. Willen*
                                        Brian M. Willen

                                        *Counsel for Plaintiff-Appellee*