# In the United States Court of Appeals
# For the Fifth Circuit

STUDENTS ENGAGED IN ADVANCING TEXAS; M.F., BY AND THROUGH NEXT FRIEND VANESSA FERNANDEZ; Z.B., BY AND THROUGH NEXT FRIEND S.B.,

*Plaintiff–Appellees*

v.

KEN PAXTON,

*Defendant–Appellant.*

*consolidated with*

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION,

*Plaintiff–Appellee*

v.

KEN PAXTON,

*Defendant–Appellant.*

On Appeal from the United States District Court
For the Western District of Texas, Austin Division

**BRIEF OF INTERNET SOCIETY, NEW AMERICA'S OPEN TECHNOLOGY INSTITUTE, AND CENTER FOR DEMOCRACY AND TECHNOLOGY AS AMICI CURIAE IN SUPPORT OF APPELLEES**

*Counsel for Amici Curiae*

Sean J. McCaffity
State Bar No. 24013122
Sommerman, McCaffity, Quesada & Geisler, LLP
3811 Turtle Creek Blvd., Suite 1400
Dallas, TX 75219
214-720-0720

June 24, 2026

# CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of record certifies that the following listed persons and entities described in the fourth sentences of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. Counsel of record certifies that the following persons and entities, in addition to those previously listed in the briefs of the parties and other amicus briefs, have an interest in the outcome of this case. The representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

*Amici Curiae:*

Internet Society
New America's Open Technology Institute
Center for Democracy & Technology

*Counsel for Amici Curiae:*

Sean J. McCaffity
State Bar No. 24013122
Sommerman, McCaffity, Quesada & Geisler, LLP
3811 Turtle Creek Blvd., Suite 1400
Dallas, TX 75219
214-720-0720

*/s/ Sean J. McCaffity*
*Counsel for Amici Curiae*

Dated: June 24, 2026

i

## TABLE OF CONTENTS

**Page**

Certificate of Interested Parties ................................................................................i

Table of Contents ............................................................................................ii

Interest of Amici Curiae ....................................................................................1

I.      Internet Society ....................................................................................1

II.     New America's Open Technology Institute.......................................2

III.   Center for Democracy & Technology..............................................2

Argument.........................................................................................................4

I.      SB 2420 does not fulfill or advance a compelling or important
government interest and substantially burdens all Texans............................8

      a.     Research demonstrates that blocking or gatekeeping children
from accessing applications does not reduce harm............................8

      b.     Age restrictions substantially burden and restrict all Texas
residents' access to applications. .......................................................13

II.     SB 2420 increases privacy and security risks for all users. .........................15

III.   There are many less restrictive and safer ways for determining a
user's age and protecting youth online. .......................................................18

Conclusion......................................................................................................26

Certificate of Service.......................................................................................27

Certificate of Compliance with Rule 32(a) ....................................................28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
   591 U.S. 610 (2020) ...................................................................................4

*Brown v. Ent. Merchants Ass'n*,
   564 U.S. 786 (2011) .................................................................................12

*Computer & Commc'ns Indus. Ass'n v. Paxton*,
   814 F. Supp. 3d 787 (W.D. Tex. 2025) .....................................................18

*Free Speech Coal., Inc. v. Paxton*,
   606 U.S. 461 (2025) .................................................................................14

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
   585 U.S. 755 (2018) ...................................................................................4

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) ...................................................................................4

*TikTok Inc. v. Garland*,
   604 U.S. 56 (2025) .....................................................................................5

**Statutes**

SB 2420, § 121.021(a) ...................................................................................15

SB 2420, § 121.022(b)(2) ..............................................................................16

SB 2420, § 121.022(d) ...................................................................................10

**Other Authorities**

*Age Restrictions and Online Safety*, Internet Society (Dec. 2025),
   https://www.Internetsociety.org/resources/policybriefs/2025/age-
   restrictions-and-online-safety/.................................................................25

**Page(s)**

Aliya Bhatia & Ariana Aboulafia, *Age Verification Technology Would Create New Barriers for Young Disabled People*, Teen Vogue (Sept. 24, 20204), https://www.teenvogue.com/story/age-verification-technology-disabled-people ...........................................................7

Aliya Bhatia & Nick Doty, *Mitigating Risk to Rights with Age Verification: Privacy-Preserving Guardrails That Should Accompany Deployments of Age Verification Approaches*, Ctr. for Democracy & Tech. (Oct. 10, 2025), https://cdt.org/insights/mitigating-risk-to-rights-with-age-verification-privacy-preserving-guardrails-that-should-accompany-deployments-of-age-verification-approaches/......................................21

Arup Kumar-Ghosh et al., *Safety vs. Surveillance: What Children Have to Say About Mobile Apps for Parental Control*, Proceedings of the 2018 CHI Conference on Human Factors in Computing Systems (Apr. 19, 2018), https://dl.acm.org/doi/10.1145/3173574.3173698 ...............................8

Chris Sadler, *Verification Without Information: The Promise of Zero-Knowledge Proofs*, New America (Apr. 2, 2020), https://www.newamerica.org/insights/verification-without-information-promise-zero-knowledge-proofs ...................................22

Danah Boyd, *It's Complicated: The Social Lives of Networked Teens* (2014) ...............................................................................................9

David Lang et al*., Do Age-Verification Bills Change Search Behavior? A Pre-Registered Synthetic Control Multiverse*, Ctr. for Soc. Media, AI, and Pol. (Mar. 3, 2025), https://csmapnyu.org/research/academic-research/do-age-verification-bills-change-search-behavior-a-pre-registered-synthetic-control-multiverse ............................................11

