**No. 25-51073 & No. 26-50001**

# United States Court of Appeals
### for the
## Fifth Circuit

STUDENTS ENGAGED IN ADVANCING TEXAS; M.F., by and through next friend VANESSA FERNANDES; Z.B., by and through next friend S.B.,

*Plaintiffs-Appellees,*

– v. –

KEN PAXTON, in his capacity as the ATTORNEY GENERAL OF TEXAS,

*Defendant-Appellant.*

*consolidated with*

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION,

*Plaintiff-Appellee,*

– v. –

KEN PAXTON, in his capacity as the ATTORNEY GENERAL OF TEXAS,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS (AUSTIN)

**BRIEF FOR *AMICI CURIAE* NATIONAL RETAIL FEDERATION AND THE TEXAS RETAILERS ASSOCIATION IN SUPPORT OF PLAINTIFFS-APPELLEES**

CEARA FLAKE
NATIONAL RETAIL FEDERATION
1101 NEW YORK AVENUE, NW
SUITE 1200
WASHINGTON, DC 20005
+1 (202) 626-8150
COUNSEL FOR NATIONAL RETAIL FEDERATION

J. JONATHAN HAWK
    COUNSEL OF RECORD
KATELYN RINGROSE
TYLER HENRY
MCDERMOTT WILL & SCHULTE LLP
2049 Century Park East
Suite 3200
Los Angeles, CA 90067
+1 (310) 788-4181

*Attorneys for Amici Curiae*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that–in addition to the persons and entities listed in the appellees Certificate of Interested Persons–the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal. In addition to the persons and entities identified in the briefs of Plaintiffs-Appellees in each consolidated case, the following persons may have an interest in the outcome of this case:

National Retail Federation (amicus curiae)

The Texas Retailer's Association (amicus curiae)

J. Jonathan Hawk (counsel of record)

Katelyn N. Ringrose (counsel for amici curiae)

Tyler Henry (counsel for amici curiae)

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(c), and Fifth Circuit Rule 28.2.1, it is hereby certified that National Retail Federation and the Texas Retailer's Association are 501(c)(6) organizations, with no parent

corporations, and no publicly held corporation owns 10% or more of any ownership interest in the organizations.

DATED: June 24, 2026

Respectfully submitted,

/s/ J. Jonathan Hawk
J. Jonathan Hawk

Counsel to Amici Curiae

**TABLE OF CONTENTS**

STATEMENT OF IDENTITY AND INTEREST ....................................................1

INTRODUCTION ...............................................................................................3

    I. THE ACT IMPOSES CONTENT-BASED RESTRICTIONS....................6

        A.    The First and Fourteenth Amendments Protect Against Content-Based Laws That Restrict the Distribution and Sale of Information ................................................................6

        B.    The Act is a Content-Based Restriction Because it Singles Out Specific Subject Matter for Differential Treatment ........................................................................9

        C.    The Act is a Content-Based Restriction Because it Seeks to Shield Minors from Certain Speech it Deems Objectionable ................................................................11

        D.    The Act Unconstitutionally Compels Speech By Retailers That Sell Goods Through Their Apps........................................12

    II. THE ACT FAILS ANY LEVEL OF SCRUTINY .................................14

        A.    The Act Cannot Satisfy Strict Scrutiny...................................14

        B.    The Act Cannot Satisfy Intermediate Scrutiny ........................17

    III. THE ACT IS UNCONSTITUTIONALLY VAGUE AND OPERATIONALLY UNWORKABLE............................................18

        A.    The Act is Void for Vagueness................................................18

        B.    The Act's Compliance Burdens Are High for Consumers and Retailers.................................................................20

        C.    The Act's Requirements Are Unclear in Practice....................25

    IV. CONCLUSION .................................................................................27

Case: 26-50001    Document: 137    Page: 5    Date Filed: 06/24/2026

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023)...........................................................................................................10

*Am. Amusement Mach. Ass'n v. Kendrick*,
  244 F.3d 572 (7th Cir. 2001) .............................................................................................7

*Am. Booksellers Ass'n v. McAuliffe*,
  533 F. Supp. 50 (N.D. Ga. 1981).................................................................................5, 19

*Ashcroft v. ACLU*,
  542 U.S. 656 (2004)............................................................................................................9

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002)............................................................................................................9

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
  591 U.S. 610 (2020)............................................................................................................8

*Bolger v. Youngs Drug Prods. Corp.*,
  463 U.S. 60, 67 (1983).......................................................................................................3

*Book People, Inc. et al. v. Wong, et al.*,
  91 F.4th 318 (5th Cir. 2024) ..........................................................................5, 6, 17, 18

*Brown v. Entertainment Merchants Ass'n*,
  564 U.S. 786 (2011)...............................................................................5, 6, 9, 10, 13

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
  447 U.S. 557 (1980)............................................................................................................6

*City of Boerne v. Flores*,
  521 U.S. 507 (1997)..........................................................................................................12

*Computer & Communications Industry Ass'n v. Paxton*,
  No. 1:25-cv-01660-RP (W.D. Tex. Dec. 23, 2025)......................................2, 9, 10, 13, 14, 17

*Counterman v. Colorado*,
  600 U.S. 66 (2023)............................................................................................................18

*Erznoznik v. City of Jacksonville*,
  422 U.S. 205 (1975)..........................................................................................................18

ii

*F.C.C. v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012) ...................................................................................5

*First Nat. Bank of Boston v. Bellotti*,
  435 U.S. 765 (1978) ...................................................................................5

