Case No. 25-51073

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

STUDENTS ENGAGED IN ADVANCING TEXAS, *et al.*,

*Plaintiffs-Appellees,*

v.

KEN PAXTON, in his official capacity as the Texas Attorney General,

*Defendant-Appellant.*

*CONSOLIDATED WITH*

No. 26-50001

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION,

*Plaintiff-Appellee,*

v.

KEN PAXTON, in his official capacity as the Texas Attorney General,

*Defendant-Appellant*

_____

On Appeal from the U.S. District Court for the Western District of Texas
No. 1:25-CV-1662
No. 1:25-CV-1660

**BRIEF OF AMICI CURIAE AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF TEXAS, ELECTRONIC FRONTIER FOUNDATION, FREEDOM TO READ FOUNDATION, AND WOODHULL FREEDOM FOUNDATION IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

_____

Vera Eidelman
AMERICAN CIVIL LIBERTIES UNION
 FOUNDATION
125 Broad Street, 18 Fl.
New York, NY 10004
Email: veidelman@aclu.org
Tel.: (212) 549-2500

Brian Klosterboer
Adriana Piñon
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF TEXAS
P.O. Box 8306
Houston, TX 77288
Email: bklosterboer@aclutx.org
(346) 299-6811

Cody Venzke
AMERICAN CIVIL LIBERTIES UNION
 FOUNDATION
915 15th St. NW
Washington, DC 20005
Email: cvenzke@aclu.org
Tel.: (202) 457-0800
*Licensed only in California. Application
pending in the District of Columbia.*

Aaron Mackey
Electronic Frontier Foundation
815 Eddy Street
San Francisco, California 94109
Email: amackey@eff.org
Tel.: (415) 436-9333


*Counsel for Amici Curiae*

# CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 5th Cir. R. 29.2, the undersigned counsel of record submit the following certificate of interested parties as described in 5th Cir. R. 28.2.1.

Amici curiae American Civil Liberties Union, ACLU of Texas, Electronic Frontier Foundation, Freedom to Read Foundation, and Woodhull Freedom Foundation state that they do not have a parent corporation and that no publicly held corporation owns 10 percent or more of their stock.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualifications or recusal.

| Person or Entity | Connection to Case |
| --- | --- |
| American Civil Liberties Union | Amicus curiae |
| American Civil Liberties Union of Texas | Amicus curiae |
| Electronic Frontier Foundation | Amicus curiae |
| Freedom to Read Foundation | Amicus curiae |
| Woodhull Freedom Foundation | Amicus curiae |
| Cody Venzke | Counsel for amici |
| Vera Eidelman | Counsel for amici |

| | |
|---|---|
| Aaron Mackey | Counsel for amici |
| Brian Klosterboer | Counsel for amici |
| Adriana Piñon | Counsel for amici |
| Students Engaged in Advancing Texas | Plaintiff-Appellee |
| M.F., by and through his next friend, Vanessa Fernandez | Plaintiff-Appellee |
| Z.B., by and through her next friend, S.B. | Plaintiff-Appellee |
| Davis Wright Tremaine LLP | Counsel for Plaintiffs-Appellees |
| Adam S. Sieff | Counsel for Plaintiffs-Appellees |
| Ambika Kumar | Counsel for Plaintiffs-Appellees |
| David M. Gossett | Counsel for Plaintiffs-Appellees |
| Abigail B. Everdell | Counsel for Plaintiffs-Appellees |
| Haley B. Zoffer | Counsel for Plaintiffs-Appellees |
| Celyra I. Myers | Counsel for Plaintiffs-Appellees |
| Computer & Communications Industry Association | Plaintiff-Appellee |
| Wilson Sonsini Goodrich & Rosati | Counsel for Plaintiff-Appellee |
| Brian M. Willen | Counsel for Plaintiff-Appellee |
| Deno Himonas | Counsel for Plaintiff-Appellee |
| Lauren Gallo White | Counsel for Plaintiff-Appellee |
| Edward P. Percarpio | Counsel for Plaintiff-Appellee |

| | |
|---|---|
| Elizabeth W. Sharkey | Counsel for Plaintiff-Appellee |
| Cooley LLP | Counsel for Plaintiff-Appellee |
| Elizabeth B. Prelogar | Counsel for Plaintiff-Appellee |
| Ephraim A. McDowell | Counsel for Plaintiff-Appellee |
| Joshua Revesz | Counsel for Plaintiff-Appellee |
| Haynes and Boone, LLP | Counsel for Plaintiff-Appellee |
| Michael Lambert | Counsel for Plaintiff-Appellee |
| William Reid Pillifant | Counsel for Plaintiff-Appellee |
| Laura Lee Prather | Counsel for Plaintiff-Appellee |
| Catherine Lewis Robb | Counsel for Plaintiff-Appellee |
| Ken Paxton, in his official capacity as Attorney General of Texas | Defendant-Appellant |
| Office of the Texas Attorney General | Counsel for Defendant-Appellant |
| Jeffrey A. Stephens | Counsel for Defendant-Appellant |
| Zachary Berg | Counsel for Defendant-Appellant |
| Tevin Long | Counsel for Defendant-Appellant |
| Mohmed Idris Patel | Counsel for Defendant-Appellant |

Dated: June 24, 2026

By: */s/ Cody Venzke*
Cody Venzke

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iii

STATEMENT OF INTEREST OF AMICI .......................................................... 1

INTRODUCTION ......................................................................................... 2

ARGUMENT ................................................................................................ 4

    I.  The Act Will Cover a Wide Universe of Speech Applications that Minors and Adults Use to Engage in Constitutionally Protected Expression. ........................................................................................ 4

    II.  The Act Is Not Merely a Regulation of Commercial Transactions But Is Aimed at Regulating Speech. ......................................................... 8

        A.  A Profit Motive Is Insufficient to Establish that Speech Is "Commercial". ......................................................................... 11

        B.  Promotional Speech about Fully Protected Speech Is Itself Fully Protected ............................................................................ 12

    III. The Act's age-rating requirement is compelled speech. ...................... 13

    IV.     The Act's parental consent and age verification provisions are content-based and cannot survive strict scrutiny as applied to speech platforms. ................................................................................ 17

