**Nos. 26-50001 & 25-51073**

# In the United States Court of Appeals for the Fifth Circuit

STUDENTS ENGAGED IN ADVANCING TEXAS; M.F., BY AND THROUGH NEXT FRIEND, VANESSA FERNANDEZ; Z.B., BY AND THROUGH NEXT FRIEND S.B.,

*Plaintiffs-Appellees,*

*v.*

KEN PAXTON, IN HIS OFFICIAL CAPACITY AS THE TEXAS ATTORNEY GENERAL,

*Defendant-Appellant.*

*consolidated with*

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION,

*Plaintiff-Appellee,*

*v.*

KEN PAXTON, IN HIS OFFICIAL CAPACITY AS THE TEXAS ATTORNEY GENERAL,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Western District of Texas, Austin Division

## BRIEF OF NETCHOICE AND THE FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

Christopher J. Marchese
Paul D. Taske
Kerry Maeve Sheehan
Corbin K. Barthold
NETCHOICE
1401 K St. NW, Suite 502
Washington, DC 20005

*Counsel for Amicus Curiae NetChoice*

Steven P. Lehotsky
Jeremy Evan Maltz
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com

*Counsel for Amici Curiae*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that, in addition to the persons and entities listed in Appellees' Certificates of Interested Persons, the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. Undersigned counsel makes these representations to assist the Judges of this Court in evaluating possible disqualification.

**Amici Curiae:**

**NetChoice.** NetChoice has no parent corporation. No publicly held corporation owns 10% or more of NetChoice's stock.

**The Foundation for Individual Rights and Expression ("FIRE").** FIRE has no parent corporation. No publicly held corporation owns 10% or more of FIRE's stock.

**Counsel for Amici Curiae:**

Steven P. Lehotsky
Jeremy Evan Maltz
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001

*Counsel for Amici Curiae*

Christopher J. Marchese
Paul D. Taske
Corbin K. Barthold
NETCHOICE
1401 K St. NW, Suite 502
Washington, DC 20005

*Counsel for NetChoice*

/s/ *Steven P. Lehotsky*
Steven P. Lehotsky
*Counsel for Amici Curiae*

i

TABLE OF CONTENTS

Certificate of Interested Persons ...........................................................................i

Table of Authorities .......................................................................................... iii

Interest of Amici Curiae .....................................................................................1

Introduction and Summary of the Argument ......................................................3

Argument ............................................................................................................4

    I.   App stores facilitate access to fully protected speech, which Texas has regulated through a content-based law. ...............................4

        A.  Mobile apps are how many Americans access the internet—which is replete with fully protected speech, information, and tools to create yet more speech. .......................5

        B.  By providing access to apps, app stores help their users access the internet's fully protected speech. ..................................9

        C.  Texas's App Store Accountability Act uses content-based coverage criteria and was animated by a content-based and censorial purpose. .........................................12

    II.  Defendant's argument that app stores facilitate access to solely commercial speech risks erroneously rendering much of the internet "commercial speech." ...................................................13

    III.  The Supreme Court's decision in *Free Speech Coalition* does not support either upholding, or applying intermediate scrutiny to, Texas's Act. .................................................................21

    IV.  The Act's replacement of app stores' granular parental controls with the Act's one-size-fits-all mandate for repeated parental consent undermines parental oversight and control. .......................................................................................................22

Conclusion.........................................................................................................25

Certificate of Service .........................................................................................26

Certificates of Compliance.................................................................................26

Certificate of Conference...................................................................................27

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023)................................................................5, 15

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
591 U.S. 610 (2020)..................................................................12

*Bartnicki v. Vopper*,
532 U.S. 514 (2001)....................................................................8

*Bd. of Educ. v. Pico*,
457 U.S. 853 (1982)....................................................................9

*Bd. of Trustees of State Univ. of N.Y. v. Fox*,
492 U.S. 469 (1989)..................................................................16

*Bolger v. Youngs Drug Prods. Corp.*,
463 U.S. 60 (1983)....................................................................15

*Book People, Inc. v. Wong*,
91 F.4th 318 (5th Cir. 2024)......................................................14

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011)........................................... 11, 12, 15, 21, 23, 24

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
447 U.S. 557 (1980)..................................................................13

*Citizens United v. FEC*,
558 U.S. 310 (2010)...................................................9, 10, 16, 17

*City of Cincinnati v. Discovery Network, Inc.*,
507 U.S. 410 (1993)..................................................................16

*City of Lakewood v. Plain Dealer Publ'g Co.,*
486 U.S. 750 (1988)................................................................10, 15

*Express Oil Change, L.L.C. v. Miss. Bd. of Licensure for Pro. Eng'rs*
*& Surveyors,*
916 F.3d 483 (5th Cir. 2019)...........................................................14

*Fla. Bar v. Went For It, Inc.,*
515 U.S. 618 (1995)........................................................................17

*Free Speech Coalition, Inc. v. Paxton,*
606 U.S. 461 (2025)..........................................................4, 12, 21, 22

*Hoover v. Morales,*
164 F.3d 221 (5th Cir. 1998)...........................................................16

*Horton v. City of Houston,*
179 F.3d 188 (5th Cir. 1999)...........................................................10

*Interstate Circuit, Inc. v. City of Dallas,*
390 U.S. 676 (1968)..........................................................................9

