Nos. 25-51073 & 26-50001

IN THE
# United States Court of Appeals
# for the Fifth Circuit

STUDENTS ENGAGED IN ADVANCING TEXAS, *et al.*,

*Plaintiffs-Appellees*,

v.

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,

*Defendant-Appellant.*
*consolidated with*

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION,

*Plaintiff-Appellee*,

v.

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,

*Defendant-Appellant.*

On Appeal from the United States District Court for the Western District of Texas
Case Nos. 1:25-CV-1660 & 1:25-CV-1662 (Hon. Robert L. Pitman)

**BRIEF OF CHAMBER OF PROGRESS AND SOFTWARE &
INFORMATION INDUSTRY ASSOCIATION AS AMICI CURIAE IN
SUPPORT OF PLAINTIFFS-APPELLEES**

Sean Marotta
Mark W. Brennan
Thomas B. Veitch
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
(202) 637-5600
sean.marotta@hoganlovells.com

*Counsel for Chamber of Progress and
Software & Information Industry
Association*

# SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record certifies that the following listed persons and entities, in addition to those already listed in the parties' briefs, have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. *Amici curiae on this brief*: Chamber of Progress and Software & Information Industry Association are non-profit, tax-exempt organizations. Each organization has no parent company, and no publicly held company has any ownership interest in it of any kind.

2. *Counsel for amici curiae on this brief*: Sean Marotta, Mark W. Brennan, and Thomas B. Veitch of Hogan Lovells US LLP.

/s/ Sean Marotta
Sean Marotta

June 24, 2026

**TABLE OF CONTENTS**

Page

SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES ...........................i

TABLE OF AUTHORITIES ...................................................................... iii

INTEREST OF *AMICI CURIAE* .................................................................1

SUMMARY OF ARGUMENT ...................................................................2

ARGUMENT .............................................................................................6

I.     The Age-Rating Requirements In SB 2420 Compel Speech In Violation Of The First Amendment ........................................................6

     A.    Courts apply strict scrutiny to laws requiring a speaker to enter the marketplace of ideas........................................................7

     B.    SB 2420 triggers strict scrutiny.......................................................10

     C.    The age-rating requirement fails under any level of First Amendment scrutiny .................................................................12

II.    The Age-Rating Requirements Will Diminish Speech And Undermine SB 2420's Purported Safety And Transparency Goals ...........................14

     A.    A law that undermines the government's asserted interest cannot survive even intermediate scrutiny.....................................14

     B.    Many developers will reduce apps to bland and inoffensive experiences.................................................................15

     C.    The threat of SB 2420 liability will skew ratings to become over-restrictive, making it harder for young people to access resources ...........................................................................19

     D.    Government-mandated age ratings will hinder parents seeking to help their children have positive online experiences.................22

CONCLUSION ...........................................................................................24

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

Page

**CASES:**

*303 Creative LLC v. Elenis,*
600 U.S. 570 (2023) ..................................................................4, 7

*Am. Acad. of Implant Dentistry v. Parker,*
860 F.3d 300 (5th Cir. 2017) ......................................................14

*Bolger v. Youngs Drug Prods. Corp.,*
463 U.S. 60 (1983) ...........................................................................7

*Book People, Inc. v. Wong,*
91 F.4th 318 (5th Cir. 2024) .....................................................4, 8

*Chiles v. Salazar,*
146 S. Ct. 1010 (2026) ..................................................................10

*Computer & Commc'ns Indus. Ass'n v. Paxton,*
814 F. Supp. 3d 787 (W.D. Tex. 2025) ......................................12

*Disc. Tobacco City & Lottery, Inc. v. United States,*
674 F.3d 509 (6th Cir. 2012) .......................................................11

*Entm't Software Ass'n v. Blagojevich,*
469 F.3d 641 (7th Cir. 2006) .......................................................11

*Florida Bar v. Went For It, Inc.,*
515 U.S. 618 (1995)....................................................................4, 12

*Free Speech Coal., Inc. v. Paxton,*
95 F.4th 263 (5th Cir. 2024) ...................................................11, 13

*Free Speech Coal., Inc. v. Paxton,*
606 U.S. 461 (2025)....................................................................12, 13

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
515 U.S. 557 (1995)......................................................................7, 8

*Janus v. Am. Fed'n of State, Cty. & Mun. Emps. Council 31*,
585 U.S. 878 (2018)...................................................................7

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
585 U.S. 755 (2018).........................................................3, 12, 13

*NetChoice v. Bonta*,
113 F.4th 1101 (9th Cir. 2024) ............................................4, 9

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)................................................................12

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
487 U.S. 781 (1988)..................................................................7

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976)..................................................................7

*X Corp. v. Bonta*,
116 F.4th 888 (9th Cir. 2024) ..............................................4, 9

*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*,
471 U.S. 626 (1985)..................................................................7

**STATUTES:**

2022 Cal. Stat. ch. 320 (AB 2273)...........................................8

Tex. Bus. & Com. Code § 121.021(b) .......................................3

Tex. Bus. & Com. Code § 121.022.............................................3

Tex. Bus. & Com. Code § 121.023.............................................3

Tex. Bus. & Com. Code § 121.052(b) .......................................3

Tex. Bus. & Com. Code § 121.056(a)(2)....................................3

Tex. Bus. & Com. Code § 121.101.............................................3

Tex. Bus. & Com. Code § 121.102.....................................................................3