Emanuel Maiberg & Joseph Cox, *Women Dating Safety App 'Tea' Breached, Users' IDs Posted to 4chan*, 404 Media (July 25, 2025), https://www.404media.co/women-dating-safety-app-tea-breached-users-ids-posted-to-4chan/ ................................................................6

Emile Marzolf, *Brussels Launched an Age Checking App. Hackers Say It Takes 2 Minutes to Break It*, Politico (Apr. 17, 2026), https://www.politico.eu/article/eu-brussels-launched-age-checking-app-hackers-say-took-them-2-minutes-break-it/ ................................................23

Eric Goldman, *Thirteen Objections to Mandatory Online Age Authentication*, Santa Clara Univ. Legal Studies Research Paper No. 5567958 (Oct. 5, 2025) ...............................................................16

Jack Caporal, *How Many Americans Have Credit Cards? Ownership, Balance-Carrying, and Application Rates*, Motley Fool Money (May 27, 2026), https://www.fool.com/money/research/credit-card-ownership-statistics/.................................................................13

Jared Ronis, *Don't Trust When You Can Verify: A Primer on Zero-Knowledge Proofs*, Wilson Ctr. (Feb. 7, 2024), https://www.wilsoncenter.org/article/dont-trust-when-you-can-verify-primer-zero-knowledge-proofs; Sarah Forland, Exploring Privacy-Preserving Verification: A Close Look at Zero-Knowledge Proofs, New America (July 17, 2025), https://www.newamerica.org/insights/exploring-privacy-preserving-age-verification/ ....................................................... 21-22

Jillian Andres Rothschild et al, *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge*, Univ. of Md. Ctr. for Democracy and Civic Engagement (Jan. 2024), https://cdce.umd.edu/sites/cdce.umd.edu/files/pubs/Voter%20ID%202023%20survey%20Key%20Results%20Jan%202024%20%281%29.pdf............13

John Perrino, *Dangerous US Supreme Court Decision for Online Privacy and Security*, Internet Soc'y (July 2, 2025), https://www.Internetsociety.org/blog/2025/07/dangerous-us-supreme-court-decision-for-online-privacy-and-security/ ................................13

The Layout, *App Store Accountability with Senator Angela Paxton*, Texas Pub. Pol'y Found. (YouTube, Apr. 28, 2025) ...........................................5

Liv McMahon, *VPNs Top Download Charts as Age Verification Law Kicks In*, (July 28, 2025), https://www.bbc.com/news/articles/cn72ydj70g5o; .........................................11

Mark Tsagas, *Online Age Checking Is Creating a Treasure Trove of Data for Hackers*, The Conversation (Nov. 11, 2025), https://theconversation.com/online-age-checking-is-creating-a-treasure-trove-of-data-for-hackers-268586 ..........................................16

Mariya Stoilova et al., *Do Parental Control Tools Fulfil Family Expectations for Child Protection? A Rapid Evidence Review of the Contexts and Outcomes of Use*, J. of Children and Media, 2024.................10

Michal Luria & Aliya Bhatia, *Opinion: Restricting and Monitoring Social Media Won't Protect Kids — Here's What Will*, CNN (May 16, 2024), https://www.cnn.com/2024/05/15/opinions/social-media-monitoring-restriction-legislation-mediation-luria-bhatia/index.html.................................................................... 8-9,10

Michal Luria & Aliya Bhatia, *Teen and Parent Perspectives on Approaches to Age Verification*, Center for Democracy & Technology (Aug. 25, 2025), https://cdt.org/insights/teen-and-parent-perspectives-on-approaches-to-age-verification/....................................9

Michal Luria & Aliya Bhatia, *What Kids and Parents Want: Policy Insights for Social Media Safety Features* (2025), https://cdt.org/wp-content/uploads/2025/11/2025-11-24-CDT-Research-Social-Media-Report-final-1.pdf......................................................9,11

Nick Doty, *Using Internet Standards to Keep Kids Away From Adult Content Online*, Ctr. for Democracy & Tech. (Mar. 25, 2025), https://cdt.org/insights/using-Internet-standards-to-keep-kids-away-from-adult-content-online ..............................................................................24

Nick Doty & Aliya Bhatia, *Standards-Based Approaches to Help Keep Kids Away from Adult Content Online*, Ctr. for Democracy & Tech. (Aug. 2025) https://www.ietf.org/slides/slides-agews-paper-standards-based-approaches-to-help-keep-kids-away-from-adult-content-online-00.pdf .........................................................................25

Peter Gray et al., *Decline in Independent Activity as a Cause of Decline in Children's Mental Well-being: Summary of the Evidence*, J. of Pediatrics, Sept. 2023 ...............................................10

Published Order, Dkt. 91 ...........................................................................5

Robert Booth, *Hack of Age Verification Firm May Have Exposed 70,000 Discord Users' ID Photos*, The Guardian (Oct. 9, 2025), https://www.theguardian.com/media/2025/oct/09/hack-age-verification-firm-discord-users-id-photos ............................................6

Sarah Forland, *Exploring Privacy-Preserving Verification: A Close Look at Zero-Knowledge Proofs*, New America (July 17, 2025), https://www.newamerica.org/insights/exploring-privacy-preserving-age-verification/ .................................................. 21-22,23

Sarah Forland et al.*, Age Assurance and Age Verification*, New America (Apr. 23, 2024), https://www.newamerica.org/insights/age-verification-the-complicated-effort-to-protect-youth-online/age-assurance-and-age-verification/ .............................................................................23

Sarah Forland & Prem M. Trivedi, *The App Store Accountability Act Poses Serious Concerns for Privacy, Security, and Free Expression*, New America (Mar. 5, 2026), https://www.newamerica.org/insights/app-store-accountability-act-privacy-security-and-free-expression.............................................11,19