*Interstate Circuit, Inc. v. City of Dallas*,
  390 U.S. 676 (1968) ...................................................................................5

*Joseph Burstyn, Inc. v. Wilson*,
  343 U.S. 495 (1952) ...................................................................................6

*McCullen v. Coakley*,
  573 U.S. 464 (2014) ...................................................................................6

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024) ................................................................................5, 6

*Nat. Press Photographers Ass'n v. McCraw*,
  594 F. Supp. 3d 789 (W.D. Tex. 2022) .....................................................8

*Near v. Minnesota ex rel. Olson*,
  283 U.S. 697 (1931) ...................................................................................4

*NetChoice, LLC v. Yost*,
  778 F. Supp. 3d 923 (S.D. Ohio 2025) .............................................5, 7, 15

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ...................................................................................5

*Police Dep't of Chicago v. Mosley*,
  408 U.S. 92 (1972) .....................................................................................8

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ..............................................................................12, 13

*Smith v. California*,
  361 U.S. 147 (1959) ...................................................................................5

*Sorrell v. IMS Health Inc.*,
  546 U.S. 552 (2011) ...................................................................................3

*Speiser v. Randall*,
  357 U.S. 513 (1958) ...................................................................................18

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
  393 U.S. 503 (1969) ...................................................................................7

iii

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994)...............................................................................................16

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*,
425 U.S. 748 (1976)...............................................................................................3, 6

*W. Virginia State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943).............................................................................................10, 11

*Winters v. New York*,
333 U.S. 507 (1948)...............................................................................................5, 7

*Wooley v. Maynard*,
430 U.S. 705 (1977).............................................................................................10, 11

*X Corp. v. Bonta*,
116 F.4th 888 (9th Cir. 2024) ................................................................................5, 12

*Young v. Am. Mini Theatres, Inc.*,
427 U.S. 50, 68-69 (1976) ......................................................................................3

**Statutes**

Children's Online Privacy Protection Act, 15 U.S.C. §§ 6501–6506 (2006)................................23

Tex. Bus. & Com. Code § 121.021(a) ...............................................................................11

Tex. Bus. & Com. Code § 121.021(b) ...............................................................................11

Tex. Bus. & Com. Code § 121.022(a)(1)..............................................................................8

Tex. Bus. & Com. Code § 121.022(h)(2) .............................................................................8

Tex. Bus. & Com. Code § 121.024(1)(A-C)........................................................................23

Tex. Bus. & Com. Code § 121.024(2) ...............................................................................21

Tex. Bus. & Com. Code § 121.052....................................................................................11

Tex. Bus. & Com. Code § 121.052(b)(2) ...........................................................................21

Tex. Bus. & Com. Code § 121.054.........................................................................21, 24, 25

Tex. Data Priv. and Sec. Act § 541..................................................................................25

**Other Authorities**

*Book People, Inc., et al.*, Order at ECF 110.................................................................5, 16, 18

Kelsey L. McAlister et al., *Social Media Use in Adolescents: Bans, Benefits, and Emotion Regulation Behaviors*, JMIR Preprints (July 22, 2024), https://doi.org/10.2196/preprints.64626 ...............................................................15

Senate Research Center, Bill Analysis, Tex. S.B. 2420, 89th Leg. Reg. Sess. (2025), available at: https://capitol.texas.gov/tlodocs/89R/analysis/pdf/SB02420I.pdf.............................................9

U.S. Const., amend I .....................................................................................................4

## STATEMENT OF IDENTITY AND INTEREST[1]

Pursuant to Federal Rule of Appellate Procedure 29, the National Retail Federation ("NRF") and the Texas Retailers Association ("TRA") respectfully submit this brief as amici curiae in the civil lawsuit filed by the Computer & Communications Industry Association ("CCIA").

NRF is the world's largest retail trade association, representing discount and department stores, home goods and specialty stores, Main Street merchants, grocers, wholesalers, chain restaurants, and internet retailers from the United States and more than 45 countries. NRF empowers the industry that powers the economy. Retailers represent the nation's largest private sector employer, contributing $5.3 trillion to the annual GDP and supporting more than one in four U.S. jobs—for 55 million working Americans. For over a century, NRF has been a voice for every retailer and every retail job, educating and communicating the powerful impact retail has on local communities and global economies.

TRA is an association of global, national, state, and local retail businesses dedicated to improving the lives of the consumers who power the Texas economic engine. TRA supports industry through government advocacy and educational

---

[1] This brief is submitted under Federal Rule of Appellate Procedure 29(a) with consent of all parties. Undersigned counsel for amici curiae certify this brief was not authored in whole or part by counsel for any of the parties; no party or party's counsel contributed money for the brief; and no one other than amici and their counsel have contributed money for this brief.

programs.

Amici regularly submit filings in cases raising significant legal issues for the retail community. Amici submit this brief to inform the Court of the myriad harms the Texas App Store Accountability Act, Tex. Bus. & Com. Code §§ 121.001 et seq., ("SB 2420" or the "Act"), would have on all app developers in Texas, including NRF and TRA members that provide apps and sell commercial items through those platforms.

**INTRODUCTION**

The Act imposes sweeping and unprecedented restrictions on the digital marketplace by conditioning access to applications, purchases, and expressive content on mandatory age verification, parental consent, and compelled publisher-style judgments about what speech and products are appropriate for minors. Though framed as a child-protection measure, the Act's plain terms sweep far more broadly. They operate to create a content-based speech regime that impermissibly burdens retailers, app developers, parents, and minors alike, and runs afoul of, among others, several aspects of the First Amendment to the United States Constitution.