        A.  The Act Impermissibly Prohibits Minors from Accessing and Engaging in Protected Speech on Certain Topics Without Parental Consent. ......................................................... 19

        B.  The Act Also Burdens the First Amendment Rights of Adults and Minors by Imposing Age Verification and Undermining User Privacy .......................................................... 20

            1.  Age verification will either chill or entirely block access to lawful speech. ...................................................... 21

2. Online age verification undermines Texas's purported interest in protecting minors' privacy....................................23

V. Even if the Age Verification and parental consent requirement were subject to intermediate scrutiny, it would still fail. .........................25

CONCLUSION .................................................................................................26

# TABLE OF AUTHORITIES

**Cases**

*303 Creative v. Elenis,*
  600 U.S. 570 (2023)............................................................................ 13, 14

*American Booksellers Foundation v. Dean,*
  342 F.3d 96 (2d Cir. 2003) ................................................................. 22, 24

*Ashcroft v. ACLU,*
  542 U.S. 656 (2004)..................................................................................20

*Barr v. American Association of Political Consultants, Inc.,*
  591 U.S. 610 (2020)..................................................................................18

*Board of Trustees of State University of New York v. Fox,*
  492 U.S. 469 (1989)..................................................................................11

*Bolger v. Younger Drugs Products Corp.,*
  463 U.S. 60 (1983)....................................................................................12

*Book People v. Wong,*
  91 F.4th 318 (5th Cir. 2024) ............................................................. 14, 15, 16

*Brown v. Entertainment Merchants Association,*
  564 U.S. 786 (2011)........................................................................... passim

*City of Austin v. Reagan National Advertising of Austin, LLC,*
  596 U.S. 61 (2022)....................................................................................17

*Erznoznik v. City of Jacksonville,*
  422 U.S. 205 (1975)....................................................................................8

*Free Speech Coalition, Inc. v. Paxton,*
  606 U.S. 461 (2025)............................................................................ 3, 17, 21

*Free Speech Coalition, Inc. v. Paxton,*
  95 F.4th 263 (5th Cir.) ...................................................................... 16, 17

*Gmurzynska v. Hutton,*
  355 F.3d 206 (2d Cir. 2004) ....................................................................13

*Groden v. Random House, Inc.*,
61 F.3d 1045 (2d Cir. 1995) ..............................................................12

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
515 U.S. 557 (1995)..........................................................................14

*Jamison v. Texas*,
318 U.S. 413 (1943)..........................................................................13

*Joseph Burstyn, Inc. v. Wilson*,
343 U.S. 495 (1952)..........................................................................11

*Lacoff v. Buena Vista Pub., Inc.*,
705 N.Y.S.2d 183 (Sup. Ct. 2000)....................................................13

*Lorillard Tobacco Company v. Reilly*,
533 U.S. 525 (2001) ..........................................................................26

*Mahanoy Area School District v. B.L.*,
594 U.S. 180 (2021)............................................................................7

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)..........................................................................25

*National Institute of Family & Life Advocates v. Becerra*,
585 U.S. 755 (2018)..........................................................................14

*NetChoice, LLC v. Bonta*,
113 F.4th 1101 (9th Cir. 2024) .........................................................15

*New York Times v. Sullivan*,
376 U.S. 254 (1964)..........................................................................11

*Packingham v. North Carolina*,
582 U.S. 98 (2017)..............................................................................6

*Page v. Something Weird Video*,
960 F. Supp. 1438 (C.D. Cal. 1996) .................................................13

*People v. Fogelson*,
21 Cal.3d 158 (1978) ........................................................................12

*PSINet, Inc. v. Chapman*,
  362 F.3d 227 (4th Cir. 2004) ........................................................ 22, 24

*Reno v. ACLU*,
  521 U.S. 844 (1997) .............................................................. 8, 22, 24

*Smith v. California*,
  361 U.S. 147 (1959) ........................................................................11

*Snyder v. Phelps*,
  562 U.S. 443 (2011) ..........................................................................7

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) ........................................................................18

*Turner Broadcasting System, Inc. v. FCC*,
  512 U.S. 622 (1994) ........................................................................18

*United States v. O'Brien*,
  391 U.S. 367 (1968) ........................................................................26

*West Virginia State Board of Education v. Barnette*,
  319 U.S. 624 (1943) .....................................................................7, 14

*X Corp. v. Bonta*,
  116 F.4th 888 (9th Cir. 2024) .........................................................17

*Zauderer v. Off. of Disciplinary Counsel of Supreme Court of Ohio*,
  471 U.S. 626 (1985) ........................................................................14

**Statutes**

Tex. Bus. & Comm. Code Ann. § 121.021..............................................9

Tex. Bus. & Comm. Code Ann. § 121.022...........................................9, 17

Tex. Bus. & Comm. Code Ann. § 121.026..............................................14

Tex. Bus. & Comm. Code Ann. § 121.052..............................................9

**Other Authorities**

American Psychological Association, *Stress in America: Generation Z* (2018)............................................................................................16

*Bluey (TV Series)*, Wikipedia..................................................................15

Burt Neuborne, Testimony to the Senate Commerce, Science and Transportation Committee, Feb. 26, 1997, *quoted in* ACLU, Comment Letter on Industry Proposal for Rating Video Programming at 4 (May 7, 1997) ...................................................................................15

*Columbine High School Massacre*, Wikipedia...........................................16

Dan Goodin, *Discord Says Hackers Stole Government IDs of 70,000 Users*, Ars Technica (Oct. 9, 2025)....................................................24

Elizabeth Marks et al., *Climate Anxiety in Children and Young People and Their Beliefs About Government Responses to Climate Change: A Global Survey*, 5 The Lancet Planetary Health e863, e866 (2021) ...............16

*France Opens Formal Probe into Teenage Suspect in Massive ID Data Breach*, Reuters (Apr. 30, 2026)...............................................24

*Google Play vs the Apple App Store: App Stats and Trends*, 42Matters (June 12, 2026) .......................................................................4

*iPhone Top Games & Apps (Paid)*, Apple..................................................5