*Joseph Burstyn, Inc. v. Wilson,*
343 U.S. 495 (1952)........................................................................10

*Kaplan v. California,*
413 U.S. 115 (1973)..........................................................................5

*Lamont v. Postmaster Gen.,*
381 U.S. 301 (1965)..........................................................................9

*Lovell v. City of Griffin,*
303 U.S. 444 (1938)..........................................................................8

*Manhattan Cmty. Access Corp. v. Halleck,*
587 U.S. 802 (2019)..........................................................................9

iv

*Martin v. City of Struthers*,
  319 U.S. 141 (1943)..............................................................................7

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*,
  460 U.S. 575 (1983)..........................................................................9, 13

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024).........................................................7, 11, 22, 25

*NetChoice, LLC v. Bonta*,
  170 F.4th 744 (9th Cir. 2026).............................................................1

*Packingham v. North Carolina*,
  582 U.S. 98 (2017)...............................................................................5

*Prison Legal News v. Livingston*,
  683 F.3d 201 (5th Cir. 2012)............................................................10

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015).......................................................................12, 13

*Reno v. ACLU*,
  521 U.S. 844 (1997)..........................................................................5, 9

*Riley v. California*,
  573 U.S. 373 (2014)..............................................................................6

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
  487 U.S. 781 (1988)......................................................................15, 17

*Serafine v. Branaman*,
  810 F.3d 354 (5th Cir. 2016)............................................................16

*Smith v. California*,
  361 U.S. 147 (1959)...................................................................9, 10, 11

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011)..........................................................................7, 12

v

*Thomas v. Collins*,
323 U.S. 516 (1945)..................................................................................18

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994)..............................................................................9, 13

*United States v. United Foods, Inc.*,
533 U.S. 405 (2001)........................................................................4, 14, 17

*Van Buren v. United States*,
593 U.S. 374 (2021)..................................................................................20

*Volokh v. James*,
148 F.4th 71 (2d Cir. 2025)........................................................................1

**Statutes**

16 C.F.R. § 312.10....................................................................................20

Fed. R. App. P. 29 .......................................................................................1

Tex. Bus. & Com. Code § 121.022 ....................................................12, 24

Tex. Bus. & Com. Code § 541.101 ............................................................19

Tex. Bus. & Com. Code § 541.102 ............................................................20

Tex. Bus. & Com. Code § 121.026 ............................................................24

**Other Authorities**

Apple App Store, Dictionnaire de l'Académie française,
https://perma.cc/WB3J-EQK4......................................................................7

Apple App Store, Top Charts: Weather, https://perma.cc/253Y-
YYY6............................................................................................................8

Br. for FIRE as Amicus Curiae Supp. Resp'ts, *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) (Nos. 22-277, 22-555)......................................................2

Br. for FIRE et al. as Amici Curiae Supp. Pet'r, *Anthropic PBC v. U.S. Dep't of War* (D.C. Cir. filed Apr. 22, 2026) (No. 26-1049) .................................................1

Br. for FIRE et al. as Amici Curiae Supp. Pet'rs, *TikTok Inc. v. Garland*, 604 U.S. 56 (2025) (No. 24-656) ......................................................................2

Br. of Patriot Voices, *Students Engaged in Advancing Texas v. Paxton* (June 19, 2026) (U.S. Nos. 25A1389, 25A1390) .........................................24

Catholic Charities USA, Privacy Policy (Oct. 31, 2023), https://perma.cc/8R8D-EMA5 ......................................................................19

Google Family Link, Help keep your family safer online, https://perma.cc/4B3C-YJY9 .......................................................................23

Google Play Store, Search: "Measurement Conversion," https://perma.cc/4SZ4-FUC3 .........................................................................8

Mozilla Support, Create Desktop Shortcut to a Website (Aug. 3, 2025), https://perma.cc/U76E-34SL.................................................................6

NTIA, Data Explorer, https://perma.cc/SM6B-SPZT ......................................6

PBS, PBS Privacy Policy (Apr. 11, 2023), https://perma.cc/Q9DE-N3N3..................................................................19

Pet.'s Reply Br., *Brown v. Ent. Merchs. Ass'n*, 2010 WL 4034925 (U.S. Oct. 8, 2010)...........................................................15

Regulation 2016/679 of the European Parliament and of the Council of 27 April 2016, arts. 12-14, 2016 O.J. (L 119) 1..........................20

The Associated Press, AP Privacy Policy (Nov. 5, 2025),
https://perma.cc/FVH2-DCTC ....................................................................19

Thomas M. Cooley, A Treatise on the Law of Torts (Chicago,
Callaghan & Co. 1879)...................................................................................8

Tushar Thakar, *Mobile vs. Desktop Statistics 2026: Shocking
Trends*, TechRT (Jan. 8, 2026), https://perma.cc/SB9L-E668 .........................6

## INTEREST OF AMICI CURIAE

Amici and their members have a substantial interest in this case.[1]

**NetChoice** is a national trade association of e-commerce and online businesses that share the goal of promoting convenience, choice, and commerce on the internet. For over two decades, NetChoice has worked to increase consumer access and options via the internet, while minimizing burdens on small businesses that are making the internet more accessible and useful.