**OTHER AUTHORITIES:**

Apprehensive-Space94, *being a teenager with a rare and incurable type of cancer*, Reddit (r/cancer) (2023), https://www.reddit.com/r/cancer/comments/15k4rkc/ being_a_teenager_with_a_rare_and_incurable_type ...................................20

BioWink GmbH, *Clue Period & Cycle Tracker*, Ver. 281.0 (iOS, June 18, 2026), bit.ly/3SeKPaa...............................................10

Niki Burnside, *Social media posts educating public about illicit drugs being removed by Meta, Australian health experts say*, ABC (Apr. 6, 2026), https://bit.ly/4uOB9AA .......................................17

The Closet (@theclosetpgh), TikTok, https://www.tiktok.com/@theclosetpgh .......................................20

*Community Guidelines Enforcement Report*, TikTok (Mar. 28, 2025), https://www.tiktok.com/transparency/en-us/community- guidelines-enforcement-2024-4...................................................16

*Community Standards Enforcement Report: Q1 2025 report*, Meta Transparency Ctr., https://transparency.meta.com/reports/community-standards- enforcement ........................................................................16

Ned Davies et al., *Some Gaza and Ukraine posts blocked under new age checks*, BBC (July 31, 2025), https://bit.ly/4xDDnFz............................5

Stacy Jo Dixon, *Most popular social networks worldwide as of February 2025, by number of monthly active users*, Statista (Mar. 26, 2025), https://www.statista.com/statistics/272014/global-social- networks-ranked-by-number-of-users ...........................................16

Christian Edwards, *US says human rights have 'worsened' in UK in past year*, CNN (Aug. 13, 2025), https://bit.ly/4vtUqbQ..............................5

Sarah Forland & Prem M. Trivedi, *The App Store Accountability Act Poses Serious Concerns for Privacy, Security, and Free Expression*, New America (Mar. 5, 2026), https://bit.ly/4xNU5lW ...................................................................19

Gay, Lesbian & Straight Education Network, *Out Online: The Experiences of Lesbian, Gay, Bisexual and Transgender Youth on the Internet* (2013) ...........................................................20

Samuel Gibbs, *Facebook Bans Women for Posting 'Men Are Scum' After Harassment Scandals*, The Guardian (Dec. 5, 2017), https://bit.ly/49sRWio...............................................................17

GSM Outdoors, *HuntStand: GPS Maps & Tools*, Ver. 8.1.4 (iOS, June 2, 2026), bit.ly/3SncA0e.............................................10

Spencer Hillbert (@spencerhillbert_yt), TikTok, https://www.tiktok.com/@spencerhilbert_yt.................................20

Lynn Hoffman et al., *Culture Wars: Now Small Businesses Are Being Affected*, 21 Small Bus. Inst. J. 1 (2025) ..........................................15

Jennifer Huddleston, *Kids' Online Safety Laws Could Dig a Graveyard for Speech and Privacy*, Cato Inst. (Oct. 30, 2025), https://bit.ly/4w7YZIP..............................................................18

Jennifer Huddleston, *What's at Stake for All of Us in the Youth Online Safety Debate*, Cato Inst. (Mar. 9, 2024), https://bit.ly/4g14eoK .................23

David Ingram, *Why U.S. politicians are up in arms about new internet rules in Britain*, NBC News (Aug. 10, 2025), https://bit.ly/4v1dOvS....................................................................5

Savannah Kuchar, *When social media censorship gets it wrong: The struggle of breast cancer content creators*, USA Today (Sept. 12, 2023), https://bit.ly/49sRReA..........................................16

L.A. Times & Steven Zeitchik, *Stigma and confusion blur the debate over adults-only rating*, The Mercury News (Aug. 13, 2016), https://bit.ly/4eE9M6a ...............................................................15

**TABLE OF AUTHORITIES–Continued**

Page

*LaserHIT*, Ver. 5.5.2 (iOS, Mar. 5, 2026), bit.ly/4af9e5u ........................................10

Kirsten Lavery, U.S. Comm'n on Protecting Religious Freedom,
*Protecting Religious Freedom Online* (2021) ...............................................17

Simon Lewis, *US to fund free speech initiatives in Europe, Trump
official says*, Reuters (Feb. 9, 2026), https://bit.ly/43Pm1Ig..........................18

Kimeko McCoy, *Brands navigate political tightrope amidst
heightened culture war risks*, Digiday (July 25, 2025),
https://bit.ly/4oKxHpi .....................................................................................15

Kobi McNutt (@K_nutt3), Instagram,
https://www.instagram.com/k_nutt3 .............................................................20

Alexander Monea, *The Digital Closet: How the Internet Became
Straight* (MIT Press 2022).............................................................................17

Abigail Moss, *'Such a Backwards Step': Instagram Is Now Censoring
Sex Education Accounts*, Vice News (Jan. 8, 2021),
https://bit.ly/3P2lT1d ......................................................................................17

Yuki Noguchi, *Teens are trying to bulk up on protein supplements.
What should parents watch for?*, NPR (July 21, 2025),
https://bit.ly/4uLO5Hr ....................................................................................17

Michael Savage et al., *US officials challenge Ofcom over online safety
laws' impact on free speech*, The Guardian (Apr. 1, 2025),
https://bit.ly/4aabCKU.......................................................................................5

*YouTube Community Guidelines enforcement*, YouTube,
https://transparencyreport.google.com/youtube-policy/removals.................16

## INTEREST OF *AMICI CURIAE*

Chamber of Progress is a tech-industry coalition that seeks to protect Internet freedom and free speech, promote innovation and economic growth, and empower technology customers and users.[1] In keeping with this mission, Chamber of Progress believes that society benefits from a legal framework that encourages the free exchange of ideas. Although the Chamber of Progress supports features to keep kids safe online, it is concerned that the Texas App Store Accountability Act ("SB 2420") imposes measures that violate the First Amendment, diminish speech, and ultimately will harm young Texans.