Shreyas Minocha et al., *Papers, Please: A First Look at Age Verification in the US*, SPDR Lab (Mar. 18, 2026), https://spdr.cc.gatech.edu/blog/AgeVerification................................................17

Steven M. Bellovin, *Privacy-Preserving Age Verification–and Its Limitations*, IAB/W3C Workshop on Age-Based Restrictions (Oct. 2025), https://www.ietf.org/slides/slides-agews-paper-privacy-preserving-age-verificationand-its-limitations-00.pdf ......................................14

Texas Attorney General, *Attorney General Ken Paxtson Secures Major Victory Protecting Children Online By Requiring Age Verification and Parental Approval for Minors' App Downloads* (June 1, 2026), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-secures-major-victory-protecting-children-online-requiring-age .......................................................................................5

UNICEF, *Global Kids Online Comparative Report*, UNICEF Office of Research (Nov. 2019), https://www.unicef.org/innocenti/media/7011/file/GKO-Comparative-Report-2019.pdf ...........................................................................8

## I.      Internet Society

Founded in 1992, the Internet Society is a U.S. nonprofit organization headquartered in Virginia for the worldwide coordination of, and collaboration on, Internet issues, standards, and applications. The Internet Society's staff—located in more than thirty countries around the world—is composed of technical experts in Internetworking, cybersecurity, and network operations, as well as policy experts in a broad range of Internet-related areas.

As a global non-governmental organization, the Internet Society believes that the Internet should be for everyone. It supports and promotes the development of the Internet as a global technical infrastructure, a resource to enrich people's lives, and a force for good in society, with an overarching goal that the Internet be open, globally connected, secure, and trustworthy. The Internet Society supports communities that seek to connect to each other through the Internet. It advances the development and application of Internet infrastructure, technologies, and open standards. The Internet Society also advocates for policies that protect the Internet and allow it to flourish for all.

---

[1] No counsel for a party in this case authored this brief in whole or in part. No person or entity—other than Amici, its members, or its counsel—made any monetary contributions intended for the preparation or submission of this brief. Counsel for all parties have consented to this filing.

## II.  New America's Open Technology Institute

The Open Technology Institute (OTI), a program within the nonprofit, nonpartisan organization New America, conducts rigorous research and advocacy to promote technology policy that serves the public interest. OTI embraces the innovative potential of the Internet and emerging technologies while championing policies that promote democratic health by protecting the agency, privacy, and free expression of all Americans. The Open Technology Institute brings together researchers, advocates, and innovators to design practical solutions to the most challenging problems of the digital age.

## III.  Center for Democracy & Technology

The Center for Democracy & Technology (CDT) is the leading nonpartisan, nonprofit organization fighting to advance civil rights and civil liberties in the digital age. It shapes technology policy, governance, and design with a focus on equity and democratic values. Established in 1994, CDT has been a trusted advocate for digital rights since the earliest days of the Internet.

CDT brings together policymakers, scholars, public interest advocates, and industry leaders to find innovative and practical solutions to the policy challenges surrounding past, present, and future technologies. CDT advocates to policymakers and the courts, engages with companies to improve their policies and product designs, and facilitates a deeper public understanding of major tech policy issues. In

addition to its advocacy work, CDT's research team produces deep-dive original

scholarship to explore novel solutions to pressing issues in technology policy.

## ARGUMENT

Texas's App Store Accountability Act ("SB 2420") will not effectively protect children from potential harm online. Quite the opposite: SB 2420 puts children and all Internet users subject to the law in harm's way by subjecting them to violations of their security, privacy, and constitutional rights. SB 2420 unreasonably burdens all Internet users in Texas, including by restricting their access to information—and, given that it is likely to be ineffective in practice, the law does not advance the government's interests.

SB 2420 applies to most types of content but carves out exceptions for some content based on use and the developer's identity—a classic example of a content-based restriction.[2] Accordingly, SB 2420 triggers strict scrutiny under the First Amendment.[3] For a law to survive strict scrutiny, it must serve a compelling government interest and be narrowly tailored to achieve that interest.[4] SB 2420 fails this test.

---

[2] The Appellees have briefed the issue explaining why SB 2420 is a content-based restriction subject to strict scrutiny. *See* Appellee Br. at 34-37. This brief will focus on the practical and technological impacts of SB 2420 to assist the Court in understanding why the State of Texas's "compelling governmental interest" justifying the law is not actually satisfied and why the technological risks of SB 2420 are not worth the sacrifice in free speech and violate the First Amendment.

[3] *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 619-21 (2020); *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

[4] *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) (quoting *Reed*, 576 U.S. at 163) ("As a general matter, such laws 'are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.'").

On June 4, 2026, this Court stayed the preliminary injunction pending the outcome of this appeal and found that strict scrutiny likely was not the appropriate test for SB 2420. Rather, this Court concluded that SB 2420 constitutes commercial speech and likely is constitutional under intermediate scrutiny.[5] To survive intermediate scrutiny, a law must advance important government interests unrelated to the suppression of speech and may not substantially burden more speech than necessary in furtherance of the government's interests.[6] For the reasons outlined below, SB 2420 would be unconstitutional under intermediate scrutiny as well.

According to the Texas Attorney General, SB 2420 is part of an effort to protect "Texas children from online predators, exploitation, and dangerous content while defending parents' fundamental right to guide and protect their children."[7] In implementing this objective, SB 2420 requires everyone in Texas to submit to "commercially reasonable" age verification to access an app store and subsequently

---

[5] Published Order, Dkt. 91, at 4. We also acknowledge that the Fifth Circuit noted that "SB2420 may not regulate speech at all, given that it does not target any substantive content but instead regulates commercial conduct with an incidental relationship to speech." *Id.* at 4 n.5. Respectfully, the conduct at issue does regulate people's First Amendment rights as it impedes access to information and engagement in today's public square.