Indeed, the Act reaches far beyond social media, or obscene or explicitly harmful material. It applies to apps which Texans engage everyday for commercial and expressive activity—including purchasing books, movies, clothing, educational materials, transportation services, groceries, and other constitutionally protected goods and information. Covered retailers are compelled to classify and publish subjective age ratings for countless products and purchases, despite the absence of objective standards and despite the deeply individualized judgments such decisions ordinarily involve. The law thus forces private entities to make sensitive expressive determinations the State itself refuses to define, decisions best left to parents.

As the District Court recognized in granting preliminary injunctive relief, that

uncertainty also creates a substantial risk of self-censorship.[2] Faced with potentially inconsistent and subjective judgments by the State and individual parent-consumers regarding what is "appropriate," retailers are likely to remove or restrict access to protected materials altogether rather than risk enforcement liability. The predictable result is a chilling effect on constitutionally protected speech and a corresponding restriction on the free flow of information.

At the same time, the Act imposes substantial burdens on consumers of any age. Adults must surrender identifying information to access lawful digital services; parents must continuously supervise and approve routine app activity; and minors may be denied access to lawful applications and purchases whenever parental approval is unavailable, delayed, or technologically impracticable. A seventeen-year-old attempting to purchase gasoline through a convenience-store app, access a news application, or download a retailer's mobile platform could be blocked entirely—not because the application contains obscene material, but because the State has imposed a sweeping gatekeeping regime untethered to any narrowly defined category of unprotected speech.

The First Amendment does not permit the government to restrict protected expression, compel speech, or burden lawful access to information through such

---

[2] *Order Granting Preliminary Injunction, Computer & Communications Industry Ass'n v. Paxton*, No. 1:25-cv-01660-RP (W.D. Tex. Dec. 23, 2025), at 17.

means. Courts have repeatedly rejected attempts to shield minors from ideas or content the government deems objectionable while simultaneously burdening the rights of adults, retailers, and distributors of protected expression. The Act suffers from those same constitutional defects.

The District Court correctly recognized these important aspects of free speech as protected by the First Amendment and properly issued a preliminary injunction.

Texas argues otherwise, insisting in large part that the Act regulates only commercial speech subject to lesser First Amendment protection. But that argument is premised on the incorrect presumption that all matters involving some form of speech disseminated via a paid-for transaction necessarily constitute speech that is "commercial" in nature. That is not the law.[3]

Here, books, banners, films, and other types of products sold through apps must be considered, as they undoubtedly contain noncommercial speech. Those types of materials cannot be characterized as "commercial" in nature simply because they are sold; nor can it be glossed over that the Act's provisions, if enforced, would suppress the dissemination of noncommercial speech communicated via those mediums.[4] Texas's characterization of the Act as a regulation of merely commercial

---

[3] *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 67 (1983); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 761 (1976); *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 68-69 (1976) ("The measure of constitutional protection to be afforded commercial speech will surely be governed largely by the content of the communication").

[4] *See Sorrell v. IMS Health Inc.*, 546 U.S. 552 (2011), (law restricting the sale, disclosure, and use of pharmacy records for marketing purposes found unconstitutional because it was a content-based

speech is far too narrow, and ignores the impermissible and immediate impact the Act would have on items that have been widely-recognized to enjoy noncommercial free speech protections under the First Amendment.

Because the Act imposes content-based restrictions, compels speech, chills lawful expression, and creates unworkable compliance obligations for retailers operating in Texas, the Court should affirm the injunction preventing the Act from taking effect.

## ARGUMENT

**I.     THE ACT IMPOSES CONTENT-BASED RESTRICTIONS**

**A.     The First and Fourteenth Amendments Protect Against Content-Based Laws That Restrict the Distribution and Sale of Information**

The First Amendment, applicable to States through the Fourteenth Amendment, prohibits laws "abridging the freedom of speech."[5] Those protections protect not only speech itself, but also the rights of people and entities who disseminate protected information, including by offering it for sale. Indeed, "[b]ecause freedom of speech is 'the indispensable condition[] of nearly every other form of freedom,' the First Amendment 'bars the government from dictating what

---

restriction that also burdened noncommercial or politically motivated speech); *compare Free Speech Coalition, Inc. v Paxton*, 145 S. Ct. 2291, 2298 (addressing law regulating access to obscene content for minors).

[5] U.S. Const., amend I; *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 707 (1931).

we see or read or speak or hear,' and protects 'the right to distribute, the right to receive, the right to read and freedom of thought.'"[6]

The Supreme Court, the Fifth Circuit, and federal courts nationwide have consistently applied free speech principles to strike down content-based regulations that restrict the abilities of book retailers, film distributors and exhibitors, TV broadcasters, participants in the videogame and software industries, and social media platform providers[7] to sell and distribute protected information. Courts have also been unwavering in recognizing that "the basic principles" of free speech protections "do not vary" when speech is being disseminated through "ever advancing technology" such as the internet.[8] And free speech protections do not fall away simply because the entity disseminating information seeks financial gain as part of a transaction.[9] Although the commercial speech doctrine can apply to the

---

[6] *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923, 947 (S.D. Ohio 2025) (Ohio law unconstitutional in requiring parental consent for minors to access social media platforms) (citations omitted); *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978) ("the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw").