*iPhone Top Games & Apps*, Apple ...........................................................4

Jillian Andres Rothschild et al., Univ. Md. Ctr. for Democracy & Civic Engagement, *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge* 2 (2024)................................22

Lee Rainie et al., *Anonymity, Privacy, and Security Online*, Pew Rsch. Ctr. (Sept. 5, 2013).............................................................................23

Matt Burgess, *When Face Recognition Doesn't Know Your Face Is a Face*, Wired (Oct. 15, 2025) .................................................................23

Michael Dezuanni, Simon Chambers & Tanya Notley, *Australian Teens Impacted by the Social Media Ban Are Getting Less News: New Research*, The Conversation (May 17, 2026) ........................................................5

Michael J. Hanmer & Samuel B. Novey, Univ. Md. Ctr. for Democracy & Civic Engagement, *Who Lacked Photo ID in 2020?: An Exploration of the American National Election Studies* 5 (2023) ...............................................22

Michelle Favario, Eugenie Park, and Jeffrey Gottfried, *Teens' Experiences on TikTok, Instagram, and Snapchat*, Pew Research Center (Apr. 15, 2026) .........................................................................................................5

Nick Evershed & Josh Nicholas, *Social Media Ban Trial Data Reveals Racial Bias in Age Checking Software: Just How Inaccurate Is It?*, The Guardian (Sept. 18, 2025) ...................................................................23

Pieter Arntz, *Age Verification Vendor Persona Left Frontend Exposed, Researchers Say*, Malwarebytes Labs (Feb. 20, 2026) ........................................24

*Project: The Robloxian Christians*, Exponential ........................................................6

Richard Power, Carnegie Mellon CyLab, *Child Identity Theft: New Evidence Indicates Identity Thieves Are Targeting Children for Unused Social Security Numbers* 3 (2011) ................................................................25

Rindala Alajaji, *Age Verification, Estimation, Assurance, Oh My! A Guide to the Terminology*, EFF Deeplinks Blog (Oct. 30, 2025) .............................. 22, 23

Tracy Kitten, Javelin, *Child Identity Fraud: A Web of Deception and Loss* 5 (2021) ...................................................................................................25

**STATEMENT OF INTEREST OF AMICI**[1]

The American Civil Liberties Union ("ACLU") is a nationwide, nonpartisan, nonprofit organization. The American Civil Liberties Union of Texas ("ACLU of Texas") is a state affiliate of the ACLU. Both organizations are dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws, including freedom of speech. They frequently advocate for First Amendment rights online and the free speech rights of young people.

The Electronic Frontier Foundation ("EFF") is a non-profit civil liberties organization with more than 30,000 active members that has worked for 35 years to ensure that technology supports freedom, justice, and innovation for all people of the world. EFF is dedicated to protecting online users' free expression and privacy rights and has fought for both in courts and legislatures across the country. EFF has challenged laws that burden internet users' rights by requiring online services to verify users' ages.

The Freedom to Read Foundation ("FTRF") is a nonprofit organization established to foster libraries as institutions that fulfill the promise of the First Amendment; support the rights of libraries to include in their collections and make

---

[1] Pursuant to Federal Rule of Appellate Procedure Rule 29(a)(4)(E), amici certify that no person or entity, other than amici curiae, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. The parties have consented to the filing.

1

available to the public any work they may legally acquire, including a broad array of authors and viewpoints; establish legal precedent for the freedom to read of all persons; and protect the public against efforts to suppress or censor speech.

The Woodhull Freedom Foundation ("Woodhull") is a non-profit organization that works to advance the recognition of sexual freedom, gender equality, and free expression. Woodhull's mission is focused on affirming sexual freedom as a fundamental human right. Woodhull has participated in litigation as a party or amicus in cases across the country dealing with free expression. Woodhull is particularly focused on governmental attempts to censor or burden access to online speech, as sexually-themed expression is often a target of such efforts.

Amici are all organizations invested in the freedom of speech online and submit this brief to highlight the implications of the law at issue for individuals' access to mobile applications primarily devoted to expression.

## **INTRODUCTION**

The "App Store Accountability Act" (the Act) regulates all mobile applications—including the thousands of applications that enable individuals to speak and access information online, from newspaper and Bible applications to those focused on creating art or music.

This brief focuses on two of the Act's mandates as applied to those speech applications: first, that app developers must age-rate their applications based on their

"content or other elements," and second that, before every app download, users must verify their ages and, if deemed to be under 18, obtain parental consent—unless the application they want to access falls into one of two content-based exceptions.

As applied to speech-based applications—that is, applications primarily devoted to creating or accessing speech—these mandates violate the First Amendment. The age rating requirement unconstitutionally compels speech by forcing developers to opine on the appropriateness of constitutionally protected speech for minors. And the content-based age verification and parental consent requirement restricts minors from accessing speech they are entitled to receive and burdens adults' access as well. Because there is no age-based difference in the constitutional protections for the vast majority of the speech regulated by the Act, there is no constitutionally supportable justification for age verification, and the Supreme Court's decision in *Free Speech Coalition v. Paxton* is inapposite. 606 U.S. 461 (2025).

Even if the parental consent and age verification requirement were subject to intermediate scrutiny, it would fail. Texas contends that the Act is merely a regulation of contracts between developers and minors, but its focus on age rating content and its content-based exemptions for age verification and parental consent show that it is, in fact, directly aimed at regulating expression. Moreover, the law does not even advance the government's purported interest while directly regulating

3

expression, as it still leaves many of the same contracts unregulated when formed through other means.

For these reasons, this Court should affirm.