**The Foundation for Individual Rights and Expression** ("FIRE") is a nonpartisan nonprofit that defends the rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended these rights nationwide without regard to speakers' views, through public advocacy, strategic litigation, and participation as amicus curiae in cases involving expressive rights, including in the digital realm. *See, e.g.*, *NetChoice, LLC v. Bonta*, 170 F.4th 744 (9th Cir. 2026); *Volokh v. James*, 148 F.4th 71 (2d Cir. 2025), *certifying questions to* N.Y. Ct. App., 267 N.E.3d 1245 (N.Y. 2025) (*accepting certified question*); *see also* Br. for FIRE et al. as Amici Curiae Supp. Pet'r, *Anthropic PBC v. U.S. Dep't of War* (D.C. Cir. filed Apr. 22, 2026) (No. 26-1049); Br. for FIRE et al. as Amici Curiae Supp.

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from amici curiae, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E). All parties consent to the filing of this brief.

Pet'rs, *TikTok Inc. v. Garland*, 604 U.S. 56 (2025) (No. 24-656); Br. for FIRE as Amicus Curiae Supp. Resp'ts, *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) (Nos. 22-277, 22-555).

Amici have extensive experience litigating against, and participating as amici in cases involving, governmental restrictions on access to online speech. Here, a motions panel permitted Defendant Texas Attorney General to enforce a law that transformed internet access in Texas overnight, and could permit similar transformation nationwide. Furthermore, the motions panel's rationale—that app stores facilitate access to solely "commercial speech," Stay.Order.3—risks broad ramifications.

### INTRODUCTION AND SUMMARY OF THE ARGUMENT

Texas has done something unprecedented. It has attempted to age-gate internet use. And it has deputized private app-store operators as government-mandated gatekeepers to the internet's wealth of protected speech, information, and speech-facilitating tools. Adopting Defendant's arguments, a motions panel of this Court stayed the district court's preliminary injunction, permitting Defendant to immediately enforce Texas's revolutionary law.[2] At this merits stage, this Court should reject those arguments and restore internet use in Texas to the status quo ante.

Amici submit this brief to make four points.

First, app stores provide their users access to immense amounts of fully protected speech. For many Americans, mobile apps are now the primary means to access the internet's wealth of protected expression, information, and speech-creating tools. Texas's App Store Accountability Act ("Act") regulates app stores with a law that is content based, both on its face and in its purpose.

Second, Defendant's contrary argument and the motions panel's holding—that app stores and the apps on them engage in nothing more than "commercial speech"—are wrong as a matter of law and fact. Offering access to expressive, informative, and speech-facilitating apps does far more than

---

[2] Although Judge Haynes concurred in granting the stay, she did not join in the panel's rationale. So references to the "panel's" rationale or conclusion refer only to the motions-panel majority's opinion.

"propose a commercial transaction." *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001). The panel's commercial-speech conclusion risks recasting much of the internet as "commercial speech" stripped of the First Amendment's full protections.

Third, the Supreme Court's decision in *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461 (2025) ("*FSC*"), does not support applying intermediate scrutiny to this Act—let alone upholding the Act under heightened First Amendment scrutiny. *FSC* considered Texas's restrictions on access to speech that is unprotected for minors. *Id.* at 469, 472-74, 485. By contrast, this Act uses content-based criteria to target access to vast amounts of fully protected speech.

Finally, the Act does not aid parents in overseeing their minor children. Texas has replaced app stores' existing suite of parental tools with a one-size-fits-all mandate that actually *limits* parental choice.

This Court should affirm the preliminary injunction and reject Texas's attempt to subject internet use to heavy-handed state control.

## ARGUMENT

### I. App stores facilitate access to fully protected speech, which Texas has regulated through a content-based law.

Texas attempts to restrict access to mobile apps, which are the primary way many Americans access the internet's wealth of fully protected speech, information, and speech-facilitating tools. Texas has done so with a facially content-based law animated by a content-based and censorial purpose. The

4

Act's unprecedented speech burdens thus trigger strict First Amendment scrutiny.

### A. Mobile apps are how many Americans access the internet— which is replete with fully protected speech, information, and tools to create yet more speech.

The internet offers people "unlimited, low-cost capacity for communication of all kinds." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (quoting *Reno v. ACLU*, 521 U.S. 844, 870 (1997)). All manner of speech, "from 'pictures, films, paintings, drawings,' . . . to 'oral utterance and the printed word'[] qualify for the First Amendment's protections . . . [when] conveyed over the Internet." *303 Creative LLC v. Elenis*, 600 U.S. 570, 587 (2023) (quoting *Kaplan v. California*, 413 U.S. 115, 119-20 (1973)).

Furthermore, the internet has been a democratizing force on information access, where people may seek out diverse sources and underrepresented voices—not just incumbent media giants. Online services like apps "allow a person with an Internet connection to 'become a town crier with a voice that resonates farther than it could from any soapbox.'" *Packingham*, 582 U.S. at 107 (quoting *Reno*, 521 U.S. at 870). As a result, the internet contains everything from high literature to fan fiction; sports highlights to academic research; cutting-edge news to age-old philosophical debates; amateur short-form videos to cinematic classics; crossword puzzles to 3D games; and more information than any library has ever held—or could ever hold.