Software & Information Industry Association ("SIIA") is a global trade association representing nearly 400 firms involved in the business of information. Through its divisions, events and advocacy, SIIA engages industry leaders and policymakers to ensure a vibrant information ecosystem: one that fosters creation, dissemination and productive use. SIIA and its members work to proactively address issues and challenges that impact their industry segments with the goal of driving innovation and growth of the information economy.

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than Chamber of Progress and SIIA, their members, or their counsel made a monetary contribution to fund the preparation or submission of this brief. A list of Chamber of Progress's partners can be found at https://perma.cc/54VB-VBFF. All parties have consented to the filing of this brief.

Chief among many issues with the law,[2] SB 2420's age ratings requirements compel developers to opine on the age-appropriateness of content and compel app stores to publish these judgments. In turn, the Texas Attorney General or private litigants can sue developers if they disagree with developers' subjective views. This regime violates core First Amendment principles and will also erode speech across the Internet, deny young Texans access to important speech venues, and ultimately make young Texans less safe. Chamber of Progress and SIIA therefore submit this brief in support of the Computer & Communications Industry Association ("CCIA") and urges this Court to affirm the district court's preliminary injunction.

## SUMMARY OF ARGUMENT

SB 2420 puts a vibrant speech ecosystem under tight government control, violating the First Amendment, eroding speech, and harming young Texans. Using apps, young Texans can follow local elections, discover the best chili recipes, study Latin, form views about border security, learn guitar, practice their golf swing, improve financial literacy, and more. SB 2420 seizes this ecosystem, forcing private entities to respond to impossible-to-answer questions about what is age-appropriate for all Texas minors. For example, when are Texas minors old enough to read the

---

[2] This brief focuses on SB 2420's ratings requirements and harms that they will cause. Chamber of Progress and SIIA also support the Computer & Communications Industry Association ("CCIA")'s challenges to SB 2420's other provisions.

Bible, including its passages involving violence and incest? Learn about breast cancer? Practice shooting? SB 2420 forces developers to answer these kinds of questions, justify their answers, and face liability for answering incorrectly. This unconstitutional regime will flatten discourse, block young Texans' access to protected speech, and hobble parents' efforts to help their children have safe and positive online experiences.

SB 2420 requires developers to rate apps and in-app purchases using government-directed age categories ("child" = below 13; "younger teenager" = 13–15; "older teenager" = 16–17; or "adult" = 18+). Tex. Bus. & Com. Code § 121.021(b). Developers must also identify "the specific content or other elements" leading to the rating. *Id.* § 121.052(b). When a minor seeks to download an app or make an in-app purchase, app stores must provide this information and obtain parental permission. *Id.* §§ 121.022-023. The Texas Attorney General or private litigants can enforce these requirements, including in cases where a developer purportedly "knowingly misrepresents an age rating or reason for that rating." *Id.* §§ 121.056(a)(2), .101,.102.

For good reason, laws that compel non-commercial, nonfactual, or controversial speech are presumptively unconstitutional under the First Amendment because these laws control speech content and erode a diversity of views. *Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755 (2018) (*NIFLA*). This Court

3

and others have repeatedly invalidated laws requiring private entities to weigh in on nuanced cultural issues. *See, e.g.*, *Book People, Inc. v. Wong*, 91 F.4th 318, 340 (5th Cir. 2024) (law requiring labeling of non-obscene sexual content); *X Corp. v. Bonta*, 116 F.4th 888, 901 (9th Cir. 2024) (law requiring websites to sort content under specified categories); *NetChoice v. Bonta*, 113 F.4th 1101, 1119 (9th Cir. 2024) (law compelling websites to "opine on potential speech-based harms to children").

SB 2420 imposes exactly such an unconstitutional requirement—obliging developers to opine on cultural issues and justify their opinions, while requiring app stores to publish these opinions and justifications—and therefore violates the First Amendment. As a content-based law, SB 2420 must survive strict scrutiny, but the law fails any level of constitutional review. Even assuming that Texas establishes an interest in protecting children, Texas fails to show how SB 2420 "directly and materially" advances this interest, thus failing strict scrutiny and more relaxed forms of review. *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 624 (1995). Indeed, rather than advance its supposed safety goals, SB 2420 will make young Texans *less safe*. This failure is evident for at least three reasons that underscore SB 2420's assault on the First Amendment, which "envisions the United States as a rich and complex place where all persons are free to think and speak as they wish, not as the government demands." *303 Creative LLC v. Elenis*, 600 U.S. 570, 603 (2023).