[6] *TikTok Inc. v. Garland*, 604 U.S. 56, 71 (2025).

[7] Texas Attorney General, *Attorney General Ken Paxtson Secures Major Victory Protecting Children Online By Requiring Age Verification and Parental Approval for Minors' App Downloads* (June 1, 2026), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-secures-major-victory-protecting-children-online-requiring-age; *see also* The Layout, *App Store Accountability with Senator Angela Paxton*, Texas Pub. Pol'y Found. (YouTube, Apr. 28, 2025) at 1:35 ("This bill builds upon someone work we have done … to protect our kids online.").

any app from the app store, on their phone or tablet. This broad definition likely means users will be required to provide sensitive personal information to app stores. Users determined to be under eighteen years of age must then obtain consent from a verified parent to download nearly any app—including ESPN, Wikipedia, or even a weather app.

Millions of Texas residents use apps on their phones and tablets daily for work, education, travel, communication, entertainment, political advocacy, and religion. There is a real risk SB 2420 will restrict Texans' primary means of accessing services on the Internet. By requiring widespread collection, processing, and storage of personal age-verification information, the law subjects all Texas users to an increased risk of data and security breaches and imposes this cost on Texans when they seek to exercise their constitutional rights. Just in the last year, popular social media and dating applications suffered attacks from hackers who retrieved large amounts of sensitive data, including personal data collected for age verification.[8] App stores and apps range widely in their cybersecurity protocols and often rely on third-party age-verification service providers that also widely vary in

---

[8] Emanuel Maiberg & Joseph Cox, *Women Dating Safety App 'Tea' Breached, Users' IDs Posted to 4chan*, 404 Media (July 25, 2025), https://www.404media.co/women-dating-safety-app-tea-breached-users-ids-posted-to-4chan/; Robert Booth, *Hack of Age Verification Firm May Have Exposed 70,000 Discord Users' ID Photos*, The Guardian (Oct. 9, 2025), https://www.theguardian.com/media/2025/oct/09/hack-age-verification-firm-discord-users-id-photos.

cybersecurity and data-handling practices. Texans should not be required to upload their personal data to an online database to be distributed indiscriminately to all apps in an app store to access the content. Some Texans will be unable to complete age checks if they do not have a government ID, use older devices, do not have access to a credit card or bank account, or choose not to share personal information without sufficient protections. Some Texans have disabilities or other conditions that limit access to an ID or the ability to complete facial age estimation scans that may be required for age verification.[9]

Fortunately, there are better, less restrictive means to protect children online. For example, Texas could have created a regime that focused its restrictions on apps and services that do not implicate access to constitutionally protected content or services for minors. To better achieve its goals of protecting children and families without raising constitutional concerns, Texas could have implemented a requirement to allow users to share voluntarily their age category for access only to the content and services they want or intend to access. SB 2420 did none of those things. It is unnecessarily broad and violates the First Amendment rights of all Texans and visitors to the state.

---

[9] Aliya Bhatia & Ariana Aboulafia, *Age Verification Technology Would Create New Barriers for Young Disabled People*, Teen Vogue (Sept. 24, 20204), https://www.teenvogue.com/story/age-verification-technology-disabled-people.

**I.     SB 2420 does not fulfill or advance a compelling or important government interest and substantially burdens all Texans.**

Research does not support SB 2420's underlying assumption that blocking or gatekeeping children from accessing applications reduces harm. Any marginal protection pales in comparison to the unconstitutional burdens on Texans.

    a.     *Research demonstrates that blocking or gatekeeping children from accessing applications does not reduce harm.*

When it comes to accessing the Internet, adding restrictions for children does not equate to additional safety. A 2019 survey report by UNICEF and London School of Economics researchers found that children with less restrictive parents were more likely to use the Internet for informational and creative activities, while children with more restrictive parents mostly chose entertainment-only activities.[10] Another study by US academics found restrictions prevented kids from using the Internet for completing simple tasks like homework.[11] Imposing additional barriers

---

[10] UNICEF, *Global Kids Online Comparative Report*, UNICEF Office of Research (Nov. 2019), https://www.unicef.org/innocenti/media/7011/file/GKO-Comparative-Report-2019.pdf.

[11] Arup Kumar-Ghosh et al., *Safety vs. Surveillance: What Children Have to Say About Mobile Apps for Parental Control*, Proceedings of the 2018 CHI Conference on Human Factors in Computing Systems (Apr. 19, 2018), https://dl.acm.org/doi/10.1145/3173574.3173698; Michal Luria & Aliya Bhatia, *Opinion: Restricting and Monitoring Social Media Won't Protect Kids — Here's What Will*, CNN (May 16, 2024), https://www.cnn.com/2024/05/15/opinions/social-media-monitoring-restriction-legislation-mediation-luria-bhatia/index.html.

to access with age verification and parental consent requirements risks discouraging or delaying minors' access to educational, informational, and creative applications.[12]

Decisions about how a child accesses and uses the Internet are deeply personal. Parents agree that even teens of the same age can vary widely in maturity.[13] These differences lead to different things being appropriate for different minors at different times. Every family makes specific judgments about maturity, educational needs, privacy, safety, and values. SB 2420 displaces those individual judgments and intrudes into an area traditionally governed by parents and families themselves.