[7] *See, e.g.*, *Winters v. New York,* 333 U.S. 507, 519-20 (1948) (books); *Smith v. California*, 361 U.S. 147, 149-50 (1959) (same); *Book People, Inc. et al. v. Wong, et al.*, 91 F.4th 318, 338-41 (5th Cir. 2024) (same); *Book People, Inc., et al. v. Wong, et al.*, Order at ECF 110, p. 13-17, No. 1:23-cv-00858 (Albright, J.) (same); *Am. Booksellers Ass'n v. McAuliffe*, 533 F. Supp. 50, 56-58 (N.D. Ga. 1981) (same); *Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676, 688-89 (1968) (film); *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 252-56 (2012) (broadcast); *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 794-95 n.3, 802-04 (2011) (videogames); *Yost*, 778 F. Supp. 3d at 947 (social media); *X Corp. v. Bonta*, 116 F.4th 888, 900-03 (9th Cir. 2024) (same).

[8] *Moody v. NetChoice, LLC*, 603 U.S. 707, 733 (2024).

[9] *See New York Times Co. v. Sullivan*, 376 U.S. 254, 266 (1964).

informational function of advertising,[10] expressive materials do not become "commercial speech" simply because they are offered for sale on retailers' applications or platforms.[11] To find otherwise—to allow content-based regulations that restrict the dissemination of protected speech regardless of channel—would interfere with protected access to that information.[12] It could coerce parties into not distributing information in the first instance,[13] and that chilling effect is precisely what the First and Fourteenth Amendments guard against.[14]

These protections apply when a law seeks to restrict minors from accessing information, including via modern technology and commercial transactions. As the Supreme Court stated in *Brown v. Entertainment Merchants Ass'n*, "[m]inors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them."[15] "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks

---

[10] *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 562 (1980).

[11] *Va. State Bd. of Pharmacy*, 425 U.S. at 761; *see also Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501–02 (1952).

[12] *Moody v. NetChoice, LLC*, 603 U.S. 707, 733 (2024).

[13] *See, e.g., Book People, Inc., et al.*, 91 F.4th at 330.

[14] *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (a First Amendment core purpose is "to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail.").

[15] *Brown*, 564 U.S. at 794.

unsuitable for them."[16] A law also cannot make a minor's access contingent upon parental consent. Such laws "do not enforce parental authority over children's speech and religion; they impose governmental authority, subject only to a parental veto[,]" and are unconstitutional.[17]

All of these principles are implicated here, where the State's effort via the Act to regulate access by minors to information ends up imposing content-based restrictions on retailers that sell goods through their apps, i.e., "purchases," including goods that communicate ideas and are afforded constitutional protections such as books and expressive clothing.[18] The Act would infringe free speech because it disincentivizes retailers from permitting access to the channels of speech available through applications and purchases, restraining the ability of retailers to be gateways for minors and adults to enact their free speech rights.

## B.     The Act is a Content-Based Restriction Because it Singles Out Specific Subject Matter for Differential Treatment

The Act is also an unconstitutional content-based restriction because it discriminates based on subject matter on its face. For decades, the Court has made clear that the government cannot "pick winners," allowing some types of speech

---

[16] *Id*. at 795.

[17] *Id.* at 794-95 n.3, 802-04 (emphasis in original).; *Am. Amusement Machine Ass'n, et al.*, 244 F.3d 572, 578 (7th Cir. 2001) (Posner, J.) (unconstitutional to condition minor's access to information on parental consent); *Yost*, 778 F. Supp. 3d at 947.

[18] *See, e.g.*, *Winters*, 333 U.S. at 519-20; *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507-10 (1969).

while banning others based on subject matter.[19] Laws that favor some categories of speakers over others for their content are facially discriminatory subject to strict scrutiny review.[20]

The Act only applies to apps that distribute certain messages. The Act exempts apps from the law's parental-consent requirements if they are operated with nonprofit educational organizations that develop standardized tests for schooling,[21] or if they, among other things, provide access to crisis hotlines.[22] These provisions determine what speech is regulated based on "subject matter" (e.g., does the app contain materials for scholastic testing) and on "function or purpose" (e.g., does the app provide access to a crisis hotline). Apps that do not meet the State's criteria for receiving favorable treatment under the Act are subject to the law's restrictions, including retailers who sell goods through their apps. The Act would thus permit children to access an app from the College Board, but bar children from accessing the app for a newspaper. That is *perforce* content-based regulation which the District Court correctly found.[23] Additionally, the District Court recorded that the Act does

---

[19] *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95–96 (1972).

[20] *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 618 (2020).

[21] Tex. Bus. & Com. Code § 121.022(h)(2).

[22] Tex. Bus. & Com. Code § 121.022(a)(1).

[23] *Nat. Press Photographers Ass'n v. McCraw*, 594 F. Supp. 3d 789, 805 (W.D. Tex. 2022) (Pittman, J.).

not target a true threat and Texas has not provided any evidence that children experience harms across the myriad apps implicated by the Act.[24]

## C.    The Act is a Content-Based Restriction Because it Seeks to Shield Minors from Certain Speech it Deems Objectionable

Laws that seek to shield minors from content that the State deems objectionable are also unconstitutional.[25] Even when the government has a compelling interest to protect children, the government cannot restrict speech that does not actually harm children.[26] Strict scrutiny applies to laws "designated to protect minors from viewing harmful materials."[27]

Texas acknowledged in the hearings below and was recorded by the District Court Order that they are specifically seeking to shield minors from certain speech the State deems objectionable.[28] The Act has been described by its authors as "protect[ing] the children of Texas" by "requiring app stores to gain consent from parents" before children can use and make purchases through apps.[29] Though States possess legitimate power to protect children from harm, they do not have free-floating power to restrict the ideas that children may be exposed to, including

---

[24] *PI Order, Computer & Commc'ns Indus. Ass'n*, No. 1:25-cv-01660-RP, at 12.