## <u>ARGUMENT</u>

**I. THE ACT WILL COVER A WIDE UNIVERSE OF SPEECH APPLICATIONS THAT MINORS AND ADULTS USE TO ENGAGE IN CONSTITUTIONALLY PROTECTED EXPRESSION.**

The Act's sweep is broad and covers applications that span the spectrum of expressive activity. As of June 2026, both the Apple App Store and the Google Play Store were approaching 2.4 million applications.[2] The most popular applications are those that allow individuals to speak, read, watch, and learn. As of June 2026, the most popular free applications included movie and sports streaming (FOX One, Peacock, and apps related to the FIFA World Cup), social media and messaging services (Threads, TikTok, and WhatsApp), photo editing (CapCut), and search and large language models (Google search, Google Gemini, ChatGPT, and Claude).[3] The top paid applications also had markedly expressive purposes: flashcards (AnkiMobile Flashcards), painting and sketching (Procreate Pocket), star maps

---

[2] *Google Play vs the Apple App Store: App Stats and Trends*, 42Matters (June 12, 2026), https://perma.cc/CRD9-WV55/.
[3] *iPhone Top Games & Apps*, Apple, https://perma.cc/342B-8E2C/ (captured June 22, 2026) (free apps).

(SkyView), a metronome and tuner (TonalEnergy), and a mobile music studio (FL Studio Mobile).[4]

Young people rely on applications such as YouTube, TikTok, Instagram, and SnapChat for entertainment, and to stay in touch with their friends and family.[5] Roughly 40 percent of teens who use TikTok and Instagram say that they get their news from those apps and go to them to keep up with political issues.[6] That mirrors global internet use by minors, with Australian teens reporting that, after the country's recent ban for youth on social media, they are getting and discussing less news.[7]

Religious apps are also some of the most popular across Google and Apple's stores. For example, users have downloaded Bible Chat, an app that helps Christian users engage in daily Bible readings, prayer, and religious study, more than 5 million times from Google, and it is among the top-10 most downloaded reference apps from

---

[4] *iPhone Top Games & Apps (Paid)*, Apple, https://perma.cc/W2WM-LGDX/ (captured June 22, 20226).
[5] *See* Michelle Favario, Eugenie Park, and Jeffrey Gottfried, *Teens' Experiences on TikTok, Instagram, and Snapchat*, Pew Research Center (Apr. 15, 2026), https://perma.cc/NU5W-U7ZB/.
[6] *Id*.
[7] Michael Dezuanni, Simon Chambers & Tanya Notley, *Australian Teens Impacted by the Social Media Ban Are Getting Less News: New Research*, The Conversation (May 17, 2026), https://perma.cc/J44A-TH5N.

Apple.[8] At one point in 2024, Hallow, an app for Catholics, was the most downloaded app from Apple, beating out Netflix, Instagram, and TikTok.[9]

Religious apps are also popular among young people. One young person even built a community on the gaming platform Roblox called "The Robloxian Christians," a place for kids to pray for one another and talk about their faith.[10] It is now a "youth-led virtual church ministry serving upwards of 40,000 young people from over 85 countries."[11]

In 2017, the Supreme Court observed that social media offers "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard," and creates "places where [people] can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 582 U.S. 98, 104, 107 (2017). Today, that is true of mobile applications more broadly.

Valuable, positive expression and connection regularly take place through online applications. At the same time, people can share distressing information or engage in negative interactions—and that does not make the content any less

---

[8] *See Bible Chat – Holy Bible Study,* Google Play, https://perma.cc/E42J-HG32/ (Captured June 24, 2026); *Bible Chat: Daily Devotional*, Apple App Store, https://perma.cc/S2ZW-FTCA/ (Captured June 24, 2026).

[9] *See* Lauren Jackson, *Finding God in the App Store*, New York Times (Sept. 14, 2025), https://perma.cc/DZ44-UBHH/.

[10] Joely Johnson Mork, *Teen's Online Church Draws Young People from Around the World*, Faith & Leadership (Aug. 23, 2016), https://perma.cc/63CJ-VCS3/.

[11] *Project: The Robloxian Christians*, Exponential, https://perma.cc/T3DH-HDFB/.

protected. *See, e.g., Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (speech is protected even if deeply offensive to listeners); *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 190 (2021) (minors have a right to engage in profane speech on social media). The presence of upsetting content is not unique to mobile applications and, just as the government could not ban minors from reading newspapers (which contain distressing news) or showing up at town hall meetings (which might have heated public debate), the government cannot ban minors from accessing protected expression online simply because of its communicative impact. *See Brown v. Entertainment Merchants Association*, 564 U.S. 786, 790 (2011) (holding that the First Amendment applies to new forms of communication regardless of their aesthetic and moral value).

The vast majority of speech available through mobile applications is protected for minors and adults alike. With the narrow exception of speech that is obscene for minors, but not adults, people under the age of 18 generally enjoy the same First Amendment rights as adults. Indeed, the Supreme Court has been emphatic that a speaker or listener's youth is no reason to diminish their rights but calls instead "for scrupulous protection of [their] Constitutional freedoms . . . if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943).

For that reason, the Supreme Court has repeatedly struck down legislation imposing age limitations on new mediums notwithstanding societal fears about their impact on children, from violent video games, *see Brown*, 564 U.S. at 789, to non-obscene sexual expression online, *Reno v. ACLU*, 521 U.S. 844, 874 (1997), to drive-in movies, *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975). And the Supreme Court has expressly held that the government cannot "create a wholly new category of content-based regulation that is permissible only for speech directed at children." *Brown*, 564 U.S. at 793–94 (rejecting government's argument that it can regulate violent speech communicated to minors just as it can sexual speech that is harmful to minors). Accordingly, as applied to speech applications, the Act regulates protected speech.

## II. THE ACT IS NOT MERELY A REGULATION OF COMMERCIAL TRANSACTIONS BUT IS AIMED AT REGULATING SPEECH.

### A. The Act Focuses on Apps' Content, Not Contract Terms

Texas attempts to avoid this result by arguing that the Act solely regulates contract terms, independent of constitutionally protected speech. Appellant Br. 18–19, Dkt. No. 35. One could imagine a law that seeks to protect minors' privacy and defend them from predatory contract terms by requiring parents to review an application's terms of service before allowing their children to use them—but, setting aside whatever the flaws of such a law might be, *this* is not that law, as shown by the centrality of the Act's age-rating requirements.

Pursuant to the Act, software developers must "age rate" their applications as appropriate for "children" (under 13), "younger teenager[s]" (13 or under but younger than 16), "older teenager[s]" (at least 16, but younger than 18), or "adult[s]" (18 or over). Tex. Bus. & Comm. Code Ann. §§ 121.021 (b), 121.052(a). The law requires that those ratings reflect the "*specific content* or other elements" of the application. *Id.* § 121.052(b) (emphasis added).