Over time, how people access the internet has changed, from bulletin boards on modems to browsers on desktop computers to mobile apps on smartphones and tablets. Instead of typing web addresses into a web browser, users can download an app from an app store that provides access to the content and tools available on web-based services.[3]

For many people, therefore, mobile apps *are* the internet. The Supreme Court observed as much over a decade ago:

> There are apps for Democratic Party news and Republican Party news; apps for alcohol, drug, and gambling addictions; apps for sharing prayer requests; apps for tracking pregnancy symptoms; apps for planning your budget; apps for every conceivable hobby or pastime . . . . The average smart phone user has installed 33 apps.

*Riley v. California*, 573 U.S. 373, 396 (2014). Today, more Americans report smartphone use than desktop and laptop use. *See* NTIA, Data Explorer, https://perma.cc/SM6B-SPZT; Tushar Thakar, *Mobile vs. Desktop Statistics 2026: Shocking Trends*, TechRT (Jan. 8, 2026), https://perma.cc/SB9L-E668 ("As of mid-2025, roughly 62-64% of web traffic worldwide comes from mobile devices.").

---

[3] In this way, apps are similar to the desktop shortcuts that browsers allow users to create. *E.g.*, Mozilla Support, Create Desktop Shortcut to a Website (Aug. 3, 2025), https://perma.cc/U76E-34SL ("You can use Firefox to create a shortcut on your computer's desktop to a page you've visited.").

These apps offer their users services that run the gamut of expressive activities. And the apps themselves come from all manner of publishers, from the Louis XIII-era Académie Française (established in 1635 to ensure common standards for the French language) to the latest start-up mobile developer.[4] Put otherwise, app stores have helped tear down barriers to entry, providing more people with access to more information from more (and more diverse) sources.

Many apps are full of expressive content in their own right. That includes movies, books, games, journalism, and myriad other forms of expressive content. It also includes apps that "engage[] in expression" by "display[ing]," "compiling, and curating" protected user-generated speech. *Moody v. NetChoice, LLC*, 603 U.S. 707, 716-17, 731 (2024).

Yet more apps provide their users with access to "information," which is likewise protected by the First Amendment. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). "Freedom to distribute information to every citizen wherever he desires to receive it is so clearly vital to the preservation of a free society that, putting aside reasonable police and health regulations of time and manner of distribution, it must be fully preserved." *Martin v. City of Struthers*, 319 U.S. 141, 146-47 (1943) (invalidating presumptive ban on door-to-door leafletting). Protected information on app stores includes

---

[4] Apple App Store, Dictionnaire de l'Académie française, https://perma.cc/WB3J-EQK4.

anything from weather forecasts to measurement conversion apps.[5] It also includes mobile web browsers, which are themselves apps that compete for users based on the features they offer. As the Supreme Court has recognized, "if the act of . . . 'publishing' information does not constitute speech, it is hard to imagine what does fall within that category." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (citation modified). This holding flows from the Court's longstanding observation that the First Amendment's freedoms of speech and press exist, in part, to ensure the free flow of information. Consequently, "[t]he press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion." *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938); *see* Thomas M. Cooley, A Treatise on the Law of Torts 219 (Chicago, Callaghan & Co. 1879) ("The privilege of the press is not confined to those who publish newspapers and other serials, but extends to all who make use of it to *place information before the public*." (emphasis added)).

Finally, apps also provide means for their users to engage in their own expression. For instance, people can use Procreate to make digital art or BandLab to create music. Such tools likewise receive the First Amendment's protections, lest the government be able to suppress speech by regulating

---

[5] *See* Apple App Store, Top Charts: Weather, https://perma.cc/253Y-YYY6; Google Play Store, Search: "Measurement Conversion," https://perma.cc/4SZ4-FUC3.

8

prior steps "in the speech process." *Citizens United v. FEC*, 558 U.S. 310, 336 (2010); *see, e.g., Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 591 (1983) (rejecting under the First Amendment a tax of paper and ink necessary to produce newspapers).

### B.  By providing access to apps, app stores help their users access the internet's fully protected speech.

By providing a vital means to access the fully protected speech on apps, app stores are engaged in expressive activity protected by the First Amendment.

Like web browsers before them, app stores provide users with means to access the internet's vast amounts of fully protected speech. So app stores are not merely retail channels for software. They are modern distribution points for protected expression across media: films and video services, books and audiobooks, news, messaging, web browsing, educational tools, and games, among others. The First Amendment has long protected distributors of expression, including booksellers, film exhibitors, the mails, libraries, and the internet itself. *E.g., Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 812 (2019) ("community bulletin boards" and "[c]omedy clubs" hosting "open mic nights"); *Reno*, 521 U.S. at 870 (internet); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 637-38 (1994) (cable operators); *Bd. of Educ. v. Pico*, 457 U.S. 853, 868-69 (1982) (libraries); *Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676, 682 (1968) (movie theaters); *Lamont v. Postmaster Gen.*, 381 U.S. 301 (1965) (mail); *Smith v. California*, 361 U.S. 147, 150 (1959) ("dissemination of books

and other forms of the printed word furnish very familiar applications of these constitutionally protected freedoms"); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952) (movies); *Prison Legal News v. Livingston*, 683 F.3d 201, 212 (5th Cir. 2012) (books).