*First*, due to how it imposes liability, SB 2420 will diminish speech and leave young Texans less safe and informed. Imposing liability for a subjective rating that describes the entirety of an app is akin to threatening liability for incorrectly answering: "What color is the rainbow?" To minimize litigation risks under such an impossible task, many developers will avoid any content that could attract controversy. For example, for fear of allegations its messaging app involves content bearing on suicide and requires an "adult" rating, a developer might curtail discussion of veterans' mental health, SSRIs, or movies like *It's a Wonderful Life*. This type of erosion is already happening under speech laws in other countries,[3] and American leaders have sounded the alarm.[4]

---

[3] *See, e.g.*, Ned Davies et al., *Some Gaza and Ukraine posts blocked under new age checks*, BBC (July 31, 2025), https://bit.ly/4xDDnFz ("Social media companies are blocking wide-ranging content—including posts about the wars in Ukraine and Gaza—in an attempt to comply with the UK's new Online Safety Act, BBC Verify has found. BBC Verify found a range of public interest content, including parliamentary debates on grooming gangs, has been restricted on X and Reddit for those who have not completed age verification checks.").

[4] *See* Michael Savage et al., *US officials challenge Ofcom over online safety laws' impact on free speech*, The Guardian (Apr. 1, 2025), https://bit.ly/4aabCKU; David Ingram, *Why U.S. politicians are up in arms about new internet rules in Britain*, NBC News (Aug. 10, 2025), https://bit.ly/4v1dOvS ("Vance warned the U.K. against going down a 'very dark path' of online 'censorship' that he said was trod earlier by the Biden administration."); Christian Edwards, *US says human rights have 'worsened' in UK in past year*, CNN (Aug. 13, 2025), https://bit.ly/4vtUqbQ ("The Trump administration has published a report claiming that human rights in the United Kingdom 'worsened' over the past year.").

*Second*, the threat of litigation will also lead developers to overzealously assign age ratings that skew older, making it harder for young Texans to access information that helps them stay safe and informed. For example, a magazine might rate its app for "adults," due to articles on opioid addiction or campus sexual assault, even if it thinks most people would consider the content appropriate for younger users. This app would then be off limits to 17-year-olds whose parents will not grant access to apps outside of an assigned age range—for example, due to reliance on ratings, lack of technical savvy, or time constraints to consider a request.

*Third*, the ratings will hinder parents looking to help their children have positive online experiences. For example, overzealous high ratings will leave parents confused by a sea of apps defensively rated for "adults" or "older teenagers." And by conscripting app stores into publishing developers' ratings, SB 2420 impedes app stores' efforts to provide information that they believe is most helpful to parents, based on established and trusted relationships with customers.

In sum, SB 2420's ratings requirements violate core First Amendment protections and will diminish speech, all while leaving young Texans less safe and informed. To prevent these harms and promote a vibrant speech environment that benefits everyone, this Court should reinstate the preliminary injunction.

**ARGUMENT**

## I. The Age-Rating Requirements In SB 2420 Compel Speech In Violation Of The First Amendment.

The ratings requirements are content-based because they compel speech, triggering strict scrutiny. They fail not just strict scrutiny, but all levels of constitutional review.

### A. Courts apply strict scrutiny to laws requiring a speaker to enter the marketplace of ideas.

Laws that compel speech are inherently content-based and trigger strict scrutiny, the highest level of constitutional review. *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 795 (1988). This demanding standard applies because mandating statements that a speaker would not make otherwise necessarily alters a speaker's message. *Id.* Stated otherwise, the First Amendment protects "the right to speak freely and the right to refrain from speaking at all." *Janus v. Am. Fed'n of State, Cty. & Mun. Emps. Council 31*, 585 U.S. 878, 891 (2018).

A more relaxed form of review may apply where the compelled speech is commercial, factual, and non-controversial. *See Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 650–653 (1985). To identify commercial speech, which "does 'no more than propose a commercial transaction,'" *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 66 (1983) (quoting *Va. State Board of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762

(1976)), courts may consider whether the speech is an "advertisement," refers to a "specific product," and has an "economic motivation," *id.* at 66–67. But the mere fact that a speaker is a commercial entity does not affect the level of scrutiny. *303 Creative LLC*, 600 U.S. at 594 (noting that the fact that "Ms. Smith offers her speech for pay and does so through . . . a company" does not "make[] a difference" for the First Amendment); *see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 574 (1995) (affirming full First Amendment rights for "business corporations" to avoid compelled speech).

Applying these principles, this Court recently upheld a preliminary injunction of a Texas law requiring private vendors to provide "sexual-content ratings" for books and other "library material," finding none of the exceptions that merit relaxed review of compelled speech applied. *Book People*, 91 F.4th at 324. Speakers were required to weigh in on when protected speech—that is, not obscene speech—was nonetheless "sexual," which is a subjective and fraught inquiry. As this Court explained, the law forced vendors to "undertake contextual analyses, weighing and balancing many factors to determine a rating," which was "anything but the mere disclosure of factual information." *Id.* The Court therefore rejected the State's argument for a relaxed form of constitutional review and upheld the district court's preliminary injunction.