A study from the Center for Democracy & Technology, one of the *amici curiae* here, shows that most families choose, at one point or another, to bypass the age verification process entirely when they believe their child is ready.[14] In that study, parents and teens noted that, when it came to appropriate restrictions for apps, a family's agency in determining what was appropriate was the most important factor.[15] Participants favored approaches enabling parents to declare their children's age and consent to which apps their children downloaded. In the same vein,

---

[12] *See generally* Danah Boyd, *It's Complicated: The Social Lives of Networked Teens* (2014).

[13] Michal Luria & Aliya Bhatia, *Teen and Parent Perspectives on Approaches to Age Verification*, Center for Democracy & Technology (Aug. 25, 2025), https://cdt.org/insights/teen-and-parent-perspectives-on-approaches-to-age-verification/.

[14] Michal Luria & Aliya Bhatia, *What Kids and Parents Want: Policy Insights for Social Media Safety Features*, 11 (2025), https://cdt.org/wp-content/uploads/2025/11/2025-11-24-CDT-Research-Social-Media-Report-final-1.pdf.

[15] *Id.*

"[r]esearchers found that tools or third-party apps that monitor kids' online access eroded parent-child relationships, created problems between children and their peers and usually had no positive impact, and sometimes even posed a negative one,"[16] including "restricted access to beneficial online activities," or "over-blocking of 'innocent' content."[17] Similarly, research from child psychologists has underlined the importance of appropriate agency and autonomy in development, especially online.[18]

SB 2420 removes parental agency by requiring parental approval not just for every app download, but also every time a previously approved app makes a "significant change", for every in-app and software application purchase.[19] These requirements risk making using a phone or tablet so infuriating that children and parents are likely to find ways to circumvent the requirements out of necessity. A child who needs to download an app to complete a homework assignment may not be able to wait until after dinnertime to get a parent to approve the app download. This is not hypothetical. Research shows people look for ways to circumvent similar laws requiring age verification when their access is restricted or adults are concerned

---

[16] Luria & Bhatia, *supra* note 10.

[17] Mariya Stoilova et al., *Do Parental Control Tools Fulfil Family Expectations for Child Protection? A Rapid Evidence Review of the Contexts and Outcomes of Use*, J. of Children and Media, 2024, at 31.

[18] Peter Gray et al., *Decline in Independent Activity as a Cause of Decline in Children's Mental Well-being: Summary of the Evidence*, J. of Pediatrics, Sept. 2023.

[19] SB 2420, § 121.022(d)

about their online privacy and security.[20] Even more simply, SB 2420 does not apply to online services accessed via web browsers. The law therefore permits circumvention for any apps available via web browsers while creating inconveniences with new barriers to access services that are optimized or only available as apps on mobile devices.

SB 2420 disregards the ways in which many families currently manage app access. Research from the Center for Democracy & Technology shows that both teens and parents were generally accepting of at least some parental involvement in approving teens' activities.[21] This is a good indication that many teens already seek an appropriate level of parental involvement when that level of involvement is determined by the parent-child relationship. Parents preferred to engage in high-level approval of app downloads and other significant actions, while viewing controls over everyday actions, such as adding a contact, excessive and

---

[20] Sarah Forland & Prem M. Trivedi, *The App Store Accountability Act Poses Serious Concerns for Privacy, Security, and Free Expression*, New America (Mar. 5, 2026), https://www.newamerica.org/insights/app-store-accountability-act-privacy-security-and-free-expression/; Liv McMahon, *VPNs Top Download Charts as Age Verification Law Kicks In*, (July 28, 2025), https://www.bbc.com/news/articles/cn72ydj70g5o; David Lang et al., *Do Age-Verification Bills Change Search Behavior? A Pre-Registered Synthetic Control Multiverse*, Ctr. for Soc. Media, AI, and Pol. (Mar. 3, 2025), https://csmapnyu.org/research/academic-research/do-age-verification-bills-change-search-behavior-a-pre-registered-synthetic-control-multiverse.
[21] Luria and Bhatia, *supra* note 13, at 20-21.

unnecessary.[22] Most participants also viewed parental involvement as necessary at younger ages but less so as teens grew more independent.[23]

SB 2420 requires parents, regardless of their own preferences, to make granular decisions related to app use for any child younger than eighteen. While the research shows parents want the ability to review certain app downloads or purchases, requiring approvals for each and every app in the same way for any child or teenager under eighteen—and re-approval for those apps every time a "significant change" occurs—is burdensome for parents and children. Parents will not be able to decide whether they want to make such approvals and there is no way for them to decide whether approvals for all app downloads or approvals for any "significant change" to app terms of service are necessary for their child. They could not provide blanket approval for any of these decisions. The frequency of requests could quickly become overwhelming. Rather than supporting parents and their children in their navigation of app stores and apps, SB 2420 imposes the judgment of the state of Texas onto decisions best left to families and the notification fatigue alone may prove enough to deter any potential benefits.[24]

---

[22] *Id.* at 21.

[23] *Id.*

[24] *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 795 n.3 (2011) ("In the absence of any precedent for state control, uninvited by the parents, over a child's speech and religion … and in the absence of any justification for such control that would satisfy strict scrutiny, those laws must be unconstitutional.").

b. *Age restrictions substantially burden and restrict all Texas residents' access to applications.*

Because the law requires that every individual in Texas verify their age when creating an account with an app store, the law burdens all Texans and people visiting the state by restricting their access to online applications. Any processes that may require some form of identification or a credit card authorization would potentially limit access for a significant number of Texans. Today, millions of Americans lack any government ID.[25] Nearly one in five American adults also do not have credit cards, according to 2026 Federal Reserve survey data.[26] These individuals may then be out of luck and unable to access the Internet.[27] Literature on this topic has provided sample case studies for how these technical issues can impact Texas residents. "Consider a hypothetical person 'Chris', a non-driving senior citizen living with an adult child in a rural area of [Texas]. To obtain a primary credential, they must first obtain an old birth certificate, possibly from out-of-state, as well as other 'breeder documents'. Some of these breeder documents—often, things like

---

[25] Jillian Andres Rothschild et al, *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge*, Univ. of Md. Ctr. for Democracy and Civic Engagement (Jan. 2024), https://cdce.umd.edu/sites/cdce.umd.edu/files/pubs/Voter%20ID%202023%20survey%20Key%20Results%20Jan%202024%20%281%29.pdf.