[25] Brown, 564 U.S. 786, 794–95, 799–805 (2011).

[26] *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 250–54 (2002).

[27] *Ashcroft v. ACLU,* 542 U.S. 656, 670 (2004).

[28] *PI Order, Computer & Commc'ns Indus. Ass'n*, No. 1:25-cv-01660-RP, at 10.

[29] Senate Research Center, Bill Analysis, Tex. S.B. 2420, 89th Leg. Reg. Sess. (2025), available at: https://capitol.texas.gov/tlodocs/89R/analysis/pdf/SB02420I.pdf (the "Bill Analysis").

through applications on a phone.[30] The Act is a content-based law that arbitrarily seeks to restrict minors from accessing content on applications and through purchases without showing true harm. The Act also materially restricts minors from the ability to interact with retailers that sell constitutionally protected information through their apps because Texas deems them objectionable. Neither of these justifications are constitutionally defensible as written in the Act and as evidenced through the record given that no harm has been found in impacted apps, and that less restrictive means exist.[31]

**D.      The Act Unconstitutionally Compels Speech By Retailers That Sell Goods Through Their Apps**

The First Amendment generally prohibits the government from compelling individuals to speak or endorse a message with which they disagree.[32] The Supreme Court has held that freedom of speech includes both the right to speak and the right to refrain from speaking.[33] In cases like *West Virginia State Board of Education v. Barnette* and *Wooley v. Maynard*, the Court invalidated requirements that individuals affirm ideological messages.[34] When a law compels speech based on its content or forces affirmation of a viewpoint, it is typically treated as a content-based regulation

---

[30] *Brown*, 564 U.S. at 794.
[31] *PI Order, Computer & Commc'ns Indus. Ass'n*, No. 1:25-cv-01660-RP, at 13.
[32] *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023).
[33] *Id*. at 589.
[34] *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943); *Wooley v. Maynard*, 430 U.S. 705 (1977).

and must satisfy strict scrutiny.

The Act compels speech by covered retailers. Section 121.052 provides, "[t]he developer of a software application shall assign to each software application *and to each purchase that can be made through the software application* an age rating based on the age categories it describes."[35] The breadth of that requirement is staggering. It would force retailers to *make decisions and publish them*—without any guidance in the Act—as to which items are appropriately purchased without parental consent by someone who: is a "child" (under 13); a "younger teenager" (13 to 15); an "older teenager" (16 to 17); or an "adult" (18 and older).[36]

Such a retailer would be required to opine on the appropriate age for someone without parental consent to purchase, e.g.: a copy of *The Catcher in the Rye* or *To Kill a Mockingbird*; a t-shirt with political messaging or expressions signaling membership in a group; a bumper sticker with religious slogans. These are issues that most, if not all, retailers will *not* decide or publish if left to their own volition. These are sensitive debates often left to families to decide for themselves, as evidenced by the fact that many retailers have never chosen to impose such restrictions. But the Act seeks to override that judgment. It seeks to dictate the content of a covered retailer's speech by compelling them to decide and declare who

---

[35] Section 121.052(a).
[36] Bill Analysis, Author's/Sponsor's Statement; Tex. Bus. & Com. Code § 121.021(a), (b).

can purchase which goods via their apps without parental consent, thus altering the marketplace of ideas. That again renders the Act a content-based law, requiring that it be subject to strict scrutiny.[37] The law is not saved because the speech would be made in connection with a potential commercial transaction. As other courts have found, it is simply unconstitutional to force retailers to "opine whether and how certain [] categories" of goods should be age-gated.[38] The Act is no different.

## II.   THE ACT FAILS ANY LEVEL OF SCRUTINY

### A.   The Act Cannot Satisfy Strict Scrutiny

Content-based laws such as the Act are subject to strict scrutiny, "the most demanding test known to constitutional law"[39] where a law is "presumptively unconstitutional." "[L]aws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference."[40] To save it, the State must identify a compelling government interest and demonstrate the law is narrowly drawn to serve that interest.[41] The State here cannot do that and the District Court highlighted that it is not clear Texas has a compelling interest in preventing minors' access to every single category of speech restricted by SB 2420. The Act is simultaneously overinclusive and underinclusive vis-à-vis the goal of

---

[37] *Bonta*, 116 F.4th at 903 (quotations omitted).
[38] *Bonta*, 116 F.4th at 899-903.
[39] *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).
[40] *Reed v. Town of Gilbert*, 576 U.S. 155, 170 (2015).
[41] *Brown*, 564 U.S. at 799; *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015).

protecting children from potentially harmful materials.[42]

On its face, the Act is seriously overinclusive. The law makes no attempt to identify types of goods that can lawfully be restricted even for minors, e.g., obscenity. Instead, the Act's restrictions are imposed with respect to all potential "purchases," i.e., goods offered for sale through the retailer's app. Texas acknowledged they could have easily employed less restrictive means to accomplish its protective goals, such as providing company incentives for content filters or educating children and parents on the importance of using these tools.[43] Instead, the Act's imposition of age classification requirements could, for example, result in barring groups of minors from purchasing famous literature such *Lord of the Flies* without parental consent. They could artificially prevent younger minors from purchasing other common, expressive materials—e.g., if a retailer desperate for a rationale underlying an age classification decided that bumper stickers could not be purchased by someone not of legal driving age without parental consent. They could incorrectly bar someone from making a purchase who was incorrectly deemed to be younger than they are, or whose account could not be linked to a parent who would otherwise readily consent.