And the age ratings are also central to the Act's age verification and parental consent requirement. The Act mandates that app stores verify user ages, and affiliate anyone identified as under 18 with an "adult" account, which must grant consent for every "individual download or purchase" by the minor—and that consent must be based in part on the age rating assigned to the application. *Id.* § 121.022(d)-(f).

In fact, of the five items that must be disclosed to parents, *two* are tied to applications' respective age ratings; none address contract terms or terms of service, even at a high-level. *Id.* § 121.022(f)(1). This focus on rating content suggests that the age verification and parental consent requirements are designed to gate not minors' contracts, but their access to speech online.

Texas cannot avoid First Amendment scrutiny by recasting content-based restrictions as mere regulation of contract terms. The Supreme Court's decision in *Brown v. Entertainment Merchants Association* is instructive on this point. In *Brown*, California required video games to be rated based on their violent content

9

and required parental consent for sales of violent video games to minors. 564 U.S. at 789. The Court affirmed an injunction against the law, reasoning, "[I]t does not follow [from traditional parental authority] that the state has the power to prevent children from hearing or saying anything without their parent's prior consent." *Id.* at 795 n.3.

If Texas were correct, California could have simply reframed the law as regulating the contractual terms of sale—for example, the terms for video game returns, or arbitration for any products liability issues—and sidestepped strict scrutiny. But, because the law at issue in *Brown* regulated speech on the basis of its content, its rule governs here: the government may not—even under the guise of regulating the sale of speech products to children—compel content ratings or premise minors' access to protected speech on parental consent without satisfying First Amendment scrutiny. This is not to say that distributors of speech are entirely exempt from regulations not directed at speech, including regulating contract terms. But that is not a fair description of the Act.

## B. As Applied to Speech Apps, the Act Regulates More Than Commercial Speech

The stay panel's conclusion that the Act is, at most, a regulation of commercial speech is also flawed. Stay Pending Appeal 3–4, Dkt. No. 91-1. The panel offered two reasons: first, that "[a]pp store transactions are commercial in nature" and, second, that "[a]pp listings propose commercial transactions."

Accepting either justification would have dangerous implications for freedom of speech.

### A. A Profit Motive Is Insufficient to Establish that Speech Is "Commercial"

The fact that speech is sold, or even motivated by profit, does not make it commercial speech. In *New York Times v. Sullivan*, the Supreme Court rejected the idea that an ad about police abuse was commercial because "the Times was paid for publishing the advertisement." 376 U.S. 254, 266 (1964). That, the Court explained, "[wa]s as immaterial in this connection as is the fact that newspapers and books are sold." *Id.* So, too, for movies. *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952). "Speech for a profit" is not "what defines commercial speech." *Bd. of Trs. of State Univ. of New York v. Fox*, 492 U.S. 469, 482 (1989).

Equally, when it comes to distributing or publishing speech, "[i]t is of course no matter that the dissemination takes place under commercial auspices. Certainly a retail bookseller plays a most significant role in the process of the distribution of books." *Smith v. California*, 361 U.S. 147, 150 (1959) (internal citation omitted)); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. at 499 (same for film distribution). That mobile applications and app services involve new mediums and new technologies does not change this result.

**B. Promotional Speech about Fully Protected Speech Is Itself Fully Protected**

The fact that the app listings communicate information about speech that can be sold doesn't make them commercial speech any more than the cover of a book or a description of a concert series would be. "[C]ommercial solicitation or promotion of constitutionally protected written works is protected as an incident to the First Amendment value of the underlying speech or activity." *People v. Fogelson*, 21 Cal.3d 158, 165 n.7 (1978). When statements "summarize an argument or opinion *within* a [protected work]," even as part of an advertisement, they "are essentially a matter of argument, to be accepted or rejected by those who [evaluate the work]." *Groden v. Random House, Inc.*, 61 F.3d 1045, 1052 (2d Cir. 1995).

The Supreme Court has recognized as much. In *Bolger v. Younger Drugs Products Corp.*, the Court noted that it had previously held that an "advertisement for religious book[s] cannot be regulated as commercial speech" and, while concluding that pamphlets promoting the sale of condoms were properly classified as commercial speech, it cautioned that "a different conclusion may be appropriate in a case where the pamphlet advertises an activity itself protected by the First Amendment." 463 U.S. 60, 67 n.14 (1983). Similarly, in *Jamison v. Texas*, the Court distinguished the states' authority to "prohibit the use of the street for the distribution of purely commercial leaflets" from an impermissible prohibition on the "distribution of handbills in the pursuit of a clearly religious activity," including ones

12

that "invite the purchase of books." 318 U.S. 413, 417 (1943).

Consequently, catalogs, advertisements, and promotional materials that summarize or discuss the content of fully protected speech are themselves fully protected. *Page v. Something Weird Video*, 960 F. Supp. 1438, 1444 (C.D. Cal. 1996); *accord Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004); *Lacoff v. Buena Vista Pub.*, Inc., 705 N.Y.S.2d 183, 190 (Sup. Ct. 2000). Because the content on speech-based applications is generally fully protected, app store listings that summarize or reflect that speech cannot be treated as purely commercial speech. Nor can age ratings based on the content of that speech.

## III. THE ACT'S AGE-RATING REQUIREMENT IS COMPELLED SPEECH.

As applied to speech-based apps, the Act's age-rating requirement violates the First Amendment for a simple reason: it compels developers and platforms to opine on the fully protected speech they carry, and the editorial decisions they make in carrying that speech.

"No government . . . may affect a speaker's message by forcing her to accommodate other views," including the government's, "and no government may interfere with her desired message." *303 Creative v. Elenis*, 600 U.S. 570, 596 (2023) (cleaned up). Limited exceptions exist for compelled commercial speech of "purely factual and uncontroversial information," *Zauderer v. Off. of Disciplinary*

*Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985), but "outside that context [the government] may not compel affirmance of a belief with which the speaker disagrees," *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995) (citing *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)); *accord Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 771 (2018). This is fatal to the age-rating provision.