The Act here burdens the same constitutional interests that apply to those other distributors by conscripting app stores into regulating access to lawful speech. The only difference is that app stores lack the physical restraints of these brick-and-mortar locations, and can thus act as bookstores, research libraries, movie theaters, record stores, video game arcades, and more—all in one convenient place. That is, app stores facilitate access to far more expression than brick-and-mortar analogs. So restrictions on app-store access have even broader effects on access to speech.

When private entities facilitate access to fully protected speech—such as app stores—they play an integral role in the "speech process." *Citizens United*, 558 U.S. at 336. Facilitating access to fully protected speech is thus itself activity protected by the First Amendment. And laws that impede private entities' ability to disseminate speech affect those entities' First Amendment rights. *E.g.*, *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 768 (1988) ("Liberty of circulating is as essential to freedom of expression as liberty of publishing") (citation modified); *Smith*, 361 U.S. at 150 (observing that the First Amendment right to "the free . . . dissemination of books and other forms of the printed word" required "no elaboration"); *Horton v. City of*

10

*Houston*, 179 F.3d 188, 189-91 (5th Cir. 1999) (recognizing "First Amendment rights" for organizations that "do not pre-screen submitted programs").

The First Amendment's protections for facilitating access to speech apply regardless of whether the speech-facilitating entity also engages in other forms of protected expression. The freedoms of speech and of the press encompass a broad range of distinct constitutional protections, making up a bundle of rights. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 792 n.1 (2011) ("Whether government regulation applies to creating, distributing, or consuming speech makes no difference."). Importantly, the First Amendment does not operate on an all-or-nothing basis, such that an entity either possesses every First Amendment right or none at all. Rather, particular First Amendment protections attach to particular activities.

Here, app stores facilitate users' access to fully protected speech, and that activity itself falls within the First Amendment's protection. Restrictions on distribution of protected speech necessarily burden the speech available to the public. *E.g.*, *Smith*, 361 U.S. at 153-54 ("impose a severe limitation on the public's access to constitutionally protected matter"). Recognizing that protection for distribution does not require the Court to further conclude that app stores exercise protected editorial discretion over the speech they disseminate. *Cf. Moody*, 603 U.S. at 728.

11

## C. Texas's App Store Accountability Act uses content-based coverage criteria and was animated by a content-based and censorial purpose.

The First Amendment's "most basic" principle is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790-91 (quotation omitted). Consequently, "[c]ontent-based laws"—those that "appl[y] to particular speech because of the topic discussed or the idea or message expressed"—"are presumptively unconstitutional" and trigger "strict scrutiny." *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015). "Strict scrutiny is unforgiving . . . [and] fatal in fact absent truly extraordinary circumstances." *FSC*, 606 U.S. at 484-85.

Here, the Act is content based, both on its face and in its undisputed purpose. Either would be sufficient to subject the Act's speech restrictions to strict scrutiny.

First, the Act exempts particular apps from its restrictions based on "the topic discussed" on the app. *Reed*, 576 U.S. at 163-64. In particular, the Act exempts apps that provide emergency services or standardized testing. Tex. Bus. & Com. Code § 121.022(h). Such exemptions subject the Act's provisions to strict scrutiny. *E.g., Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 619 (2020) (plurality op.) (content-based exceptions render law content based); *Sorrell*, 564 U.S. at 563-64 (similar).

12

Second, "'a content-based [governmental] purpose may be sufficient in certain circumstances to show that a regulation is content based.'" *Reed*, 576 U.S. at 165 (quoting *Turner*, 512 U.S. at 642). The Supreme Court has gone further and suggested that the "improper censorial goals of the legislature" are enough to invalidate a law, and not merely subject the law to strict scrutiny. *Minneapolis Star*, 460 U.S. at 580. Here, the record is replete with impermissible content-based and censorial justifications for the Act's speech restrictions. From the Act's enactment history to Defendant's justification of the law in litigation, it is plain that Texas intends the law to restrict minors' access to "unsuitable" and "objectionable" material. ROA.26-50001.571; ROA.26-50001.573; ROA.26-50001.1130:1-9; ROA.26-50001.1162.

## II. Defendant's argument that app stores facilitate access to solely commercial speech risks erroneously rendering much of the internet "commercial speech."

Ignoring the weight of authority, Defendant argues that the Act "regulates only speech that proposes a commercial transaction." AG.Br.17 (citation omitted); *see* AG.Br.17-23. And the motions panel held in a single paragraph that the Act, "*at most*, . . . regulates speech that 'proposes a commercial transaction'"—*i.e.*, commercial speech. Stay.Order.3 (emphasis added) (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980)). The panel further suggested that the Act does not regulate

13

speech at all. Stay.Order.4 n.7. Those assertions are wrong and this Court should reject them.[6]

A. App stores' provision of access to apps is not commercial speech or commercial conduct under binding precedent and common sense.

The Supreme Court has cabined the First Amendment commercial-speech doctrine to speech that "does no more than propose a commercial transaction." *United Foods*, 533 U.S. at 409; *see Book People, Inc. v. Wong*, 91 F.4th 318, 339 (5th Cir. 2024) (defining commercial speech as "[e]xpression related *solely to the economic interests* of the speaker and its audience . . . which does *no more than propose a commercial transaction*" (emphases added; quotations omitted)). Much like the Supreme Court's narrow definitions of unprotected speech, the commercial-speech doctrine must be applied strictly to avoid burdening other forms of fully protected speech. *See* CCIA.Br.30-31; SEAT.Br.22.