*Book People* aligns with other court of appeals decisions considering laws that required speakers to categorize and classify protected speech and that rejected relaxed First Amendment review. For example, *NetChoice v. Bonta* considered a requirement for businesses to "identify the purpose of [an] online service, product, or feature, how it uses children's personal information, and the risks of material detriment to children." 2022 Cal. Stat. ch. 320 (AB 2273). The court concluded that, "in requiring covered businesses to opine on and mitigate the risk that children are exposed to harmful content online," this requirement covers "far more than mere commercial speech." *NetChoice*, 113 F.4th at 1119. Rather, requiring a business to identify what types of content it considers harmful to children merited strict scrutiny. The court rejected California's argument that companies could analyze risk without opining on harmful content, explaining that "a business cannot assess the likelihood that a child will be exposed to harmful or potentially harmful materials on its platform without first determining what constitutes harmful or potentially harmful material." *Id.* at 1118. The court therefore upheld the district court's preliminary injunction.

Similarly, in *X Corp. v. Bonta*, the Ninth Circuit struck down portions of a law requiring websites to report whether and how they define and moderate certain content categories. 116 F.4th at 901. These reports were non-commercial because they "require a company to recast its content-moderation practices in language

prescribed by the State, implicitly opining on whether and how certain controversial categories of content should be moderated." *Id.* For example, "[i]nsight into whether a social media company" thinks that hate speech includes "a post citing rhetoric from on-campus protests" would be "sensitive, constitutionally protected speech that the State could not otherwise compel . . . without satisfying strict scrutiny." *Id.* at 902. In this case, too, the court of appeals applied strict scrutiny and instructed the district court to grant a preliminary injunction.

### B. SB 2420 triggers strict scrutiny.

SB 2420 requires speakers to categorize and characterize protected speech, making the law no different from these other compelled-speech provisions and similarly warranting strict scrutiny. Consider popular apps for hunting and target practice, such as HuntStand and LaserHit.[5] Families with hunting traditions might reject an "adult" rating for these apps, while gun-control activists might welcome that label. Or consider apps that help users track their menstrual cycle like Clue, which has over 100 million users.[6] Some parents may consider this helpful health information for a 13-year-old, while others might disagree on religious or other grounds. Texas forces developers to draw lines around these apps and categorize

---

[5] GSM Outdoors, *HuntStand: GPS Maps & Tools*, Ver. 8.1.4 (iOS, June 2, 2026), bit.ly/3SncA0e; *LaserHIT*, Ver. 5.5.2 (iOS, Mar. 5, 2026), bit.ly/4af9e5u.

[6] BioWink GmbH, *Clue Period & Cycle Tracker*, Ver. 281.0 (iOS, June 18, 2026), bit.ly/3SeKPaa.

which content is appropriate for Texans of different ages, changing the content of the developers' speech and thrusting them into a political debate. Strict scrutiny therefore applies.

Even if the speech SB 2420 regulates is considered commercial, strict scrutiny should still apply, as the Supreme Court's recent decision in *Chiles v. Salazar* confirms. *See* 146 S. Ct. 1010, 1022 (2026). *Chiles* repudiates anything less than strict scrutiny for content-based speech restrictions, except where laws "require speakers to disclose only factual, noncontroversial information in 'commercial speech'" or regulate "conduct in ways that incidentally sweep in speech." *Id.* Neither circumstance applies here, so *Chiles*' default rule applies and strict scrutiny is warranted.[7]

*Chiles* also makes clear that a State cannot escape strict scrutiny just because it claims to be protecting minors. *Id.* at 1021 (applying strict scrutiny to limits on speech made to minors and noting that First Amendment violations are particularly

---

[7] *Chiles* thus resolves any uncertainty about whether strict scrutiny should apply where laws compel nonfactual, noncontroversial speech. *Cf. Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 283 (5th Cir. 2024) (noting prior uncertainty regarding the appropriate standard in this circumstance). The Sixth and Seventh Circuits also apply strict scrutiny in this circumstance. *Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 554 (6th Cir. 2012) ("If a commercial-speech disclosure requirement fits within the framework of *Zauderer* and its progeny, then we apply a rational-basis standard. . . . If it does not, then we treat the disclosure as compelled speech . . . and apply strict scrutiny."); *Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 651–52 (7th Cir. 2006).

egregious "[w]hen the government seeks not just to restrict speech based on its subject matter, but also seeks to dictate what particular 'opinion or perspective' individuals may express"). Texas has already conceded that SB 2420 seeks to suppress speech that the State disfavors. As the district court noted, "SB 2420 specifically sought to shield minors from certain speech the State deems objectionable or harmful (as Texas acknowledged at the [lower court] hearing) which is a content-based justification and would still warrant strict scrutiny." *Computer & Commc'ns Indus. Ass'n v. Paxton*, 814 F. Supp. 3d 787, 799 (W.D. Tex. 2025). It must therefore survive strict scrutiny.

**C.      The age-rating requirement fails under any level of First Amendment scrutiny.**

SB 2420 is unconstitutional no matter what level of review applies, including strict scrutiny, intermediate scrutiny, or even light-touch *Zauderer* review. Strict scrutiny is "fatal in fact absent truly extraordinary circumstances," *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 485 (2025), and requires proving that the restriction is narrowly tailored to further a compelling government interest, *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015). Texas cannot meet this high bar, given SB 2420's extreme breadth and how—instead of furthering a purported safety interest—the law makes minors *less safe*. These failings, elucidated below even under less demanding forms of scrutiny, render the law unconstitutional.