[26] Jack Caporal, *How Many Americans Have Credit Cards? Ownership, Balance-Carrying, and Application Rates*, Motley Fool Money (May 27, 2026), https://www.fool.com/money/research/credit-card-ownership-statistics/.

[27] John Perrino, *Dangerous US Supreme Court Decision for Online Privacy and Security*, Internet Soc'y (July 2, 2025), https://www.Internetsociety.org/blog/2025/07/dangerous-us-supreme-court-decision-for-online-privacy-and-security/.

utility bills—may not be available to someone like Chris. Apart from the expense—

quite possibly non-trivial for a poor family—Chris must persuade their child to then

drive them 80 kilometers or more to a motor vehicles office to obtain a government-

issued photo ID."[28] People's access to apps on a mobile device is no longer trivial.

Mobile banking, the ability to call a rideshare home, and even homework and many

jobs require access to apps—such as email, document editing, or the ability to clock

in for work—that would be restricted under this law.

These burdens are far from incidental when applied to the vast array of content

subject to the Texas law. The Fifth Circuit and the U.S. Supreme Court have held

that the burden of age verification was acceptable in the context of access to speech

that is not constitutionally protected for minors. *Free Speech Coal., Inc. v. Paxton*,

606 U.S. 461, 483 (2025). However, this law goes far beyond the pornographic

websites at issue in *Free Speech Coalition. v. Paxton* and expands the burden to

nearly all applications, including those that provide access to books, movies,

magazines, short-form videos and other kinds of speech that is protected as to both

minors and adults. These burdens on constitutionally protected speech far outweigh

the limited impact, if any, on protecting children online.

---

[28] Steven M. Bellovin, *Privacy-Preserving Age Verification–and Its Limitations*, IAB/W3C Workshop on Age-Based Restrictions (Oct. 2025), https://www.ietf.org/slides/slides-agews-paper-privacy-preserving-age-verificationand-its-limitations-00.pdf.

At the same time, the threat of privacy and security violations, discussed further below, chills speech by requiring individuals to accept unreasonable risks to their data and privacy. In the name of protecting children, SB 2420 requires children and adults to expose themselves to the risk of data breaches and privacy invasions. Like many Americans, Texans who may desire to use the Internet for searching and managing sensitive information will lose their anonymity, creating a chilling effect for both users and for the very companies that design applications and online service.

## II. SB 2420 increases privacy and security risks for all users.

SB 2420 does not effectively address online harms to children— unfortunately, it makes children in Texas more susceptible to online harms by introducing new privacy and security risks. To implement this law, app stores will need to verify the age of every user in Texas seeking to download an application, with concomitant privacy and security risks for all Texas app store users.

First, SB 2420 requires that app stores use a commercially reasonable method of verification to verify an individual's age category.[29] The app store would then use this information to determine what permissions to provide the user's account and, if the user is a child, would require the user to link their account to the account of a parent or guardian. The app store would then be required to use commercially reasonable methods to verify that a parent account belongs to someone who "has

---

[29] SB 2420, § 121.021(a).

legal authority to make a decision on behalf of the minor."[30] Texas does not describe what such a verification process would look like—it is unclear whether SB 2420 would require that children or parents upload birth certificates or adoption papers simply to create this linked account. This whole process requires, at minimum, the collection of sensitive personal information from all Internet users, followed by an additional collection of even more personal information from children.

Under SB 2420, app stores would then communicate an individual's age category to software applications to determine whether a user is eligible to engage with the application. Collecting sensitive data and documents increases the risk of data breaches, enables criminals to exploit frequent age checks for phishing attacks, and allows governments or age-check providers to track people online. SB 2420 would create a virtual gold mine of personal data ripe for bad actors to hack.[31]

Furthermore, requiring children to routinely disclose highly sensitive personal data to private companies "teach[es] children that privacy invasions are the unavoidable cost of accessing vital information and services in our society. This lesson will permanently distort how children view privacy."[32] Even with the

---

[30] SB 2420, § 121.022(b)(2).

[31] Mark Tsagas, *Online Age Checking Is Creating a Treasure Trove of Data for Hackers*, The Conversation (Nov. 11, 2025), https://theconversation.com/online-age-checking-is-creating-a-treasure-trove-of-data-for-hackers-268586.

[32] Eric Goldman, *Thirteen Objections to Mandatory Online Age Authentication*, Santa Clara Univ. Legal Studies Research Paper No. 5567958 (Oct. 5, 2025).

strongest security protection, the perception of privacy and security intrusions still risks chilling speech. SB 2420 requires that app stores share individuals' personal information with software developers regardless of whether a software application is age restricted. Age verification vendors and app stores also collect a surprising amount of information, such as device metadata, when undergoing the age verification process, and this information is likely sufficient to create a distinct and trackable profile of the user's device.[33]

For the process required by the State of Texas, an individual could potentially need to automatically share sensitive personal information without sufficient safeguards and requirements placed on entities that might receive the data. Nothing in the Texas statute requires the mitigation of these risks. Indeed, the statute amplifies risk because it requires sharing of sensitive age-related information with app stores and any app a minor might download.