Put simply, the Act would impose restrictions on covered retailers that would,

---

[42] *Id.* at 803-05.
[43] *PI Order, Computer & Commc'ns Indus. Ass'n*, No. 1:25-cv-01660-RP, at 13.

in turn, severely restrict minors from accessing swaths of constitutionally protected information via goods commonly purchased through retailers' apps every day. At the same time, the Act's restrictions are seriously underinclusive. Not only could some parents consent to a minor purchasing content others deem harmful, but the Act does nothing to address risks to minors making purchases of the same content on pre-loaded applications, like by navigating to Safari on an iPhone, or making purchases in stores without parental consent.[44] In those cases, a minor could open a covered retailer's website on Safari, or walk into their brick-and-mortar store, and purchase the same product that they would be otherwise prohibited from buying without parental consent via the same retailer's app.

In addition to not being narrowly tailored, the Act also does not serve a compelling state interest. Texas has failed to show that it is necessary for the government to broadly restrict app downloads and purchases in order to prevent minors from accessing the subset of apps which might contain harmful content.[45] Further yet, Texas provides no evidence substantiating the downloading of any app without parental permission is hazardous to the health or safety of minors. The District Court appropriately noted that Texas offers no evidence that even some of the apps covered cause mental or physical health detriments to youth.[46] The Act also

---

[44] *PI Order, Computer & Commc'ns Indus. Ass'n*, No. 1:25-cv-01660-RP, at 14.
[45] *Id*. at 13.
[46] *Id*. at 14.

ignores the benefits that access to applications can have, especially for marginalized communities, and for minors.[47]

Statutes such as the Act have been rightly struck down under the First and Fourteenth Amendments as nothing more than "breathtakingly blunt instrument[s] for reducing [purported] harm to children."[48] There is no reason to reach a different conclusion here, where the Act, a content-based law, fails strict scrutiny considering the impact it would have on protected information that would otherwise be readily available for purchase from covered retailers.

**B.    The Act Cannot Satisfy Intermediate Scrutiny**

In addition to failing strict scrutiny because the government has not shown they have a compelling state interest and the Act is not the least restrictive means of meeting that interest, the Act would not even pass intermediate scrutiny. Speech restrictions can survive intermediate scrutiny only if the government proves the law serves a "real" and "not merely conjectural" government interest "unrelated to the suppression of free expression," and "will in fact" serve that interest in a "direct and material way." And the restriction on First Amendment freedoms is not greater than is "essential to the furtherance of that interest."[49] The District Court emphasized that

---

[47] Kelsey L. McAlister et al., *Social Media Use in Adolescents: Bans, Benefits, and Emotion Regulation Behaviors*, JMIR Preprints (July 22, 2024), https://doi.org/10.2196/preprints.64626.
[48] *Yost*, 778 F. Supp. 3d at 956.
[49] *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662–64 (1994).

the record contains no evidence connecting the Act's goals to its emphasized methods and would thus fail intermediate scrutiny as well.

## III. THE ACT IS UNCONSTITUTIONALLY VAGUE AND OPERATIONALLY UNWORKABLE

### A. The Act is Void for Vagueness

In addition to the other constitutional issues, the Act is void for vagueness under the Due Process Clause of the Fourteenth Amendment. A law is invalid when it (1) fails to provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly," or (2) fails to provide "explicit standards" for applying the law "to avoid arbitrary and discriminatory applications."[50] The vagueness test becomes even more stringent when a law "interferes with the right of free speech," such as the Act.[51]

Here, the Act provides no guidance on how a covered retailer should assign age classifications. There is no mention of what metrics should be used to determine an age rating, and the Act is silent on what content is appropriate or inappropriate for each age category. The Act states that app developers are not liable who use "widely adopted industry standards to determine the age rating and specific content required," but without further guidance industry practices may not be sufficient and could still lead to violations.[52] It is telling that the Opening Brief does not address

---

[50] *Book People, Inc., et al.*, Order at ECF 110, p. 15 (citations omitted).
[51] *Id.*
[52] *PI Order, Computer & Commc'ns Indus. Ass'n*, No. 1:25-cv-01660-RP, at 16.

how this case is analogous to the circumstances addressed by this Court in *Book People, Inc., et al. v. Wong* regarding vagueness,[53] and, instead, argues that "industry standards" sufficiently explains what those standards are. The Opening Brief's argument leaves unanswered the key question: what is an "industry standard" for making appropriate content designations under the Act? The difficulty in answering that question is likely why the Opening Brief does not point to one. Many retailers do not have industry standard designations for unregulated goods. It is also important to recall the breadth of goods many retailers offer for purchase and that, as to most such goods, there are no agreed-upon guidelines around age-appropriateness. This leads not only to possible selective and disparate enforcement, but also incentivizes over-censorship for companies who would like to steer clear of being accused of furnishing inappropriate content.[54] This runs the risk of all apps being tailored to children, even when children and teens are a small portion of the user population.

Decisions about access to content and purchases are often left to individual sensibilities and families,[55] e.g., where one family may believe that a book is appropriate for their 13-year-old, another family may disagree. It is impossible for a retailer to make these decisions using objective criteria, universally agreed-upon

---

[53] *Book People, Inc. v. Wong*, 91 F.4th 318, 337 (5th Cir. 2024) (vague standards governing protected expression are constitutionally suspect because they force speakers to "steer far wider of the unlawful zone," thereby chilling protected speech.)