That the Act purportedly requires developers to state their opinion, rather than that of the state, does not save it. The prohibition on compelled speech "applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley*, 515 U.S. at 573. The fact that it is a violation of the Act to "knowingly misrepresent[] an age rating or reason for that rating," Tex. Bus. & Comm. Code Ann. § 121.026(a)(2), suggests that there is a state-approved right answer—the platform must ultimately comply with the state's view of the speech it carries. Further, even if the compelled ratings reflected the platforms' own opinion, the state has still "alter[ed]" and "interfere[d]" with the content of the platform's message. *See 303 Creative*, 600 U.S. at 596.

This Court has recognized that mandatory content ratings are constitutionally impermissible, even for speech directed at children. In *Book People v. Wong*, this Court rejected Texas's requirement for book distributors to rate the sexual content of books sold to public schools. 91 F.4th 318, 337 (5th Cir. 2024). Such government-

14

mandated ratings, this Court concluded, were unprecedented and unconstitutional. Unlike industry "movie and video game ratings," which "are entirely voluntary," Texas's "rating system requires third-party sellers to rate library materials before they can sell them to public schools." *Id.* Here, just as in *Book People*, Texas is attempting to compel media ratings prior to dissemination of speech.

Even if the Act were understood to compel only commercial speech, the age rating requirement could not satisfy the applicable scrutiny because forcing developers of speech-based platforms "to opine on potential harm to children" is not "purely factual and uncontroversial." *NetChoice, LLC v. Bonta,* 113 F.4th 1101, 1117, 1120 (9th Cir. 2024). Assessing age ratings—especially at the granular level of parsing whether content is appropriate for "children," "younger teenagers," "older teenagers," or adults—is inherently subjective. For example, differentiating between the violence in *Hamlet* or *Oedipus Rex* and violence not fit for a younger audience necessarily "involve[s] purely subjective notions of taste and aesthetic judgment."[12] Likewise, many applications contain content spanning the spectrum of human speech and experience, and so would defy a simple age rating—Wikipedia for example, includes articles on everything from the children's TV show *Bluey*[13] to the

---

[12] Burt Neuborne, Testimony to the Senate Commerce, Science and Transportation Committee, Feb. 26, 1997, *quoted in* ACLU, Comment Letter on Industry Proposal for Rating Video Programming at 4 (May 7, 1997), https://perma.cc/V2Y8-ACGB.
[13] *Bluey (TV Series)*, Wikipedia, https://perma.cc/Q8PA-JFBX/.

Columbine High School massacre.[14] Similarly, news about war or school violence is distressing, but it is also valuable for minors.[15] Determining the appropriate age ratings in these instances is anything but "purely factual and uncontroversial."

This Court has already determined that content-based age ratings fail *Zauderer* for precisely this reason. In *Book People*, this Court held that "the ratings [Texas] requires are neither factual nor uncontroversial" because they require "contextual analyses, weighing and balancing many factors to determine a rating," which "is anything but the mere disclosure of factual information. And it has already proven controversial." 91 F.4th at 340.[16] The same is true here.

Similarly, this Court determined that compelled health warnings on pornographic websites failed *Zauderer* because they were not uncontroversial. *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 282 (5th Cir.), *aff'd*, 606 U.S. 461

---

[14] *Columbine High School Massacre*, Wikipedia, https://perma.cc/G78N-922J/.
[15] Elizabeth Marks et al., *Climate Anxiety in Children and Young People and Their Beliefs About Government Responses to Climate Change: A Global Survey*, 5 The Lancet Planetary Health e863, e866 (2021), https://perma.cc/GG3G-R2EK (59 percent of young survey respondents said they felt "very" or "extremely" worried about climate change); American Psychological Association, Stress in America: Generation Z (2018), https://perma.cc/CZV7-DVTH/ (75 percent of respondents in Generation Z reported mass shootings were a "significant source of stress").
[16] The *Book People* court assumed, without deciding, that the relevant speech was commercial in nature. 91 F.4th at 339.

(2025).[17] According to this Court, "controversial" means "only that there must be some widespread, good-faith dispute over the topic or the facts." *Id.*; *accord X Corp. v. Bonta*, 116 F.4th 888, 901–02 (9th Cir. 2024). The age-appropriateness of applications for minors is currently a hotly contested, openly debated issue.

### IV. THE ACT'S PARENTAL CONSENT AND AGE VERIFICATION PROVISIONS ARE CONTENT-BASED AND CANNOT SURVIVE STRICT SCRUTINY AS APPLIED TO SPEECH PLATFORMS.

A law is content-based if "it applies to particular speech because of the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (cleaned up). The Act's age verification and parental consent requirement is content-based because it does not apply to (1) any application that "provides a user with direct access to emergency services," including "crisis hotline[s]" maintained by nonprofits, or (2) an application by a nonprofit that "develops, sponsors, or administers a standardized test used for purposes of admission to or class placement in a postsecondary educational institution." Tex. Bus. & Comm. Code Ann. § 121.022(h)(1)–(2).

---

[17] The *FSC* court determined that website "landing page[s]" constituted commercial speech because the law "focus[ed] on business and corporate forms," which read "most naturally as an indication that the statute reaches only those entities that publish or distribute sexual material harmful to minors *for commercial or business purposes*." 95 F.4th at 280 (emphasis in original). As noted above, speech for profit is not, by definition, commercial speech. But, even if it were, the Act in this case contains no such limitation to only business and corporate forms.

The first exception is expressly premised on content: if an app offers emergency services, rather than, say, access to the Bible, the New York Times, or Duolingo, it is exempted. The state argues that the exception turns on purpose, not content. Appellant Br. at 28 ("it focuses on why the service is needed rather than what is being communicated"). But the Supreme Court has rejected such a distinction. In *Sorrell*, the Court held that a law "require[d] heightened judicial scrutiny" where it prohibited the use of certain information for "marketing," while allowing the same information to "be purchased or acquired by other speakers with diverse purposes and viewpoints." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 563–64 (2011).