Here, offering access to expressive, informative, and speech-facilitating apps certainly does "more than propose a commercial transaction." *United Foods*, 533 U.S. at 409. Time and again, the Supreme Court has rejected

---

[6] Even if intermediate commercial-speech scrutiny applied, the government bears the burden of justification for laws regulating commercial speech. And "th[at] burden is a heavy one." *Express Oil Change, L.L.C. v. Miss. Bd. of Licensure for Pro. Eng'rs & Surveyors*, 916 F.3d 483, 487 (5th Cir. 2019) (citation omitted).

arguments to expand the scope of the commercial-speech doctrine. Those precedents apply with full force here.

For example, the fact that speech is offered for profit is "insufficient by itself" to transform speech into "commercial speech." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 67 (1983). The "First Amendment extends to all persons engaged in expressive conduct, including those who seek profit." *303 Creative*, 600 U.S. at 600; *Plain Dealer Publ'g*, 486 U.S. at 756 n.5 ("[T]he degree of First Amendment protection is not diminished merely because the newspaper or speech is sold rather than given away."). "It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801 (1988). The government can no more "prohibit[]" the "selling [of] books" than it can restrict "the writing of them." *Brown*, 564 U.S. at 792 n.1. In *Brown* itself, the Supreme Court rejected the assertion that restricting "the sale or rental" of expression to minors regulates mere conduct. *Id.*[7] Otherwise, any number of publications, including books, newspapers, magazines, television channels, and streaming services could be deemed commercial speech. *303 Creative*, 600 U.S. at 594.

---

[7] *See* Pet.'s Reply Br., *Brown v. Ent. Merchs. Ass'n*, 2010 WL 4034925, at *3-4, *11-18 (U.S. Oct. 8, 2010) (arguing law "cover[ed] only commercial transactions entered into by minors outside the presence of parents").

Indeed, "[s]ome of our most valued forms of fully protected speech are uttered for a profit." *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482 (1989); *see Serafine v. Branaman*, 810 F.3d 354, 365 (5th Cir. 2016) (same). Seeing a movie or play often requires buying a ticket. Reading a book often requires paying a university bookstore for a textbook or an online retailer for an ebook. Streaming and buying music requires monetary payment. The examples are boundless. Put another way, some kind of transaction is often a necessary step "in the speech process." *Citizens United*, 558 U.S. at 336. "If all it takes to make speech commercial is that the speaker is paid to say it, then every writer with a book deal, every radio D.J., and every newspaper and television reporter is engaged in commercial speech." *Hoover v. Morales*, 164 F.3d 221, 225 (5th Cir. 1998). Accordingly, the fact of such transactions does not convert either the sale of speech or the underlying speech itself into commercial speech.

Likewise, it does not matter that app stores might also separately advertise particular apps (qualifying as commercial speech) or that apps themselves might include commercial speech in their broader offerings of fully protected speech. For example, the Supreme Court has observed "that much of the material in ordinary newspapers is commercial speech." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 423 (1993). After all, the newspaper industry long relied on advertising revenue, such that detailed reporting on political scandals was placed side-by-side with full-page advertisements for department store sales. Nevertheless, newspapers do far "more

16

than propose a commercial transaction." *United Foods*, 533 U.S. at 409. In such cases, the commercial-speech advertisements are "inextricably intertwined with otherwise fully protected speech." *Nat'l Fed'n of the Blind*, 487 U.S. at 796. And the government cannot "separate the component parts of" commercial speech "from the fully protected whole." *Id.* So the presence of advertisements in a publication does not permit regulating access to newspapers, any more than it can justify regulating apps and the broader internet.

B. Defendant argues otherwise, and his rationale—adopted by the motions panel—risks being dangerously sweeping.

At core, the problems with Defendant's and the motions panel's analyses are perhaps best illustrated by replacing the word "app" with "book" in the panel's analysis: "After all, users browsing [a book] store can see a catalog of [books], obtain additional information, and download or purchase [a book]." Stay.Order.3; *see* AG.Br.18 ("When users go to [a book] store, they can select different types of [books] and then drill down to receive information to determine if they want to download or purchase [a book]."). From these observations, the panel concluded that "[a]pp listings propose commercial transactions," which purportedly allows Texas to impose "'modes of regulation that might be impermissible in the realm of noncommercial expression.'" Stay.Order.3 & n.5 (quoting *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995)). If Defendant and the motions panel "were correct, the Government could prohibit" people from accessing books under the guise of regulating commercial transactions. *Citizens United*, 558 U.S. at 349. "This

troubling assertion of brooding governmental power cannot be reconciled with the confidence and stability in civic discourse that the First Amendment must secure." *Id.* "The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind[.]" *Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring). The two additional reasons the court offered are likewise flawed.

*First*, the court concluded that "[a]pp listings propose commercial transactions, regardless of whether any monetary payment is made" because "the 'payment' for apps that are purportedly 'free' is access to user data and private information." Stay.Order.3. As Plaintiffs recount, the record contains no evidence supporting this conclusion. *E.g.*, CCIA.Br.42. Besides, the fact that fully protected speech is offered for sale does not make that expression "commercial speech." *See supra* p.15. If paying money for expression is not enough to make the speech "commercial," purportedly "paying" with "data" cannot either.