12

Intermediate scrutiny requires the State to establish a "substantial interest in support of its regulation," "that the restriction on commercial speech directly and materially advances that interest," and that the restriction is drawn narrowly. *Florida Bar*, 515 U.S. at 624. The State cannot ignore less speech-restrictive alternatives. *NIFLA*, 585 U.S. at 775 (concluding that a law compelling speech failed intermediate scrutiny when a "public-information campaign" was an option, even where the State argued it had tried one before). And as this Court recently explained in upholding a preliminary injunction regarding compelled online speech, the State needs to show, among other things, that "its restrictions will in fact alleviate [the harms] to a material degree." *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 283–84 (5th Cir. 2024), *aff'd*, 606 U.S. 461 (2025).

Texas fails under even this lower standard. Texas ignores less speech-restrictive alternatives available to Texas, such as school programming, public service announcements, or relying on enforcement of Texas's Deceptive Trade Practices Act. *See NIFLA*, 585 U.S. at 775. Further, even assuming Texas has a valid interest in providing parents with maximum transparency to direct and supervise their children online, SB 2420 does not "directly and materially" advance that interest. *Infra* pp. 14–24. Rather, the law incentivizes overzealous app ratings, restricting access to important information and obstructing parents from making

informed decisions—making young Texans *less* safe and failing intermediate scrutiny.

Indeed, SB 2420 would fail even under the light-touch *Zauderer* standard. A compelled disclosure only survives *Zauderer* if it "is neither unjustified nor unduly burdensome." *NIFLA,* 585 U.S. at 776. The ratings requirements are both unjustified *and* burdensome. The compelled disclosure is vastly disproportionate to the State's purported concerns about online safety given that the law sweeps across *all* app stores and *all* app developers to compel speech on *all* apps and in-app purchases. Thus, regardless of which level of scrutiny this court applies, SB 2420 fails.

II.     **The Age-Rating Requirements Will Diminish Speech And Undermine SB 2420's Purported Safety And Transparency Goals.**

Under the threat of litigation, developers will sanitize content, apply high age ratings overzealously, or both—even if most content on their apps is innocuous. This result will make it harder for young Texans to access important resources and parents to assess safety risks. Additionally, the age ratings requirements will undermine any independent steps that app stores might take to help parents. Because SB 2420 fails to advance—and in fact impedes—the government's asserted safety interests, it fails even intermediate scrutiny, let alone strict scrutiny.

### A. A law that undermines the government's asserted interest cannot survive even intermediate scrutiny.

Under intermediate scrutiny, the government has the burden to establish that the challenged regulation directly advances the interest asserted, such that it will in fact alleviate the claimed harm to a material degree. *Am. Acad. of Implant Dentistry v. Parker*, 860 F.3d 300, 309 (5th Cir. 2017). This burden cannot be satisfied by "speculation or conjecture," but must be shown by either empirical evidence or "history, consensus, and simple common sense." *Id.* Texas cannot meet this burden, as SB 2420's practical effect will inevitably be to deprive minors of useful information and dilute the effectiveness of existing app store ratings systems, negating the law's purported safety goals.

### B. Many developers will reduce apps to bland and inoffensive experiences.

By encouraging overly restrictive ratings, SB 2420 will lead developers to strip any content that could attract controversy. Businesses typically prefer to rate their apps as safe for all ages to reach a wider audience and avoid suggesting stigmas associated with "adult" content—for example, associations with pornography or drugs.[8] Businesses also typically prefer to avoid opining on potentially sensitive topics and so would prefer to eliminate content that could force them to engage in

---

[8] *Cf.* L.A. Times & Steven Zeitchik, *Stigma and confusion blur the debate over adults-only rating*, The Mercury News (Aug. 13, 2016), https://bit.ly/4eE9M6a (explaining stigma in the context of movie ratings).

certain judgments.[9] For all these reasons, under SB 2420, many developers will avoid content that risks controversy. The result will flatten discourse, favoring the orthodox and inoffensive over new ideas and alternative viewpoints.

For example, under SB 2420, apps with user-generated content will inevitably narrow what can be discussed and created, leaving socially valuable topics off-limits. Impacted apps will include a wide expanse of services, including traditional social media and apps for photography, filmmaking, and reviewing books and movies. The problem is particularly likely because, to achieve content moderation at scale, developers necessarily rely on machine learning techniques that are imperfect and can miss the nuances of human behavior.[10] Many digital services have

[9] *See* Kimeko McCoy, *Brands navigate political tightrope amidst heightened culture war risks*, Digiday (July 25, 2025), https://bit.ly/4oKxHpi ("In the midst of escalating culture wars, brands seem more careful than ever to avoid political pitfalls and anything that could be considered a PR crisis. But it's a monumental task: The lines are increasingly blurring between culture and politics."); Lynn Hoffman et al., *Culture Wars: Now Small Businesses Are Being Affected*, 21 Small Bus. Inst. J. 1(2025) ("Now small businesses are falling victim to culture conflicts that can force upon them unwanted changes or face ruin. Small businesses need to think strategically about the larger socio-political forces involved in the culture wars to manage their responses to such eventualities.").