SB 2420 was passed to protect children—but it will have the opposite result. SB 2420 does not directly advance a substantial government interest, and it is not narrowly tailored—rather, it will undermine the government's interest in protecting children and broadly infringe the constitutional rights of Texans.

---

[33] Shreyas Minocha et al., *Papers, Please: A First Look at Age Verification in the US*, SPDR Lab (Mar. 18, 2026), https://spdr.cc.gatech.edu/blog/AgeVerification/.

**III. There are many less restrictive and safer ways for determining a user's age and protecting youth online.**

One can acknowledge that there are corners of the Internet inappropriate for children, without conceding that regulating the entire marketplace of ideas is a proportional reaction. The district court rightly recognized the importance of providing safeguards to protect children online while questioning the breadth of speech restricted under SB 2420 by blocking access to nearly any app by default.[34] Put simply, SB 2420 is not the least restrictive means of achieving the government's goal of encouraging and improving safeguards in apps for users to have age-appropriate experiences. The law is far more extensive than necessary to achieve the state's legitimate interests, meaning it should fail intermediate scrutiny as well.

As a preliminary matter, Texas (as well as any other states or governments considering age verification) could have limited the scope of its requirements to services and apps that do not implicate children's constitutional rights to access information. Texas has already enacted such a law requiring age assurance to access adult content. Moreover, it does not serve children or society to treat an application hosting a digital copy of the Constitution the same way as mature content—that's just common sense.

---

[34] *Computer & Commc'ns Indus. Ass'n v. Paxton*, 814 F. Supp. 3d 787, 800-01 (W.D. Tex. 2025).

Texas could have implemented more privacy-protective and speech-protective alternatives to requiring the use of invasive and inaccurate age assurance technologies. For instance, Texas could have required services to build systems that allow device owners to generate an age signal (which indicates only whether a user is an adult or minor or falls into a particular age category for minors), rather than requiring a strict age verification process. SB 2420 imposes a blanket mandate for all apps to obtain age information regardless of need, which unnecessarily exposes users to data exploitation. A more narrowly tailored approach would require app stores to transmit age signals only to age-restricted applications, such as those explicitly labeled for adults. Importantly, an age signal scheme should be designed to only share this age signal when an account holder or the account holder's parent has agreed to share it.[35]

These approaches are more narrowly tailored because they are either scoped to apply only to services that do not implicate children's constitutional rights to access speech or they provide parents and children with the tools they need to achieve Texas's legitimate interests without imposing barriers to accessing constitutional expression for minors or adults. Furthermore, even to the extent the constitution might permit Texas to implement more invasive age assurance requirements, the state is still obligated to provide necessary privacy and security

---

[35] Forland & Trivedi, *supra* note 19.

protections to people forced to undergo age verification. SB 2420 has a broad commercially reasonable mandate for age verification requirements. It is important that people in Texas know that their data and personal information is secure and private with responsibility for services to properly handle and process the requirements, including any third-party age verification providers. Each method of age verification presents trade-offs between accuracy, burden, security, and invasiveness, so different verification methods may make sense for different applications. The commercially reasonable requirement, in combination with the fact that it applies to many different applications, is overly broad and ironically does not support the safety or privacy of minors or adults.

Whatever method is permitted by any constitutionally permissible statute, minimum safeguards must also be included to ensure equitable access to apps and protection for privacy for all users. These safeguards include ensuring that the technology used to conduct verification is:

- reliant on high-quality sources of data to ensure context-dependent accurate verification;
- nondiscriminatory and uniformly accessible to all;
- private and secure, meaning
  - unlinkable
  - data-minimized

- limited-retention

- purpose-restricted

- securely implemented and

- not shared or distributed;

- transparent; and

- accountable and remediable.[36]

Consistent with these principles, the following methods might be adapted to fulfill properly scoped obligations in a manner that protects privacy and free expression.

- **Third-Party Zero-Knowledge Proof System:[37]** A promising approach to protecting user data and privacy are so-called zero-knowledge proofs that provide a means to verify, or provide "proof," that one party has knowledge of certain information, without having to reveal any further details beyond

---

[36] Aliya Bhatia & Nick Doty, *Mitigating Risk to Rights with Age Verification: Privacy-Preserving Guardrails That Should Accompany Deployments of Age Verification Approaches*, Ctr. for Democracy & Tech. (Oct. 10, 2025), https://cdt.org/insights/mitigating-risk-to-rights-with-age-verification-privacy-preserving-guardrails-that-should-accompany-deployments-of-age-verification-approaches/.

[37] Jared Ronis, *Don't Trust When You Can Verify: A Primer on Zero-Knowledge Proofs*, Wilson Ctr. (Feb. 7, 2024), https://www.wilsoncenter.org/article/dont-trust-when-you-can-verify-primer-zero-knowledge-proofs; Sarah Forland, *Exploring Privacy-Preserving Verification: A Close Look at Zero-Knowledge Proofs*, New America (July 17, 2025), https://www.newamerica.org/insights/exploring-privacy-preserving-age-verification/.

that fact.[38] Rather than providing proof of age to the app store, a user can provide proof of age to a trusted authenticator. The authenticator then provides digital tokens signaling an individual's age category. Tokens can be provided to age-restricted software with user permission to access software that is age restricted, such as almost all apps under the Texas law. Zero-knowledge proofs are double-blind approaches for age verification where the authenticator does not know what services a user is accessing and those services only receive necessary age category information without the ability to track or collect more information on users. This method improves privacy protections, enabling people to freely access the Internet while limiting the impact of potential data breaches by separating the verifier and the app store. Underscoring the need to ensure any restrictions are required only when constitutionally permissible, the digital ecosystem needed to scale this approach is still being developed, and there are still security vulnerabilities.[39] In the European Union, security researchers found vulnerabilities the same day a digital identity wallet developed by the

---

[38] Chris Sadler, *Verification Without Information: The Promise of Zero-Knowledge Proofs*, New America (Apr. 2, 2020), https://www.newamerica.org/insights/verification-without-information-promise-zero-knowledge-proofs/.