[54] *Id*. at 17; *See Counterman v. Colorado*, 600 U.S. 66, 77-78 (2023) (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)).

[55] *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 210 (1975).

across families and communities. Any covered retailer attempting to engage in the exercise envisioned under the Act would likely find itself under attack from all sides—with consumers criticizing heightened age restrictions on goods that communicate ideas, and the State able to arbitrarily assign fault for the same retailer's decisions to assign less restrictive age requirements to other goods that are communicating different ideas. This could leave a retailer no choice but to refrain from offering such goods for sale through its app in the first instance—distorting the marketplace of ideas.

Courts in other cases, including a recent case in this district in *Book People, Inc., et al. v. Wong, et al.*, have found analogous statutes unconstitutionally vague where they purport to require retailers and distributors to assign ratings to books without any objective guidance.[56] The lack of guidance here as to how retailers should assign even more amorphous age classifications under the Act renders the statute entirely vague, leaving open the possibility for arbitrary interpretation and enforcement of the kind the Due Process Clause guards against.

**B.**     **The Act's Compliance Burdens Are High for Consumers and Retailers**

The Act imposes substantial burdens on consumers by conditioning access to

---

[56] *Book People, Inc., et al.*, Order at ECF 110, p. 15-17 (citations omitted); *Am. Booksellers Ass'n*, 533 F. Supp. at 57.

broad segments of the digital marketplace on mandatory age verification, parental approval, and platform-level screening requirements. For adult users, the Act requires disclosure of personal identifying information as a prerequisite to accessing app marketplaces and downloading lawful applications, thereby creating privacy risks, increasing friction in access to protected speech, and chilling anonymous exploration of sensitive or controversial content. Parents are likewise burdened by the Act's ongoing consent obligations, which effectively require continuous supervision and approval of minors' digital activity regardless of the nature of the application involved. And for minors, the burdens are even more direct: the statute restricts independent access to educational, political, religious, social, and expressive platforms unless parental consent is affirmatively obtained.

In practice, this framework risks denying minors access to lawful speech altogether where parental approval is unavailable, delayed, or withheld. For example, a seventeen-year-old driving home from school may stop at a gas station to purchase gas using the convenience store company's mobile app, which allows users to activate pumps, receive discounts, and process payment digitally. Under SB 2420, however, the minor could be prevented from downloading or accessing the app unless the app store first verifies the user's age and obtains parental consent. If the minor's parent is unavailable, does not respond to a consent request, or has not previously configured parental authorization, the teenager may be unable to use the

app at all—even for a routine commercial transaction unrelated to harmful content. The same friction for consumers can exist with transit apps, pharmacy apps, grocery apps, and banking apps. By imposing sweeping access restrictions across virtually all applications—rather than narrowly targeting specific harmful conduct—the Act substantially interferes with consumers' ability to engage in the market and access lawful information, communications, and expressive content in the digital marketplace.

The Act imposes outsized burdens on amici retailers and other app developers that may drive developers to simply not offer their apps in Texas, which would only compound the unconstitutional impacts on Texans detailed above. Retailers seeking to comply with the Act face a daunting challenge. The App's age rating requirements alone may be prohibitively burdensome. Retailers often have thousands or tens of thousands of stock-keeping units ("SKUs") per store, and just as many, if not many more, available for purchase in apps. The effort required to individually rate and detail the "elements that led to each rating"[57] will impose an immediate and direct cost for each existing SKU. Many retailers' successes stem from the ability to respond quickly to changes in consumer demand; adding an age-rating compliance workstream to each new (or restocked) product adds complexity and marginal costs that will undermine retailers' ability to meet demand.

---

[57] Tex. Bus. & Com. Code § 121.052(b)(2).

The Act's parental consent requirements also add to this operational and compliance challenge. Under the Act, retailers will need to rework their in-app purchase flows to first confirm each user's "age category" and, in the case of minor users, verify "whether consent has been obtained" for each purchase or app download.[58] Retailers, who are instructed under the Act to base their determinations at least in part on "information received from the owner of an app store,"[59] will need to develop software that interacts with app store programming interfaces to receive and process such information before allowing purchases to proceed. Even the most seamless implementations of these requirements will cause delays in the purchase process and consumer friction and frustration. In retail, purchase delays become purchase denials, leading to lost revenue and the erosion of customer trust. Some delays may be outside of retailer's control entirely: what if the app store's system is delayed in communicating the purchaser's age data or consent status?

The Act's age-verification and parental-consent regime is particularly unworkable at the moment a user turns eighteen. Covered retailers must continuously monitor, update, and synchronize a user's legal status across accounts, devices, and transactions in real time. SB 2420 requires app stores to categorize users by age and to maintain parental-consent mechanisms for minors, but provides little

---

[58] *Id.* § 121.024(2).
[59] *Id.* § 121.054(b).

guidance regarding how operators are supposed to determine precisely when parental authorization obligations terminate or how quickly those permissions, restrictions, and data-sharing practices must be revoked once a user reaches majority. In practice, this creates substantial technical and compliance burdens because covered retailers must coordinate constantly changing age and consent signals across interconnected systems, while also avoiding unlawful disclosure or retention of sensitive parental and identity-verification data after a user is no longer a minor. Age-verification systems involve unresolved "practical challenges and tradeoffs," which make them unworkable for small and large covered retailers particularly where legal obligations shift based on changing age thresholds and ongoing identity assurance requirements.