The second exception, for standardized testing applications, is also content-based. "[L]aws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994); *see also Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 619 (2020). That is the case here: applications offered by test administrators are exempted because the State wants students to be able to access such tests and related content.

As a content-based law, the Act cannot survive strict scrutiny for two reasons.

**A.** **The Act Impermissibly Prohibits Minors from Accessing and Engaging in Protected Speech on Certain Topics Without Parental Consent.**

First, the Act restricts minors' access to protected speech; *Brown* is particularly instructive on this. In that case, the Supreme Court struck down a law that prohibited selling violent video games to minors—in effect, like the Act, allowing parents to choose what speech minors can access—because it failed strict scrutiny. There, like here, the state had "claim[ed] that the Act is justified in aid of parental authority." 564 U.S. at 802; *see* Appellant Br. 23, Dkt. No. 35. But, while recognizing the "legitima[cy]" of this aim, the Court held that California's law was both under- and overinclusive. *Id.* at 805.

The law was underinclusive in part because, if the material is indeed "dangerous [and] mind-altering," the Court explained, it did not make sense to "leave [it] . . . in the hands of children so long as one parent . . . says it's OK." *Id.* at 802. The law was also overinclusive because it "abridges the First Amendment rights of young people whose parents . . . think violent video games are a harmless pastime." *Id.* at 805.

The Court thus rejected the idea "that the state has the power to prevent children from hearing or saying anything *without their parents' prior consent,*" for "[s]uch laws do not enforce *parental* authority over children's speech and religion; they impose *governmental* authority, subject only to a parental veto." *Brown*, 564

19

U.S. at 795 n.3. The Court also expressed "doubts that punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Id.* at 802.

Each of those holdings governs here: To the extent the Act is an attempt to protect minors from harm, it is "seriously underinclusive . . . because it permits a parental . . . veto." *Id.* at 805. To the extent that the Act is an attempt to "assist[ ] concerned parents," it is "seriously overinclusive because it abridges the First Amendment rights of young people whose parents . . . think [mobile apps are] a harmless pastime." *Id*. And it also raises First Amendment concerns because it seeks to punish third parties "*just in case* their parents disapprove." *Id.* at 802.

**B.    The Act Also Burdens the First Amendment Rights of Adults and Minors by Imposing Age Verification and Undermining User Privacy.**

Second, even if the Act's parental consent requirement could survive strict scrutiny, the predicate requirement of age verification cannot. The Act requires app stores to implement age verification via undefined "commercially reasonable" methods. Tex. Bus. & Comm. Code Ann. § 121.021(a). Common methods include checking government IDs, collecting biometric information, and querying commercial databases. And the requirement is imposed on every user—adult and minor alike. This violates the First Amendment by directly burdening the rights of all app store users. *See Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004); *Free Speech*

20

*Coal.*, 606 U.S. at 483 (recognizing that "submitting to age verification is a burden on the exercise of [First Amendment] right[s]").

The Supreme Court's decision in *Paxton v. Free Speech Coalition* cannot save the age verification requirement. There, the Supreme Court held that a law aimed at blocking minors' access to content that is obscene as to minors was subject to intermediate scrutiny only because "[h]istory, tradition, and precedent recognize" that minors have no First Amendment right to access such sexually explicit speech. *Free Speech Coal.*, 606 U.S. at 472. The Court concluded that the law's age verification requirements were thus "an exercise of Texas's traditional power to prevent minors from accessing speech that is obscene from their perspective"—i.e., *unprotected* as to minors—and its "burden [on] adults' rights . . . ha[d] 'only an incidental effect on protected speech.'" *Id.* at 478 (citation omitted). The Court repeatedly disclaimed any application of its decision to regulations of "fully protected speech"—that is, protected speech for which the First Amendment protections do not vary by age. *Id.* at 484, 485, 493 n.12, 494 n.13.

        **1.**      **Age verification will either chill or entirely block access to lawful speech.**

Should app stores implement verification via government-issued identification to comply with the Act, it will "serve as a complete block to adults who wish to access adult material [online] but do not" have the necessary form of

identification. *PSINet, Inc. v. Chapman*, 362 F.3d 227, 237 (4th Cir. 2004); *see also Reno*, 521 U.S. at 856; *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003) (invalidating age-assurance requirement that would make "adults who do not have [the necessary form of identification] . . . unable to access those sites"). The same will be true for any minor who will struggle to prove their relationship to their parents or guardian.

About 15 million adult U.S. citizens do not have a driver's license, and about 2.6 million do not have any form of government-issued photo ID.[18] Estimates show another 28.6 million adult citizens use government IDs that lack their current names or addresses.[19]

Using biometric data, such as scanning users' faces, is no better. It is inherently imprecise, as the technology essentially guesses a user's age.[20] The

---

[18] Jillian Andres Rothschild et al., Univ. Md. Ctr. for Democracy & Civic Engagement, *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge* 2 (2024), https://perma.cc/DL9A-5T8L.

[19] *Id*. at 2, 5; *see also* Michael J. Hanmer & Samuel B. Novey, Univ. Md. Ctr. for Democracy & Civic Engagement, *Who Lacked Photo ID in 2020?: An Exploration of the American National Election Studies* 5 (2023), https://perma.cc/X7JS-J7R7 ("Over 1.3 million voting-age citizens in [Georgia, Indiana, Kansas, Mississippi, Tennessee, and Wisconsin] likely did not have the identification needed to vote in 2020.").

[20] See Rindala Alajaji, *Age Verification, Estimation, Assurance, Oh My! A Guide to the Terminology*, EFF Deeplinks Blog (Oct. 30, 2025), https://perma.cc/G644-WKZZ.

imprecision means that the Act will block adults who are miscategorized as minors and allow minors to access app stores because the system guesses that they are adults.[21] These systems are also more likely to misidentify ages for specific demographics, including people of color, people with disabilities, and people whose faces are not detected by the system, failing a wide range of app users.[22]

### 2. Online age verification undermines Texas's purported interest in protecting minors' privacy.

Having to provide identifying information to services seeking to comply with the Act—whether for age verification or to check parental relationships and consent—would require invasive data collection and impermissibly burden the First Amendment right to anonymity.