Moreover, Defendant's and the motions panel's "data-for-speech" analyses risk making much of the internet "commercial speech." Simply put, internet use requires some amount of data collection and processing. Otherwise, online services could not operate and provide the vast amount of expression and information they do. Digital services often collect users' Internet Protocol addresses, as well as technical data about the user's device, operating system, and screen resolution. Services may also use data about a user's preferred language, age, and preferences to inform what content the

18

user sees. In recognition of the internet's reliance on "data," true, comprehensive data-privacy laws—including Texas's—permit online services to collect data that is "adequate, relevant, and reasonably necessary." Tex. Bus. & Com. Code § 541.101(a)(1).

Consequently, Defendant's argument—if taken to its logical end—could render much of the internet commercial speech. *See* Catholic Charities USA, Privacy Policy (Oct. 31, 2023), https://perma.cc/8R8D-EMA5 ("CCUSA may collect personal or aggregate information about Users of the Website. . . . We use the information we collect from you for the following purposes: . . . other legitimate business purposes."); PBS, PBS Privacy Policy (Apr. 11, 2023), https://perma.cc/Q9DE-N3N3 ("We may use cookies, web beacons, local shared objects, and other similar technologies to collect information about your use of the Services."); The Associated Press, AP Privacy Policy (Nov. 5, 2025), https://perma.cc/FVH2-DCTC ("We may collect information from you automatically when you use our Services."). That would be contrary to the Supreme Court's long line of precedent evaluating online speech restrictions under traditional First Amendment scrutiny. *E.g.*, CCIA.Br.31.

*Second*, the motions panel observed that "[a]ny minor who downloads an app must *accept its terms of service*, including agreements about how the minor's data is used." Stay.Order.4 (emphasis added); *see* AG.Br.18 ("When minors download apps they are accepting terms of service, including agreements about how their data is used."). Here too, Defendant's "terms of service" rationale risks stripping many websites internet-wide of the First

19

Amendment's protections and does not support the panel's conclusion that offering apps is commercial speech. "Many websites . . . authorize a user's access only upon his agreement to follow specified terms of service." *Van Buren v. United States*, 593 U.S. 374, 394 (2021). Much like collecting data, agreeing to terms of service online is ubiquitous because it is often required. For example, state, federal, and international data-privacy regulations make such terms of service *necessary* for online services to operate responsibly and lawfully. *E.g.*, 16 C.F.R. § 312.10 (federal Children's Online Privacy Protection Act regulations requiring "retention policy"); Tex. Bus. & Com. Code § 541.102(a) ("A controller shall provide consumers with a reasonably accessible and clear privacy notice."); Regulation 2016/679 of the European Parliament and of the Council of 27 April 2016, arts. 12-14, 2016 O.J. (L 119) 1 (European General Data Protection Regulation requiring privacy notice). Yet, under the panel's rationale, websites' attempts to comply with law could be what strips them of their First Amendment protections. There is no basis for that in the Supreme Court's precedent.

If Texas wanted to regulate those terms of service—or any of their particular terms, such as "arbitration provisions," AG.Br.18 (citation modified)—it could have targeted the terms of service themselves. It did not. Perhaps that is because Texas already has robust laws addressing contract formation and enforceability concerning minors. *See* CCIA.Br.45-46 (collecting state contract regulations). Irrespective of the reason, the Act burdens threshold access to apps on app stores in particular, threatening Texans'

access to the internet's trove of valuable expression and expression-facilitating tools.

## III. The Supreme Court's decision in *Free Speech Coalition* does not support either upholding, or applying intermediate scrutiny to, Texas's Act.

Defendant also erroneously argues that the Supreme Court's *FSC* decision supports upholding the Act's unprecedented restrictions on internet use. AG.Br.23-27. It does not. Extending *FSC*'s rationale (which is limited to obscenity for minors) to permit restrictions on access to fully protected speech would turn the First Amendment on its head.

*FSC*'s analysis does not control here, because *FSC* did not concern a law impeding access to *fully protected* speech for both minors and adults. Rather, the law in *FSC* targeted "obscen[ity] for minors," which is a singular category of speech that is simultaneously protected for adults and *un*protected for minors. 606 U.S. at 469, 472-74, 485. In fact, obscenity for minors is one category of speech that *Brown* held to be unprotected for minors, and thus amenable to regulation on that basis. 564 U.S. at 794-95. Otherwise, "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.* at 795 (citation omitted).

So *FSC* reflects only how intermediate scrutiny applies to distinct age-verification requirements to access speech that is unprotected for

21

minors. 606 U.S. at 482, 487, 493 n.12. Even there, *FSC* recognized that age verification "necessarily" burdens the "right to access" speech. *Id.* at 495. But because "obscenity for minors" is "unprotected *to the extent the State seeks only to verify age*," age verification for such content will often satisfy heightened First Amendment scrutiny. *Id.* at 482 (emphasis added). By contrast, this Act restricts access to "billion[s]" of pieces of *fully protected* speech. *Moody*, 603 U.S. at 719. Accordingly, the Act impedes minors' and adults' ability to access speech they have a constitutional right to access.