[10] Demonstrating the challenges of content moderation at scale, Facebook, YouTube, Instagram, WhatsApp, TikTok, and WeChat all have over 1 billion monthly active users. Stacy Jo Dixon, *Most popular social networks worldwide as of February 2025, by number of monthly active users,* Statista (Mar. 26, 2025), https://www.statista.com/statistics/272014/global-social-networks-ranked-by-number-of-users. TikTok removed more than 153 million videos for violating community guidelines during the last quarter of 2024. *Community Guidelines Enforcement Report*, TikTok (Mar. 28, 2025), https://www.tiktok.com/transparency/en-us/community-guidelines-enforcement-

already faced criticism for content moderation policies that are perceived as overzealous, such as for removing content discussing breast cancer,[11] workplace harassment,[12] sexual wellness,[13] LGBTQ+ themes,[14] and perspectives from religious minorities.[15]

The list of content that could be curbed is endless. Developers may worry, for instance, about accusations that certain content supports eating disorders and should trigger high age ratings. This could erase discussions about popular diets, workouts, and wellness trends, such as Paleo diets, intermittent fasting, protein powder, creatine, and colostrum, preventing Texans from freely discussing their approaches

---

2024-4. YouTube removed 8,617,605 videos in the first quarter of 2025 for violations of its policies. *YouTube Community Guidelines enforcement*, YouTube, https://transparencyreport.google.com/youtube-policy/removals. Over the same time period, Meta took action on almost 24 million pieces of content across Facebook and Instagram for breaches of its violence-and-incitement policies alone. *Community Standards Enforcement Report: Q1 2025 report*, Meta Transparency Ctr., https://transparency.meta.com/reports/community-standards-enforcement.

[11] *See* Savannah Kuchar, *When social media censorship gets it wrong: The struggle of breast cancer content creators*, USA Today (Sept. 12, 2023), https://bit.ly/49sRReA.

[12] Samuel Gibbs, *Facebook Bans Women for Posting 'Men Are Scum' After Harassment Scandals*, The Guardian (Dec. 5, 2017), https://bit.ly/49sRWio.

[13] Abigail Moss, *'Such a Backwards Step': Instagram Is Now Censoring Sex Education Accounts*, Vice News (Jan. 8, 2021), https://bit.ly/3P2lT1d.

[14] Alexander Monea, *The Digital Closet: How the Internet Became Straight* 179 (MIT Press 2022).

[15] Kirsten Lavery, U.S. Comm'n On Protecting Religious Freedom, *Protecting Religious Freedom Online* 4-6 (2021).

to health and fitness.[16] Similarly, concerns that drug-related content should trigger high age ratings could inhibit discussion of Alcoholics Anonymous, helping a loved one struggling with addiction, or critically acclaimed television shows like *Breaking Bad*, *The Wire*, and *Ozark*.[17] The inevitable chill on speech that will result from the age rating requirements cuts against Texas' asserted interest.

The Trump Administration and U.S. political leaders have warned about these kinds of harms, as have analysts across the political spectrum. For example, U.S. officials have opposed Internet speech laws in the European Union and United Kingdom due to concerns that they "stifle free speech."[18] Likewise, the Cato Institute has noted how major websites have blocked content under U.K. requirements to limit content "harmful to minors," leaving "many users bereft of important news and critical discourse on these topics."[19] As Cato explains, these websites appear to have made the difficult decision that, even though such content may be permitted, "it still

---

[16] *See, e.g.*, Yuki Noguchi, *Teens are trying to bulk up on protein supplements. What should parents watch for?*, NPR (July 21, 2025), https://bit.ly/4uLO5Hr.

[17] *See* Niki Burnside, *Social media posts educating public about illicit drugs being removed by Meta, Australian health experts say*, ABC (Apr. 6, 2026), https://bit.ly/4uOB9AA.

[18] Simon Lewis, *US to fund free speech initiatives in Europe, Trump official says*, Reuters (Feb. 9, 2026), https://bit.ly/43Pm1Ig.

[19] Jennifer Huddleston, *Kids' Online Safety Laws Could Dig a Graveyard for Speech and Privacy*, Cato Inst. (Oct. 30, 2025), https://bit.ly/4w7YZIP (noting access was blocked to "content on the wars in Gaza and Ukraine to ensure compliance with the law.")

posed too much of a risk of being found in violation." [20] Similarly, New America notes that app store laws can "chill speech and prevent people . . . from accessing online spaces and content that they otherwise have a right to access." [21] These perspectives affirm the real risk that SB 2420 poses to free speech and how SB 2420 negates its own purported safety interests.

### C. The threat of SB 2420 liability will skew ratings to become over-restrictive, making it harder for young people to access resources.

Under the threat of substantial litigation, developers will also be coerced to assign high age ratings overzealously, catering to the most content-restrictive viewpoints. This limitation could cut off access for millions of young Texans to use apps that address real-world issues or provide important resources

To illustrate, even if a developer thinks that most people would agree that an app is safe for anyone 13+, the developer may assign the app a rating of "older teenager" or "adult" to minimize litigation risks. Although parents could theoretically permit their children access to an app outside the assigned age range, many parents will rely on the ratings to be accurate or default to following the ratings because they lack the resources or time to conduct research.

---

[20] *Id.*

[21] *See* Sarah Forland & Prem M. Trivedi, *The App Store Accountability Act Poses Serious Concerns for Privacy, Security, and Free Expression*, New America (Mar. 5, 2026), https://bit.ly/4xNU5lW.