[39] Forland, *supra* note 36.

government that uses a zero-knowledge proofs was announced.[40] These technical vulnerabilities exist in addition to the chilling effects on speech imposed by the implementation of any kind of age-gate system.

- **Token-Based Systems:** As described in the prior section on zero-knowledge proofs, users can verify their identity and age with an authentication provider to receive reusable tokens that can be stored in a digital wallet and allow users to provide verified age category information to online services. Tokens can be used to verify age on age-restricted apps or websites without requiring users to reenter credentials or submit identification. While not entirely double-blind (tokens are reused making it possible to track users across services) and with some security risks, expanding guidance to encourage this privacy-enhancing approach would improve reliability and can be a convenient option for many users. Digital tokens are commercially available and would improve privacy, security, and ease of access for users compared to the current standard under SB 2420.[41]

---

[40] Emile Marzolf, *Brussels Launched an Age Checking App. Hackers Say It Takes 2 Minutes to Break It*, Politico (Apr. 17, 2026), https://www.politico.eu/article/eu-brussels-launched-age-checking-app-hackers-say-took-them-2-minutes-break-it/.

[41] Sarah Forland et al., *Age Assurance and Age Verification*, New America (Apr. 23, 2024), https://www.newamerica.org/insights/age-verification-the-complicated-effort-to-protect-youth-online/age-assurance-and-age-verification/.

- **Voluntary Signaling:** With voluntary signaling, users have the option to provide their own age to facilitate age-appropriate experiences across services of their choice. There are already standards for sites with adult content to self-label and be automatically blocked by parental filters, and for people to set their content preferences.[42] This approach has the benefit of allowing users—children and adults alike—to control their experience without blocking access to constitutionally protected content or requiring that users surrender sensitive personal information.

- **Default Safety Features and Parental Account Tools:** The Texas law restricts access for all Texans or people in the state to almost all apps on their phone, tablets, or other devices. This does not address the real safety and risks that children and adult users face in their daily online experiences. Instead of only restricting access, a more effective approach would introduce incentives for default safety features, often referred to as safety by design. Empowering users with easy access to tools that help improve content suggestions, especially filtering out unwanted content that users find inappropriate or harmful, would also improve this aim. Finally, parents

---

[42] Nick Doty, *Using Internet Standards to Keep Kids Away From Adult Content Online*, Ctr. for Democracy & Tech. (Mar. 25, 2025), https://cdt.org/insights/using-Internet-standards-to-keep-kids-away-from-adult-content-online/.

want easy-to-use parental tools that help them manage and have conversations with their children about their online experiences. Texas could have supported creating just such a flexible tool adaptable to any family's needs rather than imposing burdens to access all apps in app stores.

Regardless of approach, experts agree that age verification requirements must be limited to appropriate circumstances, globally accessible, and include strong default security protections to ensure users' privacy is protected and they are able to freely access content and services that they have the constitutional right to use.[43] A successful, effective, and narrowly tailored statute to protect minors online would be narrowly tailored to require restriction of access only to services from which minors can be legally excluded, "user-controlled, accurate, accessible, private and secure, transparent, accountable, community-developed, and broadly deployable."[44] SB 2420 fulfills none of these criteria.

---

[43] *Age Restrictions and Online Safety*, Internet Society (Dec. 2025), https://www.Internetsociety.org/resources/policybriefs/2025/age-restrictions-and-online-safety/.
[44] Nick Doty & Aliya Bhatia, *Standards-Based Approaches to Help Keep Kids Away from Adult Content Online*, Ctr. for Democracy & Tech. (Aug. 2025) https://www.ietf.org/slides/slides-agews-paper-standards-based-approaches-to-help-keep-kids-away-from-adult-content-online-00.pdf.

## CONCLUSION

For these reasons, Amici urges this Court to affirm the District Courts and reinstate the preliminary injunction on SB 2420.

Dated: June 24, 2026

Respectfully submitted,

*/s/ Sean J. McCaffity*
Sean J. McCaffity
State Bar No. 24013122
Sommerman, McCaffity, Quesada & Geisler, LLP
3811 Turtle Creek Blvd., Suite 1400
Dallas, TX 75219
214-720-0720

***Counsel for Amici Curiae Internet Society, New America's Open Technology Institute, and Center for Democracy and Technology***

## CERTIFICATE OF SERVICE

I certify that on this day of June 24, 2026, I served a true and correct copy of the foregoing Brief of Internet Society, New America's Open Technology Institute, and Center for Democracy and Technology as Amici Curiae in Support of Appellees on Counsel of record for all other parties through this Court's CM/ECF system.

Sean J. McCaffity
State Bar No. 24013122
Sommerman, McCaffity, Quesada & Geisler, LLP
3811 Turtle Creek Blvd., Suite 1400
Dallas, TX 75219
214-720-0720

*Counsel for Amici Curiae*
*Internet Society, New America's Open Technology Institute, and Center for Democracy and Technology*

Dated: June 24, 2026

# CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

1.	This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 4,382 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 29(a)(5).

2.	This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO in Times New Roman 14 point font.

Dated: June 24, 2026