The fallout for retailers is not limited to the Act's requirements alone. Other laws, including privacy laws like the federal Children's Online Privacy Protection Act ("COPPA"), may be triggered. Retailers whose apps are not targeted to children have historically not been subject to these laws, which apply only when a retailer has "actual knowledge" an app user is under 13.[60] Such laws were never intended to apply to all businesses,[61] and their scope has created a pro-privacy incentive structure whereby out-of-scope businesses are incentivized to minimize the data they

---

[60] Children's Online Privacy Protection Act, 15 U.S.C. §§ 6501–6506 (2006).
[61] *Id.*

collect about users to ensure that they do not obtain such "actual knowledge." The Act appears to upend such incentives, forcing retailers to collect and process information about their customers' age they have no interest in collecting.[62] As a result, retailers may need to build compliance programs for not just the Act but also for COPPA and similar laws with "actual knowledge" requirements that may be triggered as a result of the Act. This compelled data collection, and the compliance requirements it may trigger, are costly and unnecessary for most retailers.

## C.　The Act's Requirements Are Unclear in Practice

Even if the compliance costs were manageable, the Act's lack of clarity poses additional burdens on retailers that weighs in favor of striking down the Act. While uncertainties are discussed above, including the lack of guidance around how retailers are expected to assign age ratings, further uncertainties arise out of the parental consent requirements. The Act requires retailers to "create and implement a system to use information received [from app stores] to verify" the age category and parental consent status of users.[63] While the Act requires developers to "use information received from the owner of an app store" to perform this verification, it fails to clarify whether developers may use *only* this information, or if the retailer must base its decision on other relevant information in the retailer's possession.

---

[62] Tex. Bus. & Com. Code § 121.024(1)(A-C).
[63] *Id.* at Tex. Bus. & Com. Code § 121.054.

What if a retailer has information that conflicts with information from the app store? If the retailer previously collected a user's government ID, and linked it to an in-app account, does the information on the ID override differing age category information provided by an app store? Either way, retailers are at risk—if they go off their own knowledge of a user's age, have they violated the Act because they did not rely on the app store's information? If they instead use information from the app store they know to be inaccurate, will that be used to show they knowingly violated the Act's consent and age verification requirements?

In another ambiguity, the Act requires app stores to verify age only when a user "creates an account with an app store." Existing users, therefore, are grandfathered in and will not be subject to the age verification requirements. But app developers are required to confirm age category "for each user" of their apps, with no distinction between new and existing users.[64] This results in a gap between the app store and developer obligations—there will be a large number of Texans for whom only developers, and not app stores, are required to verify age. Do retailers need to develop an independent age verification system to fill in this gap? Or turn these users away entirely until they create a new account with the app store? How are retailers expected to handle users who frequent both brick-and-mortar and app stores, making purchases on an app and exchanges in-person? These are just some

---

[64] *Id.* at Tex. Bus. & Com. Code § 121.054(1).

of the difficult compliance issues posing significant risk to retailers (not of their own doing) as they work to comply with the Act's ambiguities.

Finally, the Act offers significant operational disruptions through its notice requirements, which compel developers to inform app stores of any "significant change" to an app's terms of service or privacy policy. The ambiguity around what constitutes a "significant change"—which may include offering a new product or updating an existing app's services—will, when coupled with the need for retailers to constantly update privacy policies to reflect current practices, lead to a ceaseless cycle of notification, causing confusion and frustrating the Texas legislature's goal of having companies provide "reasonably accessible and clear privacy notice," as required by the Texas Data Privacy and Security Act.[65] Further, instead of allowing minors the freedom to budget and make independent purchases on approved apps using the allowances or "pocket money" given to them by their parents, parents will be forced to manually reconsent to every transaction, undermining the ease of digital commerce and guaranteeing constant disruption to the daily lives of both parents and children.

## IV.    CONCLUSION

The Act is not a narrowly tailored child-safety measure. It is a sweeping content-based regulatory regime that compels speech, burdens lawful commerce,

---

[65] Texas Data Privacy and Security Act § 541.

chills access to protected expression, and imposes substantial operational and constitutional harms on consumers and retailers—including amici members—throughout Texas. The Act forces private entities to make subjective judgments about speech and age appropriateness, requires pervasive age-verification and consent mechanisms untethered to any demonstrated harm, and restricts access to lawful applications and purchases beyond any constitutionally permissible scope.

The First Amendment does not allow the State to impose such broad burdens on the distribution of protected information and expressive goods in the name of protecting minors—particularly where less restrictive alternatives plainly exist and where the law's own exemptions reveal its underinclusive and content-based structure. Because SB 2420 cannot survive constitutional scrutiny and threatens immediate and irreparable harms to retailers, consumers, parents, and minors alike, the Court should affirm the district court's injunction and prevent the Act from taking effect.

Respectfully submitted,

DATED: June 24, 2026

MCDERMOTT WILL & SCHULTE LLP
/s/ J. Jonathan Hawk
/s/ Katelyn N. Ringrose
/s/ Tyler Henry

Counsel to Amici Curiae

-1-

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the

Court for the United States Court of Appeals for the Fifth Circuit by using the

appellate CM/ECF system. I further certify that all participants in the case are

registered CM/ECF users and that service will be accomplished by the appellate

CM/ECF system.

DATED: June 24, 2026

Respectfully submitted,

/s/ J. Jonathan Hawk

J. Jonathan Hawk

Counsel to Amici Curiae

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,495 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14.

Respectfully submitted,

/s/ J. Jonathan Hawk

J. Jonathan Hawk

Counsel to Amici Curiae