A reported 86 percent of internet users have taken steps online to minimize their digital footprints, and 55 percent have done so to "avoid observation by specific people, organizations, or the government."[23] The Act undermines those users'

---

[21] *See id.* (explaining how biometric systems usually group users into age ranges, such as between age 15 and 19).

[22] *See* Nick Evershed & Josh Nicholas, *Social Media Ban Trial Data Reveals Racial Bias in Age Checking Software: Just How Inaccurate Is It?*, The Guardian (Sept. 18, 2025), https://perma.cc/LX46-34S8; Matt Burgess, *When Face Recognition Doesn't Know Your Face Is a Face*, Wired (Oct. 15, 2025), https://perma.cc/9DEK-4HDW.

[23] Lee Rainie et al., *Anonymity, Privacy, and Security Online*, Pew Rsch. Ctr. (Sept. 5, 2013), https://perma.cc/5BUP-J96F.

privacy. And, without anonymity, "the stigma associated with the content" of certain applications "may deter" people from accessing them at all. *PSINet, Inc.*, 362 F.3d at 236–37; *see also Reno*, 521 U.S. at 856. *See also Am. Booksellers Found.*, 342 F.3d at 99 (age verification "require[s] that website visitors forgo the anonymity otherwise available on the internet").

Although Texas ostensibly enacted the Act out of concern for minors' privacy and wellbeing, the law's online age verification regime will make minors and adults less safe given the realities of online advertising and data insecurity.

At a minimum, the data will present a target for data thieves. In October 2025, hackers stole the government IDs of 70,000 individuals used to verify their age for the social media applications Discord.[24] Similarly, the frontend of one age verification service was left exposed on a federal server,[25] and the French agency responsible for handling age verification was hacked, resulting in the data of millions of French people being put up for sale.[26]

Compounding this concern, minors are attractive targets for identity theft due

---

[24] Dan Goodin, *Discord Says Hackers Stole Government IDs of 70,000 Users*, Ars Technica (Oct. 9, 2025), https://perma.cc/98KD-4YDX/.

[25] Pieter Arntz, *Age Verification Vendor Persona Left Frontend Exposed, Researchers Say*, Malwarebytes Labs (Feb. 20, 2026), https://perma.cc/94A9-7C82/.

[26] *France Opens Formal Probe into Teenage Suspect in Massive ID Data Breach*, Reuters (Apr. 30, 2026), https://perma.cc/5DHR-A5F4/.

to their "uniquely valuable" unused Social Security numbers.[27] A 2021 study found that one in 50 U.S. children were victims of identity fraud, and one in 45 children had personal information exposed in a data breach.[28] The risk of data breach is likely to chill constitutionally protected expression.

## V. EVEN IF THE AGE VERIFICATION AND PARENTAL CONSENT REQUIREMENT WERE SUBJECT TO INTERMEDIATE SCRUTINY, IT WOULD STILL FAIL.

Even if intermediate scrutiny were appropriate here, the age verification and parental consent requirement for speech-based applications would fail it for three reasons.

First, because the regulated content is protected for all ages, *see supra* Section I, it is unclear how age verification and parental consent relates to any legitimate government interest, much less advances a significant one.

Second, to satisfy intermediate scrutiny, "a law must further a 'substantial governmental interest' that is 'unrelated to the suppression of free expression.'" *Moody v. NetChoice, LLC*, 603 U.S. 707, 740 (2024) (quoting *United States v.*

---

[27] Richard Power, Carnegie Mellon CyLab, *Child Identity Theft: New Evidence Indicates Identity Thieves Are Targeting Children for Unused Social Security Numbers* 3 (2011), https://perma.cc/RR56-VE2H/ ("A child's identity is a blank slate, and the probability of discovery is low, as the child will not be using it for a long period of time.").

[28] Tracy Kitten, Javelin, *Child Identity Fraud: A Web of Deception and Loss* 5 (2021), https://perma.cc/Z9P4-2U4B/.

*O'Brien*, 391 U.S. 367, 377 (1968)). In *Moody*, Texas had "never been shy" about its interest in impacting "the mix of speech that the major social-media platforms present," and that interest, the Court concluded, could not survive even intermediate scrutiny. The same is true here. As detailed above, the incorporation of age ratings into the Act's age verification and parental consent requirement demonstrate that it is very much *related* to the suppression of speech.

Finally, under intermediate scrutiny, a law must "directly and materially advanc[e] the asserted governmental interest." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (citation omitted). "This burden is not satisfied by mere speculation or conjecture; rather, a governmental body . . . must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Id.* Texas has not met this burden, for it leaves contracts identical to those it regulates unregulated so long as the minor effectuates them through visiting a web browser rather than an app store. And the applications most popular for minors such as YouTube and TikTok are easily available online through a browser.

## CONCLUSION

For the foregoing reasons, the Court should affirm the court below.

26

Dated: June 24, 2026

Respectfully submitted,

Vera Eidelman
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street, 18 Fl.
New York, NY 10004
Email: veidelman@aclu.org
Tel.: (212) 549-2500

*/s/ Cody Venzke*
Cody Venzke
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
915 15th St. NW
Washington, DC 20005
Email: cvenzke@aclu.org
Tel.: (202) 457-0800
*Licensed only in California.*
*Application pending in the District of*
*Columbia.*

Brian Klosterboer
Adriana Piñon
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF TEXAS
P.O. Box 8306
Houston, TX 77288
Email: bklosterboer@aclutx.org
(346) 299-6811

Aaron Mackey
Electronic Frontier Foundation
815 Eddy Street
San Francisco, California 94109
Email: amackey@eff.org
Tel.: (415) 436-9333

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

Pursuant to Fed. R. App. P. 32(g)(1), I certify as follows:

1.     This Brief of Amici Curiae in Support of Plaintiff-Appellee and Affirmance complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 6104 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365, the word processing system used to prepare the brief, in 14 point font in Times New Roman font.

Dated: June 24, 2026

*/s/ Cody Venzke*
Cody Venzke

*Counsel for Amici Curiae*

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on June 24, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: June 24, 2026

*/s/ Cody Venzke*
Cody Venzke

*Counsel for Amici Curiae*