"[F]or *fully protected speech*, the distinction between bans and burdens makes no difference to the level of scrutiny." *FSC*, 606 U.S. at 493 n.12 (citation modified). So the Act here requires "strict scrutiny." *Id.* at 484. And these burdens are not necessary to determine whether the speech is constitutionally protected as to individual users. No historical tradition or established practice supports restricting fully protected speech in this way. *Id.* at 496. The government cannot require people to prove their ages before reading books or listening to music. Nor can it require parental consent for minors to check the news or play video games. The same applies to apps.

## IV. The Act's replacement of app stores' granular parental controls with the Act's one-size-fits-all mandate for repeated parental consent undermines parental oversight and control.

On top of all its other legal defects, the Act is counterproductive to the State's asserted interest in furthering "parent[s'] fundamental right to direct the upbringing of their children." AG.Br.24 (collecting cases).

Means exist for parents to oversee their minor children online. So Defendant cannot show—and has not shown—that the Act "meet[s] a substantial need of parents who wish to restrict their children's access to [app stores] but cannot do so." *Brown*, 564 U.S. at 803.

App stores already provide families with nuanced, granular tools to help parents oversee their minor children's online activity. CCIA.Br.7. Importantly, these tools include means for parents to consent (or not consent) to specific apps, downloads, or purchases—and much more. For example, the Google Play Store's "Family Link" service allows parents to: (1) "[s]et individual app time limits"; (2) "block apps"; (3) "set screen time limits"; (4) "block inappropriate sites"; (5) "require approval for new apps"; (6) "manage permissions"; and (7) "even delete their account." Google Family Link, Help keep your family safer online, https://perma.cc/4B3C-YJY9. These are precisely the kinds of "voluntary" private efforts that the Supreme Court has concluded undermine a governmental interest in purporting to aid parents by imposing governmental mandates. *Brown*, 564 U.S. at 802. "This system does much to ensure that minors cannot [access apps] on their own, and that parents who care about the matter can readily evaluate the [apps] their children" access. *Id.* at 803.

The Act would replace these existing tools with a blunt, one-size-fits-all mandate for parents to: (1) disclose their own sensitive data to allow for the app stores to "verify" the parent-child relationship; and (2) consent every single time their child wants to download an app or make an in-app

23

download, as well as whenever apps make "significant changes" (whatever that means) to their policies or service. Tex. Bus. & Com. Code § 121.022(b)(1)-(2), (f). Parents cannot provide blanket consent, at either the app store *or* app level. *Id.* § 121.026(a)(3).

The premise that this regime aids parents is wrong for two reasons. First, the Act does not defer to parental judgment—which varies from household to household—but imposes a single, sweeping, highly invasive bar on what minors may see, learn, and say online. Second, had the State truly wished to help parents raise their children, it could have supported and raised awareness about the existing private tools that app stores already provide parents. By mandating broad restrictions that parents must affirmatively (and repeatedly) switch off, the State acts as gatekeeper over the flow of speech for young and old alike.

"While some of the legislation's effect may indeed be in support of what some parents of the restricted children actually want, its entire effect is only in support of what the State thinks parents *ought* to want. This is not the narrow tailoring to 'assisting parents' that restriction of First Amendment rights requires." *Brown*, 564 U.S. at 804; *see* Br. of Patriot Voices at 10-12, *Students Engaged in Advancing Texas v. Paxton* (June 19, 2026) (U.S. Nos. 25A1389, 25A1390).

* * *

What Texas has done is unprecedented. But that does not mean that binding precedent is ill-equipped to address the Act. To the contrary,

24

well-established First Amendment doctrine anticipates that new technologies will spark the same kinds of censorial governmental actions that animated the First Amendment. *E.g.*, *Moody*, 603 U.S. at 733. Under longstanding First Amendment principles, the Act's restrictions are unconstitutional.

## CONCLUSION

This Court should affirm the district court's preliminary injunction.

Dated: June 24, 2026

<table>
<tr><td></td><td>/s/ Steven P. Lehotsky</td></tr>
<tr><td>Christopher J. Marchese</td><td>Steven P. Lehotsky</td></tr>
<tr><td>Paul D. Taske</td><td>Jeremy Evan Maltz</td></tr>
<tr><td>Kerry Maeve Sheehan</td><td>LEHOTSKY KELLER COHN LLP</td></tr>
<tr><td>Corbin K. Barthold</td><td>200 Massachusetts Ave. NW, Suite 700</td></tr>
<tr><td>NETCHOICE</td><td>Washington, DC 20001</td></tr>
<tr><td>1401 K St. NW, Suite 502</td><td>(512) 693-8350</td></tr>
<tr><td>Washington, DC 20005</td><td>steve@lkcfirm.com</td></tr>
<tr><td></td><td></td></tr>
<tr><td>*Counsel for Amicus Curiae NetChoice*</td><td>*Counsel for Amici Curiae*</td></tr>
</table>

## CERTIFICATE OF SERVICE

I certify that on June 24, 2026, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

*/s/ Steven P. Lehotsky*
Steven P. Lehotsky

## CERTIFICATES OF COMPLIANCE

I certify that this brief: (1) complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 5,617 words, excluding the parts of the brief exempted by Rule 32(f); and (2) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count).

I further certify that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Steven P. Lehotsky*
Steven P. Lehotsky

## CERTIFICATE OF CONFERENCE

Counsel for amici conferred with counsel for Appellant and Appellees.

All parties consent to the filing of this brief.

/s/ *Steven P. Lehotsky*
Steven P. Lehotsky