Blocking access to apps denies young people access to important spaces to learn, find support, participate in civic discourse, and encounter new ideas. For example, teenagers may inform themselves about important decisions on online platforms, such as choosing between colleges based on perspectives in the school's online communities or considering career paths based on "day-in-the-life" social media accounts with insights into jobs like agriculture,[22] petroleum engineering,[23] or entrepreneurship.[24] Apps can also help young Texans find support, such as a cancer patient trying to hear from others going through the same experience,[25] or an LGBTQ+ teen who feels isolated.[26] Using apps, young Texans can also participate in civic discourse and hone the skills of being an American citizen, having their voices heard on issues from affordability to artificial intelligence.

---

[22] Spencer Hillbert (@spencerhillbert_yt), TikTok, https://www.tiktok.com/@spencerhilbert_yt.

[23] Kobi McNutt (@K_nutt3), Instagram, https://www.instagram.com/k_nutt3.

[24] The Closet (@theclosetpgh), TikTok, https://www.tiktok.com/@theclosetpgh.

[25] Apprehensive-Space94, *being a teenager with a rare and incurable type of cancer*, Reddit (r/cancer) (2023), https://www.reddit.com/r/cancer/comments/15k4rkc/being_a_teenager_with_a_rare_and_incurable_type.

[26] According to a 2024 national survey, while only 40% of LBGTQ+ youth reported living in affirming households, 68% found online spaces supportive. Gay, Lesbian & Straight Education Network, *Out Online: The Experiences of Lesbian, Gay, Bisexual and Transgender Youth on the Internet* 28 (2013).

Online services can also expose young people to new perspectives from voices not represented in their day-to-day interactions, such as hearing from Americans with different political views. For example, children of immigrants who do not hear their new community's perspective at the kitchen table can access these views through social media; by the same token, these children can stay connected to cultural traditions in their parents' home country via these same platforms.

SB 2420's requirements will put access to these speech venues and resources in jeopardy for young Texans. As just a sampling, some developers may feel pressure to select an adult audience for apps featuring:

- Religious texts including the Bible, Torah, and Quran, which feature sexual and violent content.

- Map and review apps that include casinos, sex shops, or liquor stores.

- Biology study materials that describe reproductive anatomy.

- Trackers for running routes, strength training, weight loss, and diets, which could be associated with eating disorders.

- Recipes for healthy eating, protein intake, and increasing muscle mass, which also could be associated with eating disorders.

- Mental wellness guides, like affirmations and guided meditations, which some view as contrary to their religious practice or associated with suicidal ideation.

- Sports involving violence like football, wrestling, and mixed martial arts.

21

- Resources to recognize sexual or domestic abuse.

- Fundraising campaigns for breast, cervical, prostate, and testicular cancer.

The net result will deprive young Texans of important information, making them less safe and informed, further negating Texas's purported safety goals. This again shows how the law fails even intermediate scrutiny and threatens free speech.

**D.      Government-mandated age ratings will hinder parents seeking to help their children have positive online experiences.**

SB 2420's ratings requirements do more than chill developers and deprive minors of access to information and resources—they also undermine parents' efforts to help their children have positive online experiences. This too shows how the law fails even intermediate scrutiny, as the law does not materially advance children's safety and in fact does the opposite.

First, the inevitable overzealous application of age ratings discussed above will substitute noise for meaningful information and make it harder for parents to make informed decisions about which downloads to permit for their children. For example, faced with a sea of "adult" apps, a parent may have no easy way to distinguish between an app containing pornography and an app that helps her teenager track her period. As a result, some parents may impose more restrictions than they would like on their children's downloads because they feel they have no practical choice but to go by these ratings. Other parents may see the ratings as unreliable and disregard them, thereby defeating the purpose of the Act. Either way,

parents will be impeded from making informed decisions based on their knowledge of what is best for their child.

Second, by compelling app stores to publish developers' ratings, SB 2420 thwarts any independent measures that app stores may pursue to help families. App stores have established relationships with customers based on prior history, including their current app rating system. As the Cato Institute has noted in explaining how app store laws threaten speech rights, "[t]he focus should be on empowering and educating adults to talk to their children about technology (and serving as good role models in their own technology use), not on making the government the decision-maker."[27] Forcing app stores to scrap their existing system and impose government-mandated age ratings adds confusion, dilutes the value of parents' prior experiences, and overall will make it harder for parents to interpret information that they receive from app stores.

Because the age rating requirements will work against Texas' purported interest in protecting minors and in promoting transparency to help parents protect minors, the Act fails even under intermediate scrutiny.

* * *

---

[27] Jennifer Huddleston, *What's at Stake for All of Us in the Youth Online Safety Debate*, Cato Inst. (Mar. 9, 2024), https://bit.ly/4g14eoK.

These examples help to illustrate just some of the many ways that SB 2420's age-rating requirements will impair speech and hurt young Texans—defeating the Act's goals and demonstrating why it fails under any level of constitutional review. The law will erode discussion of any number of topics, push out alternative viewpoints, and deprive young Texans of access to all kinds of beneficial uses for apps.

## CONCLUSION

For the foregoing reasons, the Court should reinstate the district court's preliminary injunction.

Respectfully submitted,

/s/ Sean Marotta
Sean Marotta
Mark W. Brennan
Thomas B. Veitch
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
(202) 637-5600
sean.marotta@hoganlovells.com

*Counsel for Chamber of Progress and Software & Information Industry Association*

June 24, 2026

**CERTIFICATE OF SERVICE**

I certify that on June 24, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Sean Marotta
Sean Marotta

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 5,521 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14.

/s/ Sean Marotta
Sean Marotta

June 24